# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 4142 | **DATE** | 9/24/2004 |
| **CASE TITLE** | Thomas G. Ong., et al vs. Sears, Roebuck & Co., et al | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10)■ [Other docket entry] Enter Memorandum Opinion And Order. The motions to dismiss filed by the Underwriter Defendants (Docket No. 29-1), the Sears Defendants (Docket No. 33-1), Mr. Keleghan (Docket No. 32-1) and Mr. Vishwanath (Docket No. 31-1) are all granted in part and denied. Defendants Credit Suisse First Boston Corporation, Goldman, Sachs & Co., Morgan Stanley & Co., Bear, Stearns & Co., Inc. and Lehman Brothers, Inc. are all dismissed without prejudice. Plaintiffs' § 10(b) claim against Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, Mr. Bergmann, Mr. Keleghan, and Mr. Vishwanath are also dismissed without prejudice. Plaintiffs have until 10/15/04 to file an amended complaint, and Defendants have until 11/5/04 to answer or otherwise plead. Rule 16 conference set for 11/19/04 at 9:30.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | 5 | | **Document Number** |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | SEP 2 7 2004 | | 50 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | GMA | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 9/24/2004 | | |
| | | | date mailed notice | | |
| ETV | courtroom deputy's initials | | ETV | | |
| | | | mailing deputy initials | | |

U.S. DISTRICT COURT

2004 SEP 24 PH 3: 52

Date/time received in central Clerk's Office

| | | |
|---|---|---|
| THOMAS G. ONG for THOMAS G. ONG IRA and THOMAS G. ONG, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | **DOCKETED** |
| v. | ) ) | SEP 2 7 2004 |
| SEARS, ROEBUCK & CO., SEARS, ROEBUCK ACCEPTANCE CORP., ALAN LACY, PAUL J. LISKA, GLENN R. RICHTER, KEVIN T. KELEGHAN, K.R. VISHWANATH, KEITH E. TROST, GEORGE F. SLOOK, LARRY R. RAYMOND, THOMAS E. BERGMANN, CREDIT SUISSE FIRST BOSTON, GOLDMAN, SACHS & CO., MORGAN STANLEY, BEAR, STEARNS & CO., INC., LEHMAN BROTHERS and MERRILL LYNCH & CO., INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 03 C 4142 Judge Rebecca R. Pallmeyer |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Thomas G. Ong and Thomas G. Ong IRA have filed this federal securities class action lawsuit on behalf of (1) all those who purchased, pursuant to a prospectus, securities issued by defendant Sears, Roebuck Acceptance Corp. ("SRAC"), a wholly-owned subsidiary of Defendant Sears, Roebuck & Co. ("Sears"), between October 24, 2001 and October 17, 2002 (the "Class Period"), in any of three debt securities offerings dated March 18, May 21, and June 21, 2002, and (2) all those who, during the Class Period, purchased publicly traded securities issued by SRAC before the Class Period and actively traded them through the public markets and over national securities exchanges.

Sears is one of North America's largest general retailers. In addition to its retail division, Sears provides financing to its customers through private label credit cards and installment plans.

50

SRAC's principal business is purchasing Sears' short-term notes and account receivable balances, which it finances through public sales of SRAC Notes. Defendants Alan Lacy, Glenn R. Richter, Paul J. Liska, Keith E. Trost, George F. Slook, Larry R. Raymond, Thomas E. Bergmann, Kevin T. Keleghan, and K.R. Vishwanath were all officers or directors of Sears, SRAC, or both. Defendants Credit Suisse First Boston Corporation ("CSFB"), Goldman, Sachs & Co. ("Goldman Sachs"), Morgan Stanley & Co., Inc. ("Morgan Stanley"), Bear, Stearns & Co., Inc. ("Bear Stearns"), Lehman Brothers Inc. ("Lehman Brothers"), and Merrill Lynch & Co., Inc. ("Merrill Lynch") were all underwriters of the three SRAC debt securities offerings at issue in this case.

Plaintiffs allege that Sears manipulated information regarding its credit card operations to make them appear "more stable and profitable than they actually were," which artificially inflated the market value of SRAC debt securities. Specifically, Sears misrepresented its reliance on subprime creditors; selectively reported delinquency and charge-off rates; and disguised portfolio losses in order to generate high levels of reported receivables that Sears knew would prove uncollectible. Plaintiffs claim that Defendants all made materially false and misleading statements or omissions in connection with Sears' credit card operations in violation of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o; and §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

Defendants move to dismiss Plaintiffs' complaint for failure to comply with the pleading requirements of FED. R. CIV. P. 9(b) and the PSLRA, and for failure to state a claim. For the reasons set forth here, the motion to dismiss filed by CSFB, Goldman Sachs, Morgan Stanley, Bear Stearns, Lehman Brothers, and Merrill Lynch (collectively, the "Underwriter Defendants") is denied. The motion to dismiss filed by Sears, SRAC, Mr. Lacy, Mr. Liska, Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, and Mr. Bergmann (collectively, the "Sears Defendants") is granted in part and

denied in part. The motions to dismiss filed by Mr. Keleghan and Mr. Vishwanath are also granted in part and denied in part.

## BACKGROUND

Sears, a New York corporation with its principal executive offices in Hoffman Estates, Illinois, is one of the largest general retailers in North America. As part of its operations, Sears provides financing to customers through private label credit cards and installment plans. SRAC, Sears' wholly-owned subsidiary, is primarily in the business of purchasing short-term notes or receivable balances from Sears. SRAC funds these purchases by issuing debt securities such as commercial paper, medium term notes, and "other borrowings" (collectively, "SRAC Debt Securities") to the public. (Cmplt. ¶¶ 11, 12, 46, 47.)[1] Three SRAC Debt Securities offerings are at issue in this case: (1) $600 million of 6.70% notes due April 15, 2012, offered pursuant to an Indenture dated May 15, 1995 (the "Indenture"), a Registration Statement and accompanying Prospectus dated September 3, 1998 (the "Registration Statement"), and a Prospectus and Prospectus Supplement dated March 18, 2002 (the "3/18/02 Offering"); (2) $1 billion of 7.0% notes due June 1, 2032, offered pursuant to the Indenture, the Registration Statement, and a Prospectus and Prospectus Supplement dated May 21, 2002 (the "5/21/02 Offering"); and (3) $250 million of 7.0% notes due July 15, 2042, offered pursuant to the Indenture, the Registration Statement, and a Prospectus and Prospectus Supplement dated June 21, 2002 (the "6/21/02 Offering"). (Id. ¶ 2.)

Mr. Lacy was Sears' Chief Executive Officer, President, and Chairman of the Board throughout the Class Period. Mr. Richter has been Sears' Chief Financial Officer since October 4, 2002 and also served as Sears' Senior Vice President, Finance prior to that date. Mr. Liska was Sears' Chief Financial Officer until Mr. Richter took over in October 2002. He also served as a director of SRAC. Mr. Trost was the President of SRAC as well as a director of the company.

---

[1]    Plaintiffs' Amended Class Action Complaint for Violations of Federal Securities Laws is cited as "Cmplt. ¶ __."

Mr. Slook, also a director of SRAC, was SRAC's Vice President of Finance. Mr. Raymond served as a director of SRAC, as did Mr. Bergmann, who was also Chief Accounting Officer and Controller of Sears. Mr. Keleghan was President of Sears' Credit and Financial Products segment and "an Executive Vice President from the start of the Class Period until October 4, 2002, when he was forced to resign." Mr. Vishwanath was Sears' Vice President of Risk Management until the company terminated his employment on October 16, 2002. (*Id.* ¶¶ 13-21.)

CSFB, Goldman Sachs, Morgan Stanley, Bear Stearns, Lehman Brothers, and Merrill Lynch are all integrated financial services institutions that provide securities, investment management, and credit services to corporations, governments, financial institutions, and individuals. CSFB and Goldman Sachs were joint "book runners" – i.e., managing underwriters – for the 3/18/02 Offering of SRAC Debt Securities. Morgan Stanley, Bear Stearns, and Lehman Brothers were all joint lead managers for the 5/21/02 Offering. Morgan Stanley was also the book runner for that offering. Merrill Lynch was the book runner for the 6/21/02 Offering. (*Id.* ¶¶ 32-37.)

## A.     The Relationship Between Sears and SRAC

SRAC's operating income is generated primarily from the earnings on its investments in Sears' short-term notes and account receivables. In addition, Sears determined the amount of SRAC's earnings by requiring SRAC to maintain a set ratio of earnings to fixed expenses. "As a result, the yield on SRAC's investment in Sears notes is directly related to SRAC's borrowing costs, i.e., the yield under which SRAC can issue and sell its Debt Securities." It is in Sears' financial interest to keep SRAC's borrowing costs as low as possible because the less SRAC must pay purchasers of its Debt Securities, the less Sears must pay to borrow from SRAC. (*Id.* ¶ 48.)

Given the inter-relationship between Sears and SRAC, "industry analysts and the rest of the market looked to the finances, financial condition and present and future operations of Sears when assessing the investment prospects for SRAC Debt Securities." (*Id.* ¶ 49.) When industry

4

analysts viewed Sears favorably, SRAC was viewed favorably as well; when Sears experienced a downward change in its financial condition, SRAC's financial condition suffered as well. (*Id.* ¶¶ 50-53, 57-59.) According to Plaintiffs, "the intertwining of the finances and operations of SRAC and Sears cause the SRAC Debt Securities to take on the status of a direct investment with Sears itself." (*Id.* ¶ 54.)

**B.    Sears' Credit Problems**

For many years, Sears was one of the largest credit card issuers in the country. (*Id.* ¶ 60.) Prior to 1993, Sears only accepted its own proprietary credit cards ("Sears Cards") which could only be used to make purchases at Sears. (*Id.* ¶ 61.)  When Sears began accepting general credit cards in 1993, the company saw a drastic decrease in the use of its Sears Cards; indeed, by mid-2000, nearly half of the 60 million Sears Cards were either inactive or carried a zero balance. (*Id.*) At the same time, Sears' retail sales were also in decline due to increased competition from discount retailers like Wal-Mart and Kohl's. (*Id.* ¶ 62.)

In late 2000, Sears began to issue a Sears MasterCard, a general purpose credit card that could be used wherever MasterCard was accepted.  The cards carried higher lines of credit and generated fee income for Sears when used at non-Sears locations.  Sears hoped that the Sears MasterCard would "stimulate sales and help regain income Sears had lost in recent years due to the decline of its proprietary cards." (*Id.* ¶ 64.) In November 2000, Mr. Lacy, who had been named President and CEO of Sears just a month earlier, emphasized the Sears MasterCard as a top area for growth within the company. (*Id.* ¶ 65.)

By February 2001, the Sears MasterCard carried $1.4 billion in receivables and Sears, through its subsidiary Sears National Bank, had become one of the top 25 bank card issuers. A February 15, 2001 article in *American Banker* indicated that Mr. Keleghan, President of Sears Credit, had described Sears MasterCard users as "a very pristine group, almost too pristine . . . We

don't expect significant delinquencies since we're starting out with a low-risk group." (*Id.* ¶ 67.) Sears' retail segment continued to decline over the next several months, but Mr. Lacy asserted at an April 19, 2001 analyst presentation that Sears' credit segment had "a strong portfolio quality overall" and was "a great business" and "strategically very important" to Sears. (*Id.* ¶¶ 68, 69.)

Despite these representations, Sears credit operations actually suffered from several weaknesses and problems which were hidden from the market. Those weaknesses, described below, ultimately led to an announcement that Sears planned to sell the credit business. (*Id.* ¶¶ 70, 71.)

## 1. Reliance on Subprime Creditors

During the Class Period, Sears aggressively marketed its credit cards, particularly the Sears MasterCard, to "create the appearance of a growing, profitable loan portfolio." (*Id.* ¶ 72.) To that end, Sears intentionally lowered its acceptable credit profile so that more consumers would qualify for credit cards, and adopted aggressive marketing strategies designed to appeal to low-income or unstable borrowers, such as unsolicited direct mailings, free balance transfers, and convenience checks.[2] Sears also offered multiple credit cards and increased credit limits to customers who did not qualify for such benefits. (*Id.*) At the beginning of the Class Period, approximately 54% of Sears' credit portfolio consisted of subprime creditors, compared with a United States industry average of 36.6%. By the end of the Class Period, the portfolio was still nearly half subprime. (*Id.* ¶¶ 73, 74.)

---

[2] Convenience checks are special checks tied to an individual's credit card account that can be used to make purchases or transfer balances from one credit card to another. The checks often come with "hefty fees" and "steep interest rates." *See* http://www.bankrate.com/brm/news/cc/20010102a.asp.

## 2.    Selective Reporting Techniques

In addition to targeting subprime creditors, Sears misleadingly reported the charge-off and delinquency rates[3] of its credit cards on a portfolio-wide basis rather than separating out the performances of the Sears Card and the Sears MasterCard. The Sears MasterCard had higher credit limits than those traditionally offered under the Sears Card, as well as lower delinquency and charge-off rates. According to the Plaintiffs, "[t]hese factors, when combined with the dramatic increases in MasterCard receivables, declining Sears proprietary card receivables, [and] the fact that the Sears proprietary card portfolio was much larger than the new MasterCard portfolio, created an interesting phenomenon during the Class Period." Specifically, though both portfolios were separately experiencing a "striking rise in delinquencies and charge-offs every quarter," the combined portfolios reflected delinquencies and charge-offs that were relatively stable "because the Sears Card receivables overweighted the average of the two groups." (*Id.* ¶¶ 76-78.)

## 3.    Disguised Losses

Plaintiffs allege that Sears also engaged in practices designed to disguise losses to its credit portfolio. Sears National Bank, which Sears created in 1995, is not subject to the same rules and regulatory oversight as ordinary bank card issuers.[4] Thus, Sears was able to adopt more lenient credit policies than its competitors. (*Id.* ¶ 80.) For example, Sears charged-off delinquent credit card loans after 240 days compared with 180 days by competitors. (*Id.* ¶ 80(a).) Sears also deferred charge-offs by relying on generous "renewal" policies, such as offering to make a delinquent account "current" if a customer made a single, minimum payment, and then closing the

---

[3]    Charge-offs are write-offs taken on uncollectible credit card receivables. *See In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 724 n.2 (N.D. Ill. 2003). Delinquency rates describe the number of credit card receivables that are past due relative to all outstanding loans.

[4]    The Complaint does not explain why Sears National Bank is not subject to federal regulation and oversight. Nor does it describe the bank's specific role with respect to Sears, though presumably it was the institution that issued the Sears credit cards.

account and implementing an installment plan to collect the balance due. In addition, Sears "cured" or "re-aged" delinquent accounts (i.e., converted them to current status) after receiving only two consecutive minimum payments; federal regulations require three consecutive minimum payments prior to re-aging. (*Id.* ¶¶ 80(b) - (c).)

Sears also adopted promotional programs, such as zero percent financing, that allowed cardholders to minimize or avoid payments for periods of up to a year. This made it "difficult, or even impossible, for cardholders to fall behind in their payments and allowed Sears to delay reporting such accounts as delinquent." (*Id.* ¶ 80(d).) In addition, Sears repeatedly lowered the required minimum monthly payments, which allowed individuals with poor credit histories to purchase higher priced items on more extended payment schedules. This practice increased Sears' income from finance charges but also increased its exposure to bad debt. (*Id.* ¶ 80(e).) Finally, though it is industry practice to report delinquencies after 30 days, Sears did not report them until after 60 days. (*Id.* ¶ 80(f).) According to Plaintiffs, these policies misled investors as to the true quality of Sears' credit portfolio. (*Id.* ¶ 81.)

### 4. Fraudulent Billings

A final practice that served to weaken Sears' credit portfolio was fraudulent billings on customer accounts. Sears strongly encouraged its employees to induce customers to purchase additional services, including life insurance, credit protection, and extended warranties, whenever they bought a Sears product. "The incentives to make such sales were so strong that it became a regular practice for salespersons to put such items on customers' accounts without their knowledge or consent." (*Id.* ¶ 82.) This, in turn, "helped drive up the high levels of reported receivables that Sears knew to be uncollectible." (*Id.*)

## C.    False and Misleading Statements

Plaintiffs allege that Defendants issued numerous false and misleading statements to deceive the investing public into believing that Sears' credit operations were "far better, more successful and profitable, than was actually the case." (*Id.* ¶ 83.)

### 1.    Third Quarter 2001

On October 24, 2001, Sears issued a press release, filed as an SEC Form 8-K signed by Mr. Richter, announcing its results for the third quarter of 2001. Sears reported that earnings had increased by 5.3% per share over the prior year despite a decline in retail revenues. With respect to Sears Credit, the press release indicated that customer bankruptcy filings had declined from the second to third quarter of 2001 and that delinquencies were down from 7.47% to 7.41% over the previous year. (*Id.* ¶ 84.) At an analysts meeting the same day, Mr. Liska stated that "our delinquencies are actually going down. That's why we're feeling good about our portfolio." (*Id.* ¶ 86.) He also assured investors that Sears' "watch rate[5] of 5.76% was ahead of MBNA and Banc One and significantly better than Capital One or Discover," and that "our 60+ day delinquency rates or trends remain very stable." (*Id.* ¶ 87.) Mr. Liska stated that based on the stability of the credit portfolio quality, "we continue to still believe that it is very adequately and conservatively reserved in the current environment." (*Id.* ¶ 88.)

At the same analysts meeting, Mr. Keleghan stated that Sears was targeting "the best credit risk customers and the customers with the most profit potential to drive sales in the store." According to Mr. Keleghan, Sears was "bringing much more of that upper class customer who is lower risk" and "continually improv[ing] the quality of the accounts that we've booked." Mr. Keleghan confirmed Mr. Liska's representation that the credit portfolio was of high quality, stating that "the delinquency rate of these customers is a very pristine group." Mr. Keleghan also assured

---

[5]    The Complaint does not define the term "watch rate."

investors that Sears was monitoring the credit card portfolio on a daily basis to identify any problem accounts and manage outstanding credit risks. (*Id.* ¶¶ 88-90.) In response to questions about Providian, a subprime credit card lender, Mr. Keleghan stated that "[w]e don't target the subprime market, we avoid it and we try to target the middle market." (*Id.* ¶ 92.)

On November 9, 2001, Sears filed a Form 10-Q, signed by Mr. Richter, reiterating its third quarter results as stated in the October 24, 2001 Form 8-K. Sears reported that "our delinquencies are actually going down" and that "our portfolio quality has continually improved." In fact, though the combined portfolio appeared stable, charge-off and delinquency rates for both the Sears Card and Sears MasterCard had risen over the prior quarter. Sears Card charge-offs rose to 6.03%[6] and Sears MasterCard charge-offs rose from .90% to 2.02% between the second and third quarter of 2001. Similarly, Sears Card delinquencies rose to 8.13%[7] and Sears MasterCard delinquencies rose from 1.20% to 1.93% from the second to third quarters of 2001. (*Id.* ¶¶ 93, 94.) A few weeks later on November 26, 2001, Mr. Liska held another conference call with analysts and again represented that Sears' portfolio was "adequately reserved." (*Id.* ¶ 95.)

### 2. Fourth Quarter 2001

On January 10, 2002, Sears issued a press release, filed as an SEC Form 8-K and signed by Mr. Liska, announcing preliminary results for the fourth quarter of 2001. The press release stated that earnings per share for the full year 2001 would be approximately $4.22, "essentially flat with comparable 2000 earnings per share of $4.21." The press release further assured that "portfolio quality remains solid, with delinquency levels flat compared to the prior year period." (*Id.* ¶ 96.) A week later on January 17, 2002, Sears issued another press release, also filed with the

---

[6] Plaintiffs do not indicate the Sears Card charge-off rate for the second quarter of 2001.

[7] Plaintiffs do not indicate the Sears Card delinquency rate for the second quarter of 2001.

SEC, stating that the portfolio delinquency rate for the fourth quarter of 2001 was 7.58% compared with 7.56% for the fourth quarter of 2000. The press release indicated that "[p]ortfolio quality remains stable with flat year-over-year delinquencies. The domestic allowance for uncollectible accounts of $1.1 billion is flat as a percentage of ending credit receivables." (*Id.* ¶ 97.) The press release further reported that Sears Credit generated $1.5 billion of Sears' $2.202 billion in operating income for 2001, even though Sears Credit accounted for only 12.6% of Sears' revenues. (*Id.* ¶ 98.)

Also on January 17, 2002, Sears held a conference call with investors to discuss the fourth quarter 2001 results. Mr. Lacy told investors that "[i]mportantly, the quality of our receivables portfolio has remained strong and our outlook is stable looking into 2002." Mr. Liska elaborated that "[t]he provision for uncollectible accounts increased by $52M in the quarter to $391M. The provision reflects a $26M addition to the allowance . . . The addition to the reserve was made to reflect growth in receivables and not because of concern about portfolio quality." Mr. Liska noted that Sears expected charge-off rates to remain "roughly flat with 2001 with stable credit quality in the portfolio." (*Id.* ¶¶ 99, 100; Transcript of Analyst Conference Call of 1/17/02, Ex. N to Sears Mem.)[8]

In its SEC filings, Sears reported that delinquencies had remained "flat" and that charge-offs had increased only 9% over the past year, from 4.79% at year-end 2000 to 5.23% at year-end 2001. These figures were presumably based on the portfolio as a whole. Viewed separately, however, Sears Card delinquencies had increased by 12% from 7.94% in the fourth quarter of 2000 to 8.91% in the fourth quarter of 2001. Sears Card charge-offs had also increased 20% over the previous year from 4.79% to 5.78%. Sears MasterCard similarly showed an increase in

---

[8] The Memorandum of Law in Support of Motion to Dismiss the Amended Class Action Complaint on Behalf of Sears, SRAC and Certain Individual Defendants is cited as "Sears Mem., at __."

delinquencies from .38% at year-end 2000 to 1.97% in the fourth quarter of 2001. MasterCard charge-offs increased from 2.02% in the third quarter of 2001 to 2.09% in the fourth quarter of that year. (*Id.* ¶ 102.)

### 3. First Quarter 2002

UBS Warburg is the global investment banking division of wealth management company UBS AG; UBS Warburg provides corporate, institutional, government, and private clients worldwide with debt and equity finance, advisory services, research, risk management, and securities and foreign exchange. *See Nikko Asset Mgmt. Co. v. UBS AG*, 303 F. Supp. 2d 456, 458 (S.D.N.Y. 2004); http://www.ubs.com. On March 7, 2002, UBS Warburg issued a report discussing Sears' credit card business. Based on a conversation between a UBS Warburg representative and Mr. Keleghan, the report indicated that Sears' "management seems focused on employing a prudent and risk averse growth strategy." (Cmplt. ¶ 103.) One week later, on March 14, 2002, Sears filed its Form 10-K for 2001, which was signed by Mr. Lacy, Mr. Liska, and Mr. Bergmann. The Form 10-K repeated the financial information contained in the January 17, 2002 Form 8-K, and acknowledged that charge-offs had increased by $446 million "primarily due to increased customer bankruptcy filings." Sears asserted, however, that "the delinquency rate for 2001 remained relatively flat with 2000." In fact, as noted, Sears Card delinquencies had risen from 7.86% at the beginning of 2001 to 8.91% at year-end, a 13% increase. The Sears MasterCard also saw a 73% increase in delinquencies from the first quarter of 2001 (1.15%) to the fourth quarter (1.97%). (*Id.* ¶¶ 106-08.)

On March 14, 2002, *American Banker* carried a story titled "A Catalog [of] Reasons for Sears' Card Profits," detailing the reasons for Sears' apparent success in the credit card business. The article observed that Sears had placed "a heavy emphasis on risk management" and reported that "Mr. Keleghan brags that Sears' portfolio nearly equals the market leader MBNA in its charge-

off rate." (*Id.* ¶ 109.) On March 28, 2002, the *Chicago Sun-Times* reported that Sears' credit cards accounted for 65% of its operating income in 2001 and was "a positive" for the company. According to the article, investors said that "[t]he income has provided Sears with the funds to improve stores and invest in new projects." (*Id.* ¶ 110.)

On April 10, 2002, Sears issued a press release, filed with the SEC and signed by Mr. Bergmann, announcing preliminary earnings for the first quarter of 2002. The reported earnings exceeded Wall Street projections by more than 50%; Sears reported that operating earnings had increased 107% for the quarter due to cost-cutting measures in the retail segment and "a very strong quarter" in the Sears credit segment. As a result, Sears increased its earnings projections for 2002 from 13-15% growth to 17% growth over the prior year. (*Id.* ¶ 111.) On April 18, 2002, Sears issued another press release, filed on Form 8-K and signed by Mr. Liska, repeating these numbers and stating that the Credit and Financial Product division's operating income had increased by $78 million (21.4%) to $443 million.[9] In the press release, Sears acknowledged that the net charge-off rate had "increased to 5.43 percent from 5.07 percent last year primarily due to increased customer bankruptcy filings over the last year." The company reported a slight decrease in year-over-year delinquencies, however, from 7.50% in the first quarter of 2001 to 7.31% in the first quarter of 2002, "indicating stable portfolio quality." In addition, the company stated that "[t]he domestic allowance for uncollectible accounts of $1.1 billion is 4.13 percent of ending credit receivables compared with 4.14 percent at the end of last year's quarter." (*Id.* ¶ 112.) Unlike the April 10, 2002 press release, which described Sears as "a leading U.S. retailer of apparel, home and automotive products and services," the April 18 release described Sears as "a broadline retailer with significant service and credit businesses." (*Id.* ¶ 113.)

---

[9]    The Complaint does not indicate the period during which Sears claimed to have realized this increase.

Also on April 18, 2002, Sears held a conference call with analysts to discuss its first quarter results. During the call, Mr. Lacy reported a "record first quarter" for Sears and stated:

> Our credit and financial products business had an outstanding quarter, with operating income growing by 21% on a comparable basis. This was the result of higher revenues and favorable funding costs. The Sears MasterCard product continues to be a valuable growth vehicle for us, with balances now over $6 billion.

(*Id.* ¶ 114.) Mr. Lacy reiterated Sears' projection for a 17% increase in earnings for the year, which he deemed "conservative." (*Id.*) Mr. Liska acknowledged very poor performance in the retail segment but reported a "stable portfolio quality" with respect to Sears Credit:

> For the quarter, credit and financial products revenue increased 1.4% to $1.3 billion primarily due to higher average balances. The allowance stands at $1.1 billion, or 5.13% of all receivables. In rate terms, this is flat with prior year and up slightly versus the end of 2001. The net charge-off rate increased by 36 basis points over last year to 5.43%, primarily the reflection of an uptick in bankruptcy filings. The 60 plus days delinquencies are down in the first quarter, approximately 20 basis points to 7.31% versus a year ago at 7.5%.

(*Id.* ¶ 115.) Mr. Liska qualified these statements by noting that the "current macro economic outlook remains uncertain at this point." He expressed optimism, however, as to Sears' ability to manage "any potential risk of a charge off line" and stated that the company was "cautiously optimistic that credit will do better than the mid-single digit increase guidance we previously communicated." (*Id.*) In response to an analyst's question about the adequacy of Sears' allowance for bad debt, Mr. Liska responded that "[w]e're very comfortable with the absolute level of that reserve." (*Id.* ¶ 116.)

At the end of the main presentation, an analyst asked what Sears management "had said, or could say, about what Sears expected . . . its 'loss experience to be with the MasterCard portfolio.'" (*Id.* ¶ 118.) Rather than providing information as to the separate MasterCard and Sears Card portfolios, Mr. Lacy and Mr. Liska both insisted that the portfolio needed to be viewed as a whole. According to Mr. Liska,

> [W]e're approaching this on a portfolio basis, because as you probably know, we originally . . . substituted people out of the Sears card into the Sears MasterCard

14

that were of better credit quality or had stopped using their Sears card. So, we look at it more as managing a portfolio and we're probably never going to be in that position that we're going to talk about them as discre[te] portfolios because we don't manage it like that. And it would probably be misleading if we did that. So, we're just going to comment on it on a total portfolio basis.

(*Id.* ¶ 119.) Mr. Lacy agreed with Mr. Liska and assured the analysts that Sears "started off . . . with the most pristine credits within the Sears proprietary card base" and "focused on those people that are very strong credit quality people." At the same time, he did state that "as we go forward, that's going to get more blended." (*Id.*)

On May 7, 2002, Sears filed a Form 10-Q for the first quarter of 2002, signed by Mr. Bergmann and repeating the financial information contained in the Form 8-K. Sears misleadingly represented that delinquencies had decreased by "19 basis points" compared with the first quarter of 2001; that charge-offs had risen from 5.07% to 5.43% (a 7% increase); and that credit quality remained "stable." In fact, viewing the portfolios separately, charge-offs on the Sears MasterCard had increased by 230% from .80% in the first quarter of 2001 to 2.65% in the first quarter of 2002, and charge-offs on the Sears Card had increased 16.4% from 5.29% in the first quarter of 2001 to 6.16% in the first quarter of 2002. The Sears MasterCard had a delinquency rate of 2.55%, an increase of 122% (140 basis points) over the 1.15% reported in the first quarter of 2001. The Sears Card similarly saw a jump in delinquencies from 7.86% in the first quarter of 2001 to 8.77% in the first quarter of 2002, an increase of 11.6% (91 basis points). (*Id.* ¶ 121.)

### 4. Second Quarter 2002

On May 13, 2002, Sears announced that it was acquiring Lands' End, Inc., "the largest specialty apparel catalog company and seller of apparel on the Internet in the U.S." (*Id.* ¶ 123.) Mr. Lacy asserted that the transaction would not affect Sears' projection that 2002 full year comparable earnings per share would increase approximately 17% over the previous year. (*Id.*) In response to this announcement, Sears' stock price rose 9% in one week from $51.81 on May

10 to $56.46 on May 17. On May 14, 2002, UBS Warburg upgraded its rating on Sears to "Buy" from "Hold," and Standard & Poor ("S&P"), the rating agency service, "reaffirmed its 'A-' rating on both Sears and SRAC debt." (*Id.* ¶¶ 124, 125.) The Lands' End acquisition was completed on June 17, 2002. Of the $1.6 billion raised in "these offerings,"[10] $629 million was directly backed by Sears' credit card receivables. (*Id.* ¶ 127.)

On July 18, 2002, Sears issued a press release, filed with the SEC on Form 8-K and signed by Mr. Bergmann, reporting results for the second quarter of 2002. In the press release, Mr. Lacy is quoted as saying that Sears expected a 22% increase in full year comparable earnings (compared with the 17% increase projected in the first quarter of 2002). The press release indicated that "[t]he net charge-off rate for the quarter decreased to 5.32 percent from 5.42 percent last year primarily due to decreased customer bankruptcy filings." Sears also reported that year-over-year delinquencies decreased from 7.26% to 6.87%, "indicating stable portfolio quality," and that "[t]he domestic allowance for uncollectible accounts of $1.4 billion is 5.1 percent of ending credit receivables compared with 5.24 percent at the end of last quarter." Total operating income for the quarter was $666 million, $412 million of which came from Sears Credit. (*Id.* ¶ 130.)

In addition to these figures, the July 18 press release also announced an accounting change:

> The company announced a change in its accounting for the allowance for uncollectible accounts in the credit business. Sears historical allowance methodology provided for uncollectible principal and accrued finance charges on past due accounts. Sears has changed its allowance methodology to include current balances and accrued credit card fees in the methodology. The company believes that this change in its methodology moves it appropriately to a more conservative position in regard to its allowance for uncollectible accounts. As a result of the accounting change, the company recorded a cumulative effect, non-cash charge of $191 million as of the beginning of the fiscal 2002 year. The change did not impact second quarter 2002 results.

---

[10] Plaintiffs do not specify the "offerings" referred to here.

(*Id.* ¶ 131.) According to the Complaint, "Sears admitted that until this point, it had entirely failed to create reserves for probable losses for accounts that were not delinquent, thus creating a false impression that its portfolio was larger and more profitable than was actually the case." (*Id.*)

During a July 18, 2002 conference call with analysts, Mr. Lacy said that "[t]he credit quality of our receivables portfolio has . . . improved. Both our delinquency and the charge-off rates have improved versus last year." Mr. Lacy also assured investors that the new accounting methodology "is non-cash and does not imply any change in our portfolio credit quality or the economics of our credit business." (*Id.* ¶¶ 132, 133.) He concluded by reiterating Sears' projected 22% increase in earnings over the previous year. (*Id.* ¶ 134.) Mr. Liska then reinforced Mr. Lacy's comments, stating that the accounting change "has no economic impact and doesn't reflect any underlying change [in] portfolio quality. In fact, delinquency [and] net write-offs have both improved versus last year." (*Id.* ¶ 135.)

During the conference call, an analyst asked Mr. Lacy about Sears' performance in comparison with that of Capital One, which had reported that bank regulators were requiring it to "increase its capitalization and reserves, and to tighten its risk controls in light of its significant proportion of loans to subprime consumers" (39.8% compared with the national average of 36.6%). Mr. Lacy stated:

> In our case, we are about 180 degrees different than CapOne. . . You know, we have never intentionally lended [sic] to subprime people, people as they get into trouble do migrate to being subprime, but we never intentionally lent to subprime people. . . So, our growth, and I guess I would say perhaps in contrast to CapOne, our growth is being based on a payment product that is appealing to even better risk customers and therefore, as we grow, we are in fact improving the overall credit risk of our portfolio.

(*Id.* ¶¶ 129, 136.) At the end of the call, Mr. Liska assured investors that Sears had invested significantly in risk management and "fe[lt] very good about the systems environment." (*Id.* ¶ 139.)

The market reacted favorably to Sears' statements about its second quarter 2002 performance; on July 18, 2002, Sears' stock closed at $45.75, up from $44.33 the previous day.

In an analyst report dated July 18, 2002, Merrill Lynch stated that Sears "does not engage in any sub prime lending" and that "the Sears credit division debt/equity ratio is currently 9x, well below the typical 15x of traditional monoline credit card issuers." In another analyst report dated July 19, 2002, Banc One reported that "Sears does not lend to subprime customers, a segment that has attracted increased scrutiny given the problems at Capital One." (Id. ¶¶ 140, 141.)

On July 22, 2002, the OCC, the Federal Reserve, the Federal Deposit Insurance Corporation ("FDIC"), and the Office of Thrift Supervision (together, the Federal Financial Institutions Examination Council ("FFIEC")) issued draft new guidelines on credit card lending, "[i]n part in reaction to the Capital One problems." (Id. ¶ 145.) The new guidelines provided, among other things, that (1) card issuers should carefully consider risk exposure both when increasing lines of credit and when issuing additional cards; (2) "workout" programs should not extend longer than 48 months; and (3) lenders should utilize proper risk controls to ensure that they have adequately reserved for losses. (Id.) Mr. Keleghan was asked about Sears' reaction to the new guidelines during an interview with *Bloomberg News* on July 25, 2002. Mr. Keleghan stated that "[f]rom everything I've read, I feel we're already there." With respect to the problems at Capital One, he assured investors that "I don't suspect we'll come under the same scrutiny. We don't do subprime lending at all in the MasterCard portfolio. All my growth is coming from prime and superprime." (Id. ¶ 146.) Contrary to these assertions, however, Sears was not in compliance with the new FFIEC guidelines because it was issuing new credit cards to consumers who did not qualify; had workout programs that typically lasted 50 to 52 months; and did not create proper allowances for loan losses. (Id. ¶ 148.)

On July 30, 2002, *American Banker* reported on Sears' plans to partner with other retailers who would then accept the Sears store card at their own establishments. The article explained that Mr. Keleghan was not concerned that Sears store cardholders might be too risky to justify the plan and had stated that "[t]he majority of these customers are very creditworthy." Mr. Keleghan

18

acknowledged some risk but described it as "minimal." (*Id.* ¶ 149.) In truth, Plaintiffs allege, the Sears credit portfolio was heavily weighted towards risky, subprime customers and was very unstable as evidenced by the steadily increasing delinquency and charge-off rates. (*Id.* ¶ 150.)

On August 9, 2002, Sears filed its Form 10-Q for the second quarter of 2002, signed by Mr. Bergmann. Sears reported that delinquencies had "decreased 39 basis points" in 2002 compared with 2001 (from 7.26% to 6.87%), and that the net charge-off rate had decreased from 5.42% in 2001 to 5.32% in 2002. (*Id.* ¶¶ 152, 153.) In fact, Sears MasterCard delinquencies had increased from 1.20% in the second quarter of 2001 to 2.57% in the second quarter of 2002, a 114% increase.[11] Sears Card delinquencies also rose from 7.86% in the second quarter of 2001 to 8.75% in the second quarter of 2002, a 14% increase. Charge-off rates for both cards similarly increased over the previous year, with MasterCard showing a 232% increase from .90% to 2.99%, and Sears Card showing a 7.2% increase from 5.78% to 6.20%. In addition, contrary to Sears' representations that it "never intentionally lent to subprime people," the company actually "had systematically targeted the subprime market for years." (*Id.* ¶ 142.)

## D.    Sears Reveals Its Credit Problems

Plaintiffs allege that the true state of Sears' credit portfolios finally began to emerge in October 2002. On October 4, 2002, Sears issued a press release abruptly announcing that Mr. Liska had replaced Mr. Keleghan as Sears' Executive Vice President and President of Credit and Financial Products. On October 7, 2002, Sears issued another press release reaffirming its projection of a 22% increase in comparable earnings per share, but stating that: "The company now expects comparable earnings increases . . . in the mid-single digit percent range in its credit and financial products segment." (*Id.* ¶¶ 157, 158.) This represented a significant decrease from

--------

[11]    The Complaint attributes these figures to the first as opposed to the second quarters of 2001 and 2002. The first quarter figures, however, were reported earlier in the Complaint and the court assumes Plaintiffs are referring to the second quarters of those years. (*See* Cmplt. ¶ 121.)

earlier projections; indeed, as of July 18, 2002, Sears had projected credit segment growth "in the low double digits." Sears' stock started to trade down in response to the revised projections. (*Id.* ¶ 159.)

Later that day, Mr. Lacy spoke to investors during a conference call and "reaffirm[ed]" Sears' projection of a 22% increase in earnings per share. With respect to Mr. Keleghan, Mr. Lacy explained that "Kevin left the company at my request, because I lost confidence in his personal credibility. . . . His departure is not related to business performance and does not indicate a change in our credit strategy." (*Id.* ¶¶ 160-62.) Financial services firm W.R. Hambrecht commented on Mr. Keleghan's departure as follows: "we got incrementally bad news . . . . CEO Lacy stated that he asked Keleghan to leave because he had lost confidence in Keleghan's personal credibility. We don't know what that means, exactly, but we believe it bodes poorly for Sears Credit operations which represent approximately 65% of operating profit and creates even greater uncertainty about the quality of earnings at the credit division." (*Id.* ¶ 165.) By the close of business on October 7, 2002, the price of Sears stock had fallen from $37.64 to $32.25. (*Id.* ¶ 163.) The price of SRAC Debt Securities issued pursuant to the 6/21/02 Offering also fell from $24.81 per share on October 8, 2002 to $21.91 per share on October 10, 2002.

On October 17, 2002, Sears issued a press release announcing that it would be increasing its allowance for bad debt by $222 million. The charge against earnings required to cover this increase reduced Sears' earnings for the quarter by 26% as compared to the prior year. Despite having ten days earlier projected a 22% increase in earnings per share that year, Sears now estimated earnings per share would increase only 15%. (*Id.* ¶ 168.) In an analysts meeting that day, Mr. Lacy attributed Sears' problems in its credit business to the duplicity of Mr. Keleghan and Mr. Vishwanath:

> [I]t became clear to me that Kevin [Keleghan] was not being forthcoming about these issues that this business was facing . . . and had become a barrier to getting an objective situation assessment as to what was happening in our business and

I terminated him for basically my personal loss of confidence in him relative to his personal credibility . . . You should also know that during the course of our analysis we determined that the VP of Risk Management and Credit [Mr. Vishwanath] had also withheld information and had led us to terminate his employment effective yesterday.

(*Id.* ¶ 169.)

When Mr. Liska took over the conference call, he admitted that "[o]ne of the disclosures that [we] make today centers around a portion of our portfolio that is Middle American. A large portion of the proprietary card, our proprietary card portfolio is Middle America." (*Id.* ¶ 170.) In an analysts meeting a year earlier, Mr. Keleghan had explained, "we try to target the middle market," distinguishing that group from the "subprime" market; in this October 2002 meeting, Mr. Liska refers to "Middle America" as another way of saying "subprime": "It is generally recognized that [M]iddle America accounts deteriorate more quickly in a tough economy than prime accounts do." Though he suggested that the proportion of Sears borrowers that were subprime was declining, Mr. Liska acknowledged that Sears' credit portfolio had been heavily subprime for years: "In 1998 Middle America balances represent[ed] 60% of our portfolio. They represent 48% today. Last year the segment represented 54% of our portfolio." (*Id.* ¶ 171.)

In response to Sears' disclosures, W.R. Hambrecht reported that Sears' "shocking 26% decrease in earnings . . . stunned the Street and all in attendance" at the analysts meeting. "Frankly, it was the realization of our worst-case scenario regarding the state of the company's credit operations, which represent more than 60% of Sears' operating profit." (*Id.* ¶ 173.) Indeed, the price of Sears stock fell $10.80 per share (approximately 32%) to close at $23.15 on October 17, 2002, and there was "extraordinary trading volume" that day of 36 million shares, 12 times greater than Sears' daily trading average of 2.9 million shares during the Class Period. SRAC Debt Securities also fell 8.6% from $24.05 per share on October 16, 2002 to $21.99 per share on October 17, 2002, "on trading of 153,600 Notes, six times the daily trading average of 25,000 shares." (*Id.* ¶¶ 174, 175.) Shortly before the end of the Class Period, SRAC had

announced its intention to offer approximately $800 million of three-year SRAC Debt Securities at an interest rate of 13 to 14 basis points above the one-month London Interbank Offered Rate ("Libor"). (*Id.* ¶¶ 51, 176.) After the October 2002 announcements, however, the debt securities were priced at 38 points above Libor. (*Id.* ¶ 177.)

On November 12, 2002, Sears filed its Form 10-Q for the third quarter of 2002. In that report, Sears for the first time revealed to investors how the Sears MasterCard and Sears Card portfolios had both been deteriorating during the Class Period. Sears explained that "[b]ecause the MasterCard portfolio has a lower delinquency rate than the Sears Card, the growth in the MasterCard portfolio coupled with the decline in the Sears Card portfolio led to an improvement in the total portfolio delinquency rate as compared to the third quarter of 2001." Sears also stated that it "charges off accounts at 240 days where[as] most bankcard issuers charge off at 180 days. Therefore Sears' delinquency rate is not directly comparable to participants of the bankcard industry." (*Id.* ¶¶ 179, 180.) With respect to its re-aging policies, Sears disclosed that

> [t]he Company's current credit processing system charges off an account automatically when a customer's number of missed monthly payments reaches eight, except that accounts can be re-aged once per year when a customer makes two consecutive monthly payments. Also, accounts may be charged off sooner in the event of customer bankruptcy. Finance charge and credit card fee revenue is recorded until an account is charged off at which point the charged off balances are presented as a reduction of revenue.

(*Id.* ¶ 181.)

An article on *The Street.com* reported that this new data "shows deep deterioration in the MasterCard portfolio. A back-of-the-envelope calculation suggests that, if this rot continues, the company may have to make loan provisions in 2003 that could wipe out a large part of the earnings analysts currently forecast." (*Id.* ¶ 183.) On November 20, 2002, Bear Stearns described Sears'

"aggressive write-off policy" as a "key concern," and expressed "uneas[e]" as to whether Sears had "adequately accounted for the potential level of charge-offs."[12] (*Id.*)

On January 16, 2003, Sears issued a press release announcing that it was adding another $150 million to its reserves for uncollectible accounts, in part due to "increases in the net charge-off rate and delinquencies." (*Id.* ¶ 184.) On February 28, 2003, S&P downgraded its rating on Sears, no longer deeming the company to be A-list. On March 12, 2003, Sears filed its 2002 Form 10-K repeating the delinquency and charge-off information contained in the third quarter 2002 SEC filings. For the first time, Sears included a full discussion of its account management programs:

> Such programs, some of which are not typical among bank card issuers, include the use of (a) no minimum payment/zero-percent financing for up to 12 months for Sears' retail customers, (b) percentage off promotions, (c) a 240-day contractual delinquency period, (d) a renewal or workout program for late stage delinquencies, [and] (e) a re-aging policy . . .

(*Id.* ¶ 187.) Sears also acknowledged, as it had in the Form 10Q for the third quarter of 2002, that "the Company contractually charges off accounts at 240 days, whereas most bank card issuers charge off at 180 days. As a result, Sears' delinquency rates are not directly comparable to participants in the bank card industry." (*Id.* ¶ 188.)

At its height, Sears' credit represented almost 70% of Sears' earnings and by 2003, Sears had become the third largest issuer of MasterCard. On March 26, 2003, however, Sears announced that it would be selling all of its credit operations "in an attempt to create value for all investors and focus on its profitable core retail and related services business." (*Id.* ¶ 189.) A number of lawsuits followed.

## E.    This Lawsuit

On June 17, 2003, Plaintiffs filed suit against Sears, SRAC, Mr. Lacy, Mr. Liska, Mr. Richter, and Mr. Bergmann, alleging violations of federal securities laws in connection with the 6/21/02

---

[12]    The Complaint does not indicate the format of this report.

Offering of SRAC's Debt Securities. Shortly thereafter on August 27, 2003, the court appointed Plaintiffs Lead Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 780-4, *et seq.* Plaintiffs amended the Complaint on October 16, 2003, adding Mr. Keleghan, Mr. Vishwanath, Mr. Trost, Mr. Slook, Mr. Raymond, and all the Underwriter Defendants as Defendants. In the amended complaint, Plaintiffs seek to represent (1) all those who purchased or acquired SRAC Debt Securities pursuant to a prospectus during the Class Period (the "Issuer Class") in the 3/18/02 Offering, the 5/21/02 Offering, and the 6/21/02 Offering; and (2) all those who purchased, during the Class Period, publicly traded SRAC Debt Securities that were issued by SRAC before the start of the Class Period and actively traded through the public markets and over national security exchanges (the "Trader Class").

In Counts One through Three, Plaintiffs allege that the Underwriter Defendants, Mr. Trost, Mr. Slook, Mr. Liska, Mr. Raymond, Mr. Richter, and Mr. Bergman violated § 11 of the Securities Act by "failing to make a reasonable investigation or possess reasonable grounds for believing that the representations contained in the Registration Statement, including the documents incorporated therein, were true and without omissions of any material facts and were not misleading." (Cmplt. ¶¶ 241, 245, 246, 265, 269, 270, 291, 295, 296.) Counts Four through Six charge the Underwriter Defendants with violating § 12(a)(2) of the Securities Act by making material misrepresentations in the three SRAC Debt Securities offerings "knowingly or recklessly and for the purpose and effect of concealing the truth with respect to the SRAC's and Sears' operations, business management, performance and prospects from the investing public and supporting the artificially inflated price of the SRAC Debt Securities." (*Id.* ¶¶ 318, 330, 342.) Count Seven alleges that the Individual Defendants violated § 15 of the Securities Act because they acted as controlling persons of SRAC and had the power to influence and control the decision-making of both Sears and SRAC, "including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading herein." (*Id.* ¶ 348.)

24

In Count Eight, Plaintiffs claim that Sears, SRAC, and the Individual Defendants violated § 10(b) of the SEA and Rule 10b-5 promulgated thereunder by engaging in a "plan, scheme and course of conduct" to deceive the investing public regarding Sears' high-risk credit practices and induce Plaintiffs to purchase SRAC Debt Securities at artificially inflated prices during the Class Period. (*Id.* ¶ 352.) Plaintiffs also charge in Count Nine that the Individual Defendants violated § 20(a) of the SEA because they acted as controlling persons of SRAC and had the power to influence and control the decisions of SRAC and/or Sears, "including the content and dissemination of the SEC filings and other statements that Lead Plaintiffs contend are false and misleading." (*Id.* ¶ 364.)

## DISCUSSION

Sears, SRAC, Mr. Lacy, Mr. Liska, Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, and Mr. Bergman (collectively, the "Sears Defendants"), the Underwriter Defendants, Mr. Keleghan, and Mr. Vishwanath have filed four separate motions to dismiss the complaint for failure to state a claim. The purpose of a motion to dismiss is to test the sufficiency of the plaintiffs' complaint, not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Plaintiffs alleging fraud must do so "with particularity," FED. R. CIV. P. 9(b), meaning "the who, what, when, where and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990). The particularity requirement ensures that plaintiffs "conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).

In addition to complying with Rule 9(b), Plaintiffs alleging claims under § 10(b) of the SEA must also follow the strict pleading requirements of the PSLRA, which was enacted to discourage claims of "so-called 'fraud by hindsight.'" *Amzak Corp. v. Reliant Energy, Inc.*, No. 03 C 0877, 2004 WL 407027, at *2 (N.D. Ill. Jan. 28, 2004) (quoting *In re Brightpoint, Inc. Sec. Litig.*, No. IP99-0870-C-H/G, 2001 WL 395752, at *3 (S.D. Ind. Mar. 29, 2001)). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, [and] the reason why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). *See also Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 823 (N.D. Ill. 2000).

Defendants variously argue that dismissal is appropriate because Plaintiffs lack standing to pursue claims relating to the 3/18/02 and 5/21/02 Offerings; the Complaint fails to identify any false and misleading statements attributable to them; Plaintiffs have failed to allege scienter; and there is no basis for control person liability under § 15 of the Securities Act or § 20(a) of the SEA. The court addresses each argument in turn.[13]

## A. The Underwriter Defendants

Plaintiffs have sued the Underwriter Defendants under §§ 11 and 12(a)(2) of the Securities Act for allegedly making material misrepresentations in the 3/18/02, 5/21/02, and 6/21/02 SRAC Debt Securities Offerings. To state a claim under either section, Plaintiffs "must allege that defendant is responsible for untrue statements of material fact or omitted material facts in a registration statement or prospectus." *Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2002 WL 1160171, at *5 (N.D. Ill. May 30, 2002). *See also Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1399-1400 (7th Cir. 1995); *Miller v. Apropos Technology, Inc.*, No. 01 C 8406, 2003 WL 1733558, at *4 (N.D. Ill. Mar. 31, 2003) (citing *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546

---

[13]     To the extent Defendants' arguments overlap, the court addresses them only once except where separate discussion is appropriate.

(8th Cir. 1997)). Plaintiffs are not required to show scienter or reliance to support such claims; rather, "persons in certain positions [are] absolutely liable for the material and misleading statements unless they can affirmatively make certain showings as to their knowledge and diligence." *Abrams*, 2002 WL 1160171, at *5. The statute identifies underwriters as one of the groups that may be liable for misrepresentations. 15 U.S.C. § 77k(a).

The Underwriter Defendants argue that Lead Plaintiffs lack standing to assert claims relating to the 3/18/02 and 5/21/02 SRAC Debt Securities Offerings because they only purchased securities in the 6/21/02 Offering. They also claim that Plaintiffs have failed to identify any false and misleading statements in the Registration Statement, Prospectuses, or any documents incorporated therein.[14]

## 1. Standing to Sue

To have standing to sue for a violation of § 11 of the Securities Act, a plaintiff must have purchased securities that are the "direct subject" of the allegedly defective registration statement. *Harden v. Raffensperger, Hughes & Co.*, 933 F. Supp. 763, 766 (S.D. Ind. 1996) (quoting *Wolfson v. Solomon*, 54 F.R.D. 584, 587 (S.D.N.Y. 1972)). Standing under § 12(a)(2) similarly requires the purchase of securities offered in the prospectus. *See Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 1194, 1196 (6th Cir. 1981) (options trader was a seller, and not a purchaser of securities so he lacked standing to sue under § 12(a)(2)); *Cathedral Trading, LLC v. Chicago Bd. Options Exchange*, 199 F. Supp. 2d 851, 858 (N.D. Ill. 2002) (quoting *Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987)) ("Section 12 imposes liability on persons who offer or sell securities and only grants standing to the person purchasing such security from them"). The Underwriter Defendants argue that Plaintiffs do not have standing to pursue claims

---

[14] Mr. Lacy, Mr. Liska, Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, and Mr. Bergmann adopt the arguments set forth by the Underwriter Defendants with respect to liability under § 11 of the Securities Act. This discussion therefore applies to those Defendants as well.

based on the 3/18/02 and 5/21/02 Offerings, either individually or on behalf of a class, because it is undisputed that they purchased securities only in the 6/21/02 Offering.

Plaintiffs insist that the Underwriter Defendants have confused the issue of standing with whether Plaintiffs would be adequate class representatives. In their view, the fact that they never bought securities in two of the three Offerings may mean that their claims are not typical of other putative class members, but it does not deprive them of standing to sue for claims arising from those Offerings. (Pl. Resp., at 53.)[15] In support of this argument, Plaintiffs direct the court to *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957 (W.D. Wis. 2003), in which the defendant sought dismissal of plaintiffs' § 12(a)(2) claims for lack of standing. In *Friedman*, the lead plaintiffs bought their securities on the open market and not directly through the initial offering as required by statute. *Id.* at 976. The court found that this raised a question as to whether the lead plaintiffs could serve as class representatives but did not deprive plaintiffs generally of standing to sue. The court found it significant that "some members of the class purchased shares directly in the offering," and that those purchasers were "members of the proposed class and would be entitled to relief under § 12(a)(2) if a violation could be proven." *Id.* According to the court, it was at the class certification stage that "plaintiffs will have to be prepared to explain . . . how lead plaintiffs can serve as adequate class representatives even though they do not have claims under § 12(a)(2)." *Id.* But see *Scholes v. Tomlinson*, 145 F.R.D. 485, 491-92 (N.D. Ill. 1992) (where named plaintiffs did not purchase *any* securities from the Tomlinson defendants, court certified a subclass of only those investors who did purchase securities from them).

It is not clear whethr any other plaintiffs in *Friedman* had standing. Citing *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003), however, Defendants urge that Plaintiffs' argument fails to address the fact that there are no named plaintiffs in this case with standing to

---

[15]     Lead Plaintiffs' Consolidated Response to Motions to Dismiss Filed by Defendants is cited as "Pl. Resp., at __."

assert claims relating to the 3/18/02 and 5/21/02 Offerings. In *In re WorldCom*, the underwriter defendants sought dismissal of the plaintiffs' § 11 and § 12(a)(2) claims on the grounds that the lead plaintiff did not purchase bonds in the relevant offerings and, thus, lacked standing to sue. *Id.* at 420. The court agreed that a plaintiff must have standing to bring the claims asserted in a lawsuit, and that "it is well established that named plaintiffs may jointly represent the class and it is their claims that determine whether there is standing to bring the claims alleged on behalf of the class." *Id.* at 421. The court noted however, that "[t]he Underwriter Defendants have not shown that there is any legal bar to a lead plaintiff asking other plaintiffs to join a lawsuit as named plaintiffs in order to represent more broadly the interests of the class at the time of the filing of the consolidated class complaint." *Id.* at 422. The complaint adequately alleged that at least two of the named plaintiffs had standing to assert claims based on the two bond offerings and, thus, the defendants' motion to dismiss was denied. *Id.*

Plaintiffs lack standing to sue on their own behalf with respect to the 3/12/02 and 5/21/02 Offerings since they never purchased any securities in those offerings. The fact that they have filed a class action lawsuit that includes putative class members who did purchase the relevant securities does not confer the necessary standing in this case because none of those putative class members is a named plaintiff. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 257 (S.D.N.Y. 2004) ("a party named 'lead plaintiff' under the PSLRA need not have standing to sue on each individual claim asserted in the complaint so long as other named plaintiffs have standing to pursue the claims at issue"); *In re WorldCom*, 294 F. Supp. 2d at 422 ("it was well established that named plaintiffs may jointly represent the class and it is their claims that determine whether there is standing to bring the claims alleged on behalf of the class"). Thus, Plaintiffs' claims with respect to the 3/12/02 and 5/21/02 Offerings are dismissed without prejudice to their naming additional plaintiffs with the requisite standing.

## 2.    False and Misleading Statements

Merrill Lynch, the only underwriter involved in the 6/21/02 Offering, is the sole remaining Underwriter Defendant in this case. It argues that Plaintiffs have not identified any false or misleading statements in the Registration Statement and Prospectuses. Merrill Lynch first claims that Plaintiffs cannot establish that Sears' public filings regarding allowances for bad debt were false or misleading or violated Generally Accepted Accounting Principles ("GAAP") merely because on October 17, 2002, the company amended its earnings guidance to reflect a $222 million[16] charge for increased allowances. In Merrill Lynch's view, this is a "classic case of pleading 'fraud by hindsight.'" (Underwriter Mem., at 11-12.)

GAAP are "the official standards adopted by the American Institute of Certified Public Accountants (the 'AICPA'), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the 'APB'), and the Financial Accounting Standards Board (the 'FASB')." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889-90 (8th Cir. 2002). Sources for GAAP include APB opinions, FASB Accounting Research Bulletins ("ARB"), and FASB Statements of Financial Accounting Standards ("SFAS"). *Id.* at 890. "[A] violation of GAAP generally will not be sufficient to establish fraud, [but] when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter." *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *10 (N.D. Ill. Nov. 4, 1998) (quoting *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996)).

---

[16]    The Underwriter Defendants claim that Sears took only a "$189 million charge (after taxes)." (Memorandum of Law in Support of Underwriter Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Underwriter Mem."), at 11.) Plaintiffs allege that the company took a $222 million charge "due to a $189 million increase to the allowance for uncollectible accounts." (Pl. Resp., at 57 n.51; Cmplt. ¶ 168.) For purposes of this motion to dismiss, the court assumes that Sears took a $222 million charge.

Plaintiffs identify three GAAP violations: (1) failing to reserve for accounts that were not yet delinquent; (2) classifying fraudulent billings as expenses in the quarter in which they came due rather than as bad debt; and (3) reporting delinquency and charge-off rates on a portfolio-wide basis. SFAS No. 5 requires that lenders establish allowances, or reserves, to account for the fraction of their loan portfolio that is likely to become uncollectible. An estimated loss from a loss contingency "shall be accrued by a charge to income" if: (1) "information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements"; and (2) "the amount of the loss can be reasonably estimated." (Cmplt. ¶¶ 194, 195.) In addition, financial statements must disclose contingencies when it is at least reasonably possible (i.e., a greater than slight chance) that a loss may have been incurred. (*Id.* ¶ 195.)

For most of the Class Period, Sears created reserves only for losses likely to occur relative to accounts that had already become delinquent. Plaintiffs claim that Sears violated GAAP by failing to create reserves for accounts that were not yet delinquent, but that carried some degree of risk of nonpayment due to Sears' risky credit practices. Plaintiffs note that when Sears changed its accounting methodology on July 18, 2002 to also provide reserves for nondelinquent accounts, it resulted in a reduction in Sears' receivables in the amount of $300 million. (Cmplt. ¶ 199.) According to Plaintiffs, the "change in methodology was an admission that [Sears'] earlier policy failed to reserve for probable losses that were not yet delinquent, and thus created the false impression that its portfolio was more profitable than was in fact the case." (Pl. Resp., at 57-58.) The announcement of the change in methodology, Plaintiffs argue, "was in reality a correction of an earlier error *disguised* as a voluntary change in policy." (*Id.* at 58.) Merrill Lynch responds that in changing the methodology, Sears simply wanted to move to "a more conservative position in regard to its allowance for uncollectible accounts." It notes that the price of Sears' stock rose in

response to the news, and claims that Plaintiffs have merely alleged fraud by hindsight. (Cmplt. ¶¶ 131, 140; Underwriter Mem., at 12; Underwriter Reply, at 9.)[17]

The court agrees that a change in accounting methodology, in and of itself, does not indicate that earlier financial statements violated GAAP. Plaintiffs have alleged, however, that Sears lowered its credit standards to target subprime customers; offered additional cards and credit increases to customers who did not qualify for them; and altered payment terms to allow customers to pay their bills over longer and riskier schedules, but did not account for the additional risk of nonpayment inherent in such policies. (Cmplt. ¶ 200.) Merrill Lynch claims that Sears publicly disclosed in its SEC filings how the company provided credit and charged-off accounts; they do not, however, cite any evidence suggesting that Sears fairly revealed the risky nature of its credit practices. (Underwriter Mem., at 13.) Viewing the undisclosed credit practices together with the later change in accounting methodology, the court concludes that Plaintiffs have sufficiently alleged that the public filings were false or misleading.

Plaintiffs also allege that Sears violated GAAP and failed to create adequate reserves because it classified fraudulent billings as expenses in the quarter in which they came due, rather than classifying them as bad debt. (Cmplt. ¶ 201.) The fraudulent billings stemmed from Sears' alleged practice of encouraging or inducing employees to add additional services to customer accounts without their knowledge or consent. (*Id.* ¶ 82.) To the extent Sears should have known that such a practice would increase the risk of uncollectible receivables and failed to account for such a risk, Plaintiffs have adequately alleged a GAAP violation. Merrill Lynch states in conclusory fashion that the fraudulent billings were not "material to the allowance as stated"; absent some development of the argument, however, it does not support dismissal. *See United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("[i]t is not this court's responsibility to

---

[17] The Reply Memorandum of Law in Support of Underwriter Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is cited as "Underwriter Reply, at __."

research and construct the parties' arguments"); *Kaufman v. Motorola, Inc.*, No. 95 C 1069, 1999 WL 688780, at *8 (N.D. Ill. Apr. 16, 1999) (quoting *McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 466 (7th Cir. 1981)) ("delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of these facts to him and these assessments are peculiarly ones for the trier of fact").

In addition to the problems with reserves, Plaintiffs allege that Sears improperly reported delinquency and charge-off rates on a portfolio-wide basis, which hid the fact that the portfolios were separately in decline. Merrill Lynch acknowledges that Sears later reported separate data for both portfolios, but claims that this does not show that earlier reports were false or misleading. (Underwriter Mem., at 14) (citing *Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1169 (7th Cir. 1995) ("[t]he securities laws ask whether the disclosures were proper at the time; they use an *ex ante* perspective").) To the contrary, Plaintiffs have alleged that Sears deliberately disguised its risky credit practices by reporting combined delinquency and charge-off data for the portfolio as a whole, which made those rates appear stable even though they were steadily increasing each quarter when viewed on a per-portfolio basis. Merrill Lynch insists that Sears adequately disclosed the manner in which it accounted for delinquencies and charge-offs, noting that in the company's 2001 Form 10-K, it explained that "[a]ccounts are considered delinquent when a customer has failed to make a payment in each of the last three or more billing cycles," and that the company "charges off an account automatically when a customer has failed to make a required payment in each of the eight billing cycles following a missed payment." (2001 Form 10-K, Ex. 5 to Underwriter Mem., at 19 n.2, F-11.)

Assuming this is true and that investors would understand that a "billing cycle" was 30 days, the disclosures nonetheless fail to address Plaintiffs' allegations that Sears misleadingly reported those rates on a combined portfolio basis and hid its practice of deliberately targeting subprime customers. Citing Mr. Keleghan's presentation to analysts on October 24, 2001, Merrill Lynch

claims that Sears did disclose that the portfolios included subprime customers. Specifically, Mr. Keleghan discussed a chart showing that "our middle market or our higher risk customers . . . accounted for about 24% of the accounts." (Presentation of 10/24/01, Ex. 10 to Underwriter Mem.) The court notes that in that same October 24, 2001 session, Mr. Keleghan used the expression "middle market" as shorthand for *more* credit-worthy customers, commenting that "we avoid [the subprime market] and we try to target the middle market." In any event, Plaintiffs do not dispute the existence of subprime customers in the portfolio; rather, they claim that Sears misled investors into believing that the company had relatively few subprime customers when, in fact, the portfolio was 54% subprime in 2001 and 48% subprime in 2002. (Cmplt. ¶ 171.)

Merrill Lynch finally argues that a number of the allegedly false and misleading statements constitute forward-looking statements or puffery that are not actionable under §§ 11 or 12(a)(2). Merrill Lynch has incorporated arguments in this regard made by the Sears Defendants and, thus, the court addresses them below. Their motion to dismiss based on the above arguments is denied.

## B.    The Sears and SRAC Defendants

Plaintiffs allege that Sears, SRAC, and all of the individual Defendants violated § 10(b) of the Securities Exchange Act and SEC Rule 10b-5 by misrepresenting the financial performance of Sears' credit operations, which caused Plaintiffs to purchase securities at artificially inflated prices.    Plaintiffs also allege that the individual Defendants are responsible for the misrepresentations as controlling persons under § 20(a) of the SEA and under § 15 of the Securities Act. To state a claim under § 10(b) and Rule 10b-5, Plaintiffs must allege that each defendant "(1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff[s] relied, and (6) that reliance proximately caused plaintiff[s'] injuries." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280 (7th Cir. 1996).

34

To state a claim under § 20(a) of the Act, Plaintiffs must allege "(1) a primary securities violation; (2) [that] each of the Individual Defendants exercised general control over the operations of [Sears and/or SRAC]; and (3) [that] each of the Individual Defendants 'possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised.'" *Johnson v. Tellabs, Inc.*, 303 F. Supp. 2d 941, 969 (N.D. Ill. 2004) (quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)). The requirements for claims under § 15 of the Securities Act "are largely co-extensive with the requirements for Section 11 claims. The only additional element that Section 15 would require is that the Defendant was in a position of control over the alleged violators of Section 11." *Miller*, 2003 WL 1733558, at *7. *See also* 15 U.S.C. § 77o(a).

The Sears Defendants, Mr. Keleghan, and Mr. Vishwanath separately moved for dismissal of all claims against them. The court addresses each in turn.

### 1.     The Sears Defendants

The Sears Defendants first challenge Plaintiffs' standing to proceed with certain claims. To the extent Plaintiffs do have standing, the Sears Defendants contend that the Complaint fails to allege that they made any false or misleading statements, or that they acted with knowledge or motive to deceive. In the absence of viable claims under § 10(b) (or § 11 as argued by the Underwriter Defendants), the Sears Defendants say, Plaintiffs' § 20(a) and § 15 claims against the individual Defendants fail as well.

### a.     Standing to Redress Post-Purchase Statements

The Sears Defendants first seek to dismiss Plaintiffs' Rule 10b-5 claim to the extent it is based on allegedly misleading statements made after Plaintiffs purchased their securities. (Sears Mem., at 4) (citing *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992)). In *Roots*, the plaintiff sought to represent a class of persons who purchased Lands' End stock

between March 7, 1989 and December 11, 1989. 965 F.2d at 1414. The plaintiff's last purchase of stock occurred on July 25, 1989. The court held that all of the pre-July 25, 1989 statements were not actionable on various grounds, leaving only post-July 25, 1989 statements to form the basis of the fraud claim. Those post-purchase statements, however, "could not have affected the price at which plaintiff actually purchased." *Id.* at 1420. In addition, "[h]aving no claim of its own based on the post-purchase statements, Roots would not be a proper representative of a class of persons who bought Lands' End stock after defendants' allegedly fraudulent post-July 25, 1989 statements." *Id.* at 1420 n.6. The court thus affirmed dismissal of the complaint. *See also In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104, 112 (N.D. Ill. 1996) (Castillo, J.) (following *Roots* to hold that class period could not extend beyond last stock purchase date); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 908 (N.D. Ill. 2001) (Moran, J.) (citing *Roots* and finding that "[s]tatements made after named plaintiffs purchased their stock cannot form the basis for § 10(b) liability, even if other class members purchased later").

Plaintiffs respond by citing a variety of district court cases from outside this jurisdiction which have allowed plaintiffs to rely on post-purchase statements. In *Alfus v. Pyramid Technology Corp.*, 764 F. Supp. 598 (N.D. Cal. 1991), for example, the defendants sought dismissal of the plaintiff's § 10(b) claim to the extent she relied on statements made after she purchased her securities. *Id.* at 606. Viewing the issue as one of class representation, the court held that the plaintiff could fairly represent a class of stockholders because she purchased securities during the class period:

> Reducing the class period according to Alfus' purchase date would imply "that only someone who bought on the last day of a class period would be able to bring an action based on" the logical dates alleged in the Amended Complaint. . . Rather, Alfus is representative of those purchasers who acquired their stocks between the date that Pyramid reported its fiscal 1988 report, and March 23, 1989, the day after Pyramid made its first adverse announcement to the securities analysts, causing stock prices dramatically to fall. Since Alfus alleges that she was injured during the period in a manner typical of all stockholders who purchased in that same period,

the standing requirement is fulfilled, and Alfus is a suitable representative of the named class.

*Id. See also In re Rhythms Sec. Litig.,* 300 F. Supp. 2d 1081, 1085-86 (D. Colo. 2004) (plaintiff, who had standing to assert claims based upon some of the defendant's alleged misrepresentations, also had standing to represent a class of purchasers based on the remaining misrepresentations). *But see In re Discovery Zone,* 169 F.R.D. at 112 (rejecting argument that, where defendants engaged in a common course of fraudulent conduct spanning the class period, post-purchase statements are actionable).

The court is bound by Seventh Circuit precedent on this issue and, in any event, finds the rationale of *Roots* persuasive. The price at which Plaintiffs purchased their debt securities on June 21, 2002 could not have been affected by statements made after that date, and Plaintiffs have not identified any other individuals who are alleged to have purchased securities between June 21, 2002 and the end of the Class Period. The court recognizes that this decision restricts Plaintiffs' allegations to some degree, but the motions to dismiss have been pending for several months. Plaintiffs have therefore been on notice of this issue but have made no apparent effort to identify individuals who have standing to sue.

### b.    False and Misleading Statements

Plaintiffs have identified five categories of allegedly false or misleading statements: (1) statements about the adequacy of loan loss reserves; (2) statements about subprime lending; (3) statements about underwriting standards; (4) statements about delinquencies and charge-offs; and (5) statements distinguishing Sears from other subprime lenders. (Pl. Resp., at 16-25.) The court considers each category in turn.

### i.    Loan Loss Reserves

Plaintiffs allege that throughout the Class Period, Sears repeatedly misrepresented that its allowances for bad credit card debt were "adequate" and "conservative." (Cmplt. ¶¶ 88, 106.) At

an analysts meeting on October 24, 2001, Mr. Keleghan told investors that "as our MasterCard receivables continue to grow, the pressure on [bad debt] allowance is just not there." (*Id.* ¶ 89.) SEC filings in January and April of 2002 further reported that reserves had remained roughly flat as a percentage of receivables. (*Id.* ¶¶ 97, 106, 112.) In Plaintiffs' view, Sears "in effect, represented that there was no need to increase portfolio reserves for any deterioration in credit quality over time," even though portfolio quality was steadily declining. (Pl. Resp., at 17.) Plaintiffs allege that Sears had been recklessly extending credit to high-risk customers and had experienced rising delinquency and charge-off rates in both the Sears MasterCard and Sears Card portfolios, but failed to disclose such risky credit practices or to increase its reserves to offset potential losses.

The Sears Defendants claim that Sears fairly reported that delinquency and charge-off rates "for the portfolio viewed as a *whole*" were roughly constant and that there was "nothing suspicious about the fact that the *overall* loss reserve, expressed as a percentage of *overall* receivables likewise remained constant." (Sears Reply, at 9) (emphasis in original).[18] This argument ignores Plaintiffs' allegations that Sears misled investors by failing to report that the Sears MasterCard and Sears Card portfolios, viewed separately, were both declining. Indeed, when asked to comment on the separate portfolios in April 2002, Mr. Liska stated that "we're probably never going to be in that position that we're going to talk about them as discre[te] portfolios because we don't manage it like that. And it would probably be misleading if we did that. So, we're just going to comment on it on a total portfolio basis." (Cmplt. ¶ 119.) Approximately seven months later, however, Sears filed a Form 10-Q for the third quarter of 2002 that did reveal the deterioration of the separate portfolios. (*Id.* ¶ 179.)

---

[18]     The Reply Memorandum of Law in Support of Motion by Sears, SRAC and Certain Individual Defendants to Dismiss the Amended Class Action Complaint is cited as "Sears Reply, at ___."

The Sears Defendants next object that Plaintiffs have failed to demonstrate that any of Sears' actions violated GAAP. Plaintiffs allege that Sears violated GAAP by (1) failing to reserve for accounts that were not yet delinquent but that carried some degree of risk of nonpayment in light of Sears' risky credit practices; (2) failing to account for risk of nonpayment inherent in its decision to deliberately target subprime creditors and alter payment terms "to allow customers to pay bills over longer – and thus riskier – schedules"; and (3) failing to create adequate reserves for fraudulent billings stemming from Sears employees adding unwanted products and services to customer accounts. (Cmplt. ¶¶ 82, 199-201.) The Sears Defendants acknowledge that Sears changed its reserve policy with respect to non-delinquent loans in the second quarter of 2002 but claim that Plaintiffs have not cited any GAAP provision allegedly violated by the prior policy. (Sears Reply, at 10.) To the extent Plaintiffs argue that Sears failed to create adequate reserves in the face of known risks in its credit portfolios, which ultimately led the company to sell its credit business, the Complaint sufficiently alleges that Sears violated GAAP's requirement that companies fairly disclose and account for loss contingencies. (Cmplt. ¶¶ 194-98.) *See, e.g., United States v. Morris*, 80 F.3d 1151, 1164 (7th Cir. 1996) ("[a]lthough we can agree with defendants that the estimation of probable losses in a large loan portfolio . . . is more an art than a science, . . . representations by management about the adequacy of reserves still may be fraudulent if they are knowingly false or misleadingly incomplete").

The Sears Defendants also argue that Plaintiffs have not identified any specific GAAP provision addressing whether fraudulent credit card charges should be expensed or reserved. (*Id.*) The crux of Plaintiffs' allegation, however, is that Sears encouraged fraudulent billings on customer accounts but made no provision to offset the losses likely to arise from such a practice. This suffices to allege a GAAP violation regardless of whether the company, in a technical sense, properly classified the fraudulent charges as expenses.

## ii.    Subprime Lending

Plaintiffs claim that the inadequacy of the loan loss reserves was compounded by the fact that Sears misrepresented the quality of its credit portfolio. Specifically, at an analysts meeting on October 24, 2001, Mr. Keleghan assured investors that "[w]e don't target the subprime market, we avoid it and try to target the middle market." (Cmplt. ¶ 92.) Mr. Keleghan stated that Sears was targeting "the best credit risk customers and the customers with the most profit potential to drive sales in the store"; "bringing much more of that upper class customer who is lower risk"; and "continually improv[ing] the quality of the accounts that we've booked." He also confirmed a representation by Mr. Liska that "the delinquency rate of these customers is a very pristine group. (*Id.* ¶¶ 88, 89.) Sears made additional statements in that regard, but all occurred after June 21, 2002. (*See id.* ¶ 136 (on July 18, 2002: "we never intentionally lent to subprime people"); *id.* ¶ 146 (on July 25, 2002: "[w]e don't do subprime lending at all in the MasterCard portfolio. All my growth is coming from prime and superprime"); and *id.* ¶ 149 (on July 30, 2002: "the majority of these customers are very creditworthy").) On October 17, 2002, Mr. Liska acknowledged that "[a] large portion of the proprietary card, our proprietary card portfolio is Middle America." (*Id.* ¶ 170.)

The Sears Defendants claim that Mr. Liska's alleged admission in October 2002 does not demonstrate that the earlier statements were false or misleading because he was only referring to the Sears Card portfolio, not the Sears MasterCard portfolio. According to the Sears Defendants, "[t]he fact that a significant segment of the *Sears Card* portfolio was not prime had been previously disclosed by Sears." (Sears Reply, at 11) (emphasis in original). In support of this argument, the Sears Defendants note that at the October 24, 2001 analysts meeting, Mr. Keleghan discussed a chart showing that "our middle market or our higher risk customers . . . accounted for about 24% of the accounts." (*Id.*) As noted earlier, in that same meeting, Mr. Keleghan used the expression "middle market" as shorthand for *more* credit-worthy customers. Assuming the

40

October 21 statement was understood as a reference to the subprime market, however, the disclosure that the Sears Card portfolio was 24% subprime – well below the national average of 36% – did not speak to whether the company deliberately targeted subprime customers, as alleged by Plaintiffs. Indeed, Mr. Liska ultimately admitted that the combined portfolio was 60% subprime in 1998, 54% subprime in 2001, and 48% subprime in 2002. (Cmplt. ¶ 171.) At this stage of the proceedings, Plaintiffs have sufficiently alleged that Mr. Keleghan's statements were false and misleading.

### iii.    Underwriting Standards

Plaintiffs also allege that Sears misled investors by repeatedly assuring them that the company's underwriting standards were "targeted" and "prudent." (Pl. Resp., at 22-23.) For example, on October 24, 2001, Mr. Keleghan told investors that Sears was monitoring the credit card portfolio on a daily basis to identify any problem accounts and manage outstanding credit risks. (Cmplt. ¶ 90.) In addition, during a conference call with analysts on April 18, 2002, Mr. Lacy stated that Sears had made "investments in risk management systems and processes [that] well position us to manage . . . any potential risk." (*Id.* ¶ 115.) According to Plaintiffs, Sears had actually lowered its underwriting standards and extended loans that, in Plaintiffs' view, "could be easily identified as far too risky for the applicant." (Pl. Resp., at 23.) The Sears Defendants argue that Plaintiffs have not shown why Sears' underwriting practices were imprudent "in light of prevailing circumstances." (Sears Mem., at 8.) Viewed together with the misrepresentations regarding portfolio quality and loan loss reserves, however, the court finds the allegations sufficient to withstand dismissal.

### iv.    Delinquencies and Charge-Offs

As explained in connection with the loan loss reserves, Defendants created the false impression that delinquency and charge-off rates for Sears' credit portfolio were relatively stable

by presenting information on a combined portfolio basis. The individual Sears MasterCard and Sears Card portfolios, however, both showed rising delinquencies and charge-offs every quarter. (Cmplt. ¶¶ 77, 78, 118, 119.) Plaintiffs allege that Defendants misled investors by failing to provide information about the portfolios separately, even when specifically asked for such figures during the April 18, 2002 conference call with analysts. (*Id.* ¶ 119.) The Sears Defendants deny that Sears' failure to disclose sub-portfolio data was misleading, noting "growing MasterCard balances with relatively lower delinquency and charge-off rates." (Sears Reply, at 12.) Even if the Sears MasterCard had lower delinquency and charge-off rates than the Sears Card, however, the rates for both portfolios were steadily increasing every quarter. That information was arguably relevant to investors, who did not receive an accurate and meaningful assessment regarding portfolio quality. *See HealthCare Compare*, 75 F.3d at 280 ("Rule 10b-5 . . . prohibits the . . . omission of a material fact that would render statements made misleading").

### v.     Other Subprime Lenders

Plaintiffs finally allege that Defendants falsely and misleadingly told investors that Sears' underwriting practices were distinguishable from its subprime competitors. As noted earlier, on October 24, 2001, Mr. Keleghan assured investors that unlike Providian, a subprime credit card lender, "[w]e [Sears] don't target the subprime market, we avoid it and we try to target the middle market." (Cmplt. ¶ 92.) At the same October meeting, Mr. Liska told investors that Sears' "watch rate of 5.76% was ahead of MBNA and Banc One and significantly better than Capital One or Discover." (*Id.* ¶ 87.) Mr. Lacy made additional statements explaining how Sears was "180 degrees different" from subprime lender Capital One, but that occurred on July 18, 2002, nearly a month after Plaintiffs purchased their debt securities. (*Id.* ¶ 136.) Plaintiffs allege that the statements were all false and misleading because Sears later acknowledged that its credit policies were "not typical among bank card issuers." (*Id.* ¶ 187.)

42

The Sears Defendants claim that only the charge-off period of 240 days was not typical of other bankcard issuers that charged-off accounts after 180 days, and that Plaintiffs do not identify any statements where Sears compared its delinquency rates with those of other card issuers. (Sears Reply, at 12-13.) The March 12, 2003 Form 10-K, however, states that other "account management programs" were atypical as well, including (1) no payment/zero-percent financing for up to 12 months for Sears' retail customers; (2) percentage-off promotions; (3) a renewal or workout program for late stage delinquencies; and (4) a re-aging policy. (Cmplt. ¶ 187.) The Sears Defendants also claim that Sears' delinquency and charge-off policies were fully disclosed to the market long before the Class Period, pointing to several Form 10-Ks that disclose the company's policy of charging-off accounts after a customer fails to make required payments in "each of the eight billing cycles." (Sears Mem., at 8 n.8.)

Plaintiffs urge that this disclosure does not support a "truth-on-the-market" defense because investors would not necessarily equate eight billing cycles with a 240-day charge-off policy. (Pl. Resp., at 26 n.18.) Sears essentially conceded as much, Plaintiffs say, by filing a 2002 Form 10-K that explicitly disclosed the "240-day contractual delinquency period." (*Id.* at 26) (citing *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000)) (market is presumed to have absorbed a "truth" that offsets a falsehood only if "the corrective information [was] conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements") (citation omitted). The Sears Defendants respond that a June 2001 prospectus filed with the SEC specifically disclosed that a "billing cycle is the period of approximately 30 days ending on th[e] billing date," (Ex. S to Sears Mem.), and that the market price for SRAC's Debt Securities is presumed to "impound[] all [such] available information." (Sears Reply, at 13) (citing *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1129 (7th Cir. 1993).)

Even assuming that the market was aware of Sears' 240-day charge-off policy before the Class Period, there is no evidence that it similarly absorbed any information disclosing the workout and promotions policies, which were also not typical of other bankcard issuers. Nevertheless, it is not clear to this court how an admission in 2002 that Sears' policies were not typical of other bankcard issuers demonstrates the falsity of earlier statements that Sears did not have policies comparable to other subprime lenders. Absent further explanation on this issue, the court cannot say that Plaintiffs have alleged false statements based on comparisons to other subprime lenders.

### c.   Scienter

The Sears Defendants next argue that Plaintiffs have not alleged any facts giving rise to a strong inference that they acted with fraudulent intent. To establish scienter, Plaintiffs must plead facts establishing that the Sears Defendants acted with intent to deceive. *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998). The Seventh Circuit has not addressed the proper test for scienter in light of the PSLRA, and courts in this district are split. Most courts, however, have adopted the standard enunciated by the Second Circuit, requiring plaintiffs in a PSLRA action to allege (1) facts showing that defendants had both motive and opportunity to commit fraud; or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *Press v. Chemical Investment Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999). *See In re Spiegel, Inc. Sec. Litig.*, No. 02 C 8946, 2004 WL 1535844, at *24 (N.D. Ill. July 8, 2004) (collecting cases).

Plaintiffs claim that the Sears Defendants knew that Sears' credit card accounts were riskier and more unstable than they led the public to believe, which demonstrates conscious misbehavior or recklessness. (Pl. Resp., at 28.) Recklessness requires "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Finance Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997).

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). One of the "classic fact patterns" that gives rise to a strong inference of scienter is where "defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665-66 (8th Cir. 2001) (citing *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1260-61 (10th Cir. 2001)); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000); *Novak*, 216 F.3d at 311.

The parties do not address whether Sears and SRAC acted with fraudulent intent but focus instead on knowledge of the individual Defendants.[19] The Sears Defendants claim that Plaintiffs have essentially alleged "fraud by hindsight" and have not identified any facts that would have put company officials on notice that their representations were false when made. (Sears Mem., at 11) (citing *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990).) In *DiLeo*, a pre-PSLRA case, the plaintiffs alleged that Continental Illinois Bank failed to increase its reserves fast enough despite being aware that a substantial amount of the Bank's reported receivables would likely prove uncollectible. 901 F.2d at 626. The plaintiffs claimed that the Bank auditors aided and abetted the fraud, but failed to identified give any examples of problem loans that the auditors should have caught. In affirming dismissal of the complaint, the Seventh Circuit stated:

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy.

[19] A corporation can only "know" those things known by persons acting on its behalf. The court concludes that if Plaintiffs' allegations on this matter are adequate with respect to the Individual Defendants, they are adequate with respect to Sears and SRAC, as well.

> The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

*Id.* at 627-28. *See also Arazie v. Mullane*, 2 F.3d 1456, 1466-67 (7th Cir. 1993) (affirming dismissal where stockholders failed to refer to any document, meeting, or transaction that could or should have put the defendant on notice that the New Jersey Casino Control Commission objected to a $50 million loan from defendant's Atlantic City casino to service its own debt on casinos located in Nevada).

Unlike the plaintiffs in *DiLeo*, Plaintiffs have offered more than disparate financial statements to support their claims. Plaintiffs allege that Sears deliberately targeted subprime lenders while denying such a practice to investors; misleadingly reported information on a portfolio-wide basis rather than disclosing the deterioration of each separate portfolio; implemented policies designed to disguise losses, such as charging-off delinquent credit card loans after 240 days compared with 180 days by competitors, relying on generous "renewal" policies, "re-ageing" delinquent accounts, and adopting promotional programs that increased Sears' exposure to bad debt; and encouraged employees to put fraudulent billings on customer accounts. Thus, the court does not agree that Plaintiffs have merely alleged "fraud by hindsight."

At the same time, Plaintiffs have offered little to indicate that the individual Defendants had specific knowledge that the company's representations were false or misleading. Plaintiffs argue that the Sears Defendants must have known that Sears' credit portfolios were riskier and more unstable than investors were led to believe because of the "inter-relationship between SRAC's core business operations – the issuance and sale of Notes [–] and the concurrent purchase of notes and credit card receivables from Sears." (Pl. Resp., at 28.) In Plaintiffs' view, "the individual

defendants can be assumed to have knowledge of the facts regarding Sears' credit card operations at the time the misleading statements were made." (*Id.* at 29.)

In support of this position, Plaintiffs cite *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722 (N.D. Ill. 2003), a case similarly alleging securities fraud based on misrepresentations regarding Sears' credit card practices. Judge Bucklo found that the plaintiffs in that case had sufficiently alleged scienter as to the individual defendants (Mr. Lacy, Mr. Liska, Mr. Richter, Mr. Bergmann, Mr. Keleghan, and Mr. Vishwanath) because they were officers of the company who had access to non-public information and could be "assumed to know of facts 'critical to [Sears'] core operations or to an important transaction that would affect [the] company's performance.'" *Id.* at 726-27 (quoting *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003) (Castillo, J.)) The credit division was "a core portion of Sears' business" and, in the court's view, "[l]ogically, defendants in their positions would be expected to have knowledge of the facts regarding the credit card portfolio at the time they were making statements about the portfolio or signing off on SEC filings." *Id. See also Danis v. USN Communications, Inc.*, 73 F. Supp. 2d 923, 938-39 (N.D. Ill. 1999) (Conlon, J.) ("facts critical to a business's core operations . . . generally are so apparent that their knowledge may be attributed to the company and its key officers") (internal quotations omitted).)

Other courts have rejected the notion that corporate officers must have known a statement was false or misleading because of their positions within the company. *See, e.g., Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 957 (N.D. Ill. 2003) (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002)) ("[a] pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company"). *Chu*, 100 F. Supp. 2d at 837 ("[t]o the extent the plaintiffs plead scienter based exclusively on an individual defendant's position in Sabratek's hierarchy, their claims must be dismissed").

47

The Sears Defendants do not dispute that Mr. Lacy and Mr. Liska, both of whom made numerous representations to investors regarding Sears' credit portfolio in addition to serving as CEO and CFO of the company, respectively, had knowledge of the false and misleading statements alleged in the Complaint.[20] They do, however, argue that there is no strong inference of scienter as to Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, or Mr. Bergmann. All five men were officers of Sears and/or SRAC, and two of them (Mr. Richter and Mr. Bergmann) signed certain SEC filings. Plaintiffs allege generally that "each Individual Defendant . . . was privy to confidential and proprietary information concerning Sears, SRAC, their operations, finances, financial condition and present and future business prospects," and that they attended management and Board of Directors meetings. (Cmplt. ¶ 25.) There are no allegations, however, regarding any specific meetings that Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, or Mr. Bergmann attended, or the information they received at those meetings that would have put them on notice that Sears was making material misstatements.

Plaintiffs argue that they do not need to supply such detail because they are relying on the "group pleading" doctrine, which "allows plaintiffs to rely on the presumption that certain statements of a company, such as financial reports, prospectuses, registration statements, and press releases, are the collective work of those high-level individuals with direct involvement in the everyday business of the company." *Johnson*, 262 F. Supp. 2d at 946 (quoting *Sutton v. Bernard*, No. 00 C 6676, 2001 WL 897593, at *5 n.5 (N.D. Ill. Aug. 9, 2001)). Defendants contend the "group pleading" doctrine did not survive the PSLRA. This court recently considered this issue in detail and concluded that "group pleading may be appropriate in certain circumstances notwithstanding the PSLRA, as long as the complaint sets forth facts demonstrating that each defendant may be

---

[20]   In light of this court's findings regarding Mr. Keleghan and Mr. Vishwanath, discussed below, the court will entertain a motion to dismiss the § 10(b) claim as to Mr. Lacy and Mr. Liska.

responsible for the fraudulent statements." *Spiegel*, 2004 WL 1535844, at *20-23. As noted, no such facts are presented here. Aside from being corporate officers, two of whom signed certain SEC filings, Plaintiffs have not identified any facts suggesting that Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, or Mr. Bergmann were aware that Sears' SEC filings and other statements were false. Thus, Plaintiffs have not sufficiently alleged strong circumstantial evidence that these Defendants acted knowingly or recklessly. *Cf. Sears, Roebuck, and Co.*, 291 F. Supp. 2d at 726-27 (inferring conscious misbehavior or recklessness based, in part, on the individual defendants' positions within the company).

Plaintiffs argue, however, that the individual Defendants had motive and opportunity to commit fraud. To establish motive, Plaintiffs must show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Tricontinental Indus. Ltd. v. Anixter*, 215 F. Supp. 2d 942, 949 (N.D. Ill. 2002) (internal quotation marks and citations omitted). Plaintiffs claim that the Sears Defendants were motivated to "mislead the market as to the success of Sears' credit card operations and financial stability because [they] wanted to keep borrowing costs [from SRAC] low." (Pl. Resp., at 34.) As evidence of such motive, Plaintiffs note that Sears used a substantial portion of its funds from SRAC to purchase Land's End, and claim that "[b]y keeping SRAC's borrowing costs low, Sears was able to minimize its own costs of obtaining money from SRAC to finance the Land's End purchase, making it that much more of a favorable acquisition." (*Id.*)

As the Sears Defendants observe, because this is the type of general motive that is possessed by all corporate officials, it does not satisfy the scienter requirement. (Sears Reply, at 14) (citing *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).) The Sears Defendants argue that lowering the cost of borrowing and financing acquisitions do not constitute "concrete and personal benefit[s]" indicative of scienter. (*Id.*) (citing *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871 (W.D.N.C. 2001).) In *First Union*, the plaintiffs alleged that the defendants, among other things,

were motivated to inflate stock price in order to "enhance the ability of First Union to fund acquisitions . . . [s]pecifically, [the purchase of] Everen Capital Corporation." *Id.* at 895. The court held, without discussion, that "[t]hese allegations, either alone or in conjunction with one another, are insufficient to sustain the 'strong inference' of scienter required to state a claim for securities fraud." *Id. See also Mortensen v. AmeriCredit Corp.*, 123 F. Supp. 2d 1018, 1024 (N.D. Tex. 2000) (for purposes of pleading scienter, defendant's alleged motive of "obtaining debt on more favorable terms" was an "unsupported, generalized allegation of motive that [was] insufficient as a matter of law").

In this case, Plaintiffs have not alleged any facts regarding when Sears first considered acquiring Land's End, or suggesting that the individual Sears Defendants implemented the allegedly fraudulent credit policies in order to assist with that purchase. All corporate officers are motivated to keep borrowing costs low, and absent some indication that these Defendants acted to achieve some concrete personal gain, the court concludes these allegations are insufficient to plead fraudulent intent. *See, e.g., Rehm*, 954 F. Supp. at 1253 ("[t]o permit such general allegations of motive to support the scienter requirement would subject companies to securities fraud lawsuits whenever their public statements of corporate earnings were subject to downward revisions").

### d. Forward-Looking Statements and Puffery

The Sears Defendants claim that their alleged misstatements amount to general expressions of optimism that fall within the PSLRA's safe harbor for forward-looking statements or are non-actionable puffery.[21] A forward-looking statement is not actionable if: "(1) 'the statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from

---

[21]     As noted, the Underwriter Defendants join in these arguments.

those in the forward-looking statement,' or if the statement is immaterial; or (2) if the plaintiffs fail[] to prove that the statement was made with actual knowledge that it was false or misleading." *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 842-43 (N.D. Ill. 2003). Forward-looking statements include statements (1) "containing a projection of revenues" or other financial items; (2) "of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; (3) "of future economic performance"; or (4) "of the assumptions underlying or relating" to the aforementioned statements. 15 U.S.C. § 78u-5(i)(1)); *Friedman*, 295 F. Supp. 2d at 989.

The Sears Defendants identify numerous statements that they deem forward-looking, such as "earnings guidance and forecasts concerning the anticipated quality of Sears credit-card portfolio – the truth of which would only be discernable after they were made." (Sears Mem., at 16-17) (citing Cmplt. ¶ 87 ("we feel very comfortable with our portfolio going forward again"); ¶ 99 ("[i]n regard to 2002, our preliminary earnings guidance is that earnings per share on a comparable basis would grow 13 to 15% . . . This is conservative guidance which we believe is appropriate . . .); ¶ 100 ("[w]e continue to monitor the macro economic picture very closely. At this point we feel very comfortable that credit quality will remain in good shape throughout 2002"); ¶ 119 ("[a]s we go forward, [the quality of Sears' credit portfolio] might actually look a little bit more, not ultimately probably, but will look maybe a little bit more like the normal portfolio").) The Complaint, however, contains allegations that Sears officials knew the projections were false because they deliberately failed to disclose the deterioration of the credit portfolio or the unsound techniques that caused it. In making a forward-looking statement, a speaker must "speak the whole truth," *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995), and is liable if a statement contains an omission that makes the affirmative statement misleading or false. *See Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989).

The Sears Defendants nonetheless argue that the forward-looking statements were "consistently accompanied by meaningful cautionary language" to the effect that projections were subject to "changes in . . . delinquency and charge-off trends in the credit card receivables portfolio." (Sears Mem., at 17.) A warning that trends could change, however, is not the same as a warning that the current portfolio was experiencing rising delinquencies and charge-offs due to its high-risk customers. In addition, given the allegations that Sears and SRAC knowingly omitted material information, general disclaimers that SEC filings "contain[ed] forward-looking statements" that were "based on assumptions about the future" are not enough to save them from potential liability at this stage of the proceedings. Though the disclaimers did include some Sears-specific information, "[t]here is no reason to think – at least, no reason that a court can accept at the pleading stage, before plaintiffs have access to discovery – that the items mentioned in [Sears'] cautionary language were those thought at the time to be the (or any of the) 'important' sources of variance." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004). (*See* Form 8-K dated 10/24/01, Ex. E to Sears Mem., at 4.) Nor can the Sears Defendants avoid dismissal by arguing that their projections were "not only realistic; they actually came true." (Sears Reply, at 18.) "[I]t is inappropriate to entertain such an argument at the pleading stage." *Asher*, 377 F.3d at 735.

Even if the alleged misstatements are not forward-looking, the Sears Defendants argue, they nonetheless are not actionable because they were immaterial. To be material, a statement must "significantly alter the total mix of information available to the investor." *In re Old Banc One Shareholders*, No. 00 C 2100, 2004 WL 1144043, at *4 (N.D. Ill. Apr. 30, 2004). "[M]ere puffery and glowing representations of expected boom are not enough to state claims" under the SEA. *Tellabs*, 262 F. Supp. 2d at 951. As examples of such puffery, the Sears Defendants point to statements touting Sears' credit card segment as "a great business"; statements describing the "strong portfolio quality overall" and the "improving trends in the balance and revenue growth in our credit business"; and statements expressing that "[t]he credit team has really been executing . . .

superbly" and "we feel good about our credit quality." (Sears Mem., at 18) (citing Cmplt. ¶¶ 69, 86, 87, 95, 96, 101, 114, 115).)

The Sears Defendants claim that this case is like *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999), in which investors sued Advanta and several of its officers for failing to disclose aggressive techniques to attract new credit card customers despite knowledge of the risks involved, and simultaneously making false or misleading statements that portrayed Advanta in an unduly positive light. *Id.* at 528. Advanta represented, among other things, that its "credit quality continues to be among the best in the industry. Our emphasis on gold cards – and targeting of high quality customer prospects with great potential for profitability – sets us apart from other credit card issuers." *Id.* at 537. The plaintiffs alleged that while Advanta was issuing these positive portrayals, unbeknownst to investors, it was also relaxing its underwriting and monitoring procedures, changing its methodology for computing bankruptcy charge-offs, and repricing its "teaser rates" – special low rates offered to new customers – from 17% to 13 or 14%. *Id.* at 538. The court held that the positive statements were not material because there was no "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 538-39 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

In this case, Plaintiffs allege more than just positive statements without full disclosure of underlying facts. Plaintiffs charge Defendants with making affirmative misstatements regarding the quality of the Sears credit portfolio and the customers it was targeting. *Cf. Advanta*, 180 F.3d at 538 (alleging that superior credit risk customers were switching to other credit card companies, not that Advanta affirmatively targeted subprime customers). Materiality, moreover, presents a mixed question of law and fact and requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of these facts to him," determinations that are particularly appropriate for resolution by the trier of fact. *Kaufman*, 1999

WL 688780, at *8. At this stage of the proceedings, the court declines to conclude that all of the statements attributed to these Defendants are immaterial as a matter of law.

### e. Control Person Liability

To state a claim under § 20(a) of the Act, Plaintiffs must allege (1) a primary violation of § 10(b); (2) each defendant's control over the operations of Sears and/or SRAC; and (3) each defendant's power or ability to control the specific transaction or activity forming the basis of the primary violation. *Tellabs*, 303 F. Supp. 2d at 969; *Sears, Roebuck and Co.*, 291 F. Supp. 2d at 727. Section 20(a) does not require scienter or heightened pleading. *Sears, Roebuck and Co.*, 291 F. Supp. 2d at 727. Controlling person liability under § 15 of the Securities Act similarly requires a primary violation of § 11. *See Tabankin v. Kemper Short-Term Global Income Fund*, No. 93 C 5231, 1994 WL 30541, at *6 (N.D. Ill. Feb. 1, 1994) ("[w]ithout primary liability, there is no secondary liability"). The Sears Defendants claim that Plaintiffs' § 20(a) and § 15 claims must fail because they have not alleged primary violations under § 10(b) or § 11. Having rejected the latter arguments, the former fail as well.

### f. Summary

In sum, Plaintiffs have adequately stated § 10(b) and Rule 10b-5 claims against Sears, SRAC, Mr. Lacy, and Mr. Liska, but not Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, or Mr. Bergmann. Plaintiffs have also stated § 20(a) and § 15 claims against the individual Sears Defendants. The Sears Defendants' motion to dismiss is thus granted in part and denied in part.

### 2. Mr. Keleghan

Mr. Keleghan seeks dismissal of the claims against him for failure to allege that he made any false or misleading statements, or that he acted with fraudulent intent. He also claims that there is no basis for control person liability under § 20(a).

### a.    False and Misleading Statements

Plaintiffs allege that Mr. Keleghan made numerous false and misleading statements regarding the quality of Sears' credit portfolio and Sears' policy of targeting subprime customers. At an analysts meeting on October 24, 2001, Mr. Keleghan stated that Sears was targeting "the best credit risk customers and the customers with the most profit potential to drive sales in the store." According to Mr. Keleghan, Sears was "bringing much more of that upper class customer who is lower risk" and "continually improv[ing] the quality of the accounts that we've booked." Mr. Keleghan confirmed Mr. Liska's representation that "the delinquency rate of these customers is a very pristine group" and assured investors that Sears was monitoring the credit card portfolio on a daily basis to identify any problem accounts and manage outstanding credit risks. (Cmplt. ¶¶ 88-90.) In response to questions about subprime lender Providian, Mr. Keleghan stated that "[w]e don't target the subprime market, we avoid it and we try to target the middle market." (*Id.* ¶ 92.) Several months later on March 7, 2002, UBS Warburg issued a report indicating that based on a conversation with Mr. Keleghan, Sears' "management seems focused on employing a prudent and risk averse growth strategy." (*Id.* ¶ 103.) One week later, *American Banker* reported that "Mr. Keleghan brags that Sears' portfolio nearly equals the market leader MBNA in its charge-off rate."[22] (*Id.* ¶ 109.)

Mr. Keleghan denies that his statements about Sears' subprime lending activities were false or misleading, noting that he acknowledged in a July 25, 2002 article in *Bloomberg News* that "[s]ome accounts may migrate [to subprime customers] over time." (Keleghan Mem., at 4.)[23] The disclosure that Sears' credit card accounts may migrate towards subprime customers, however,

---

[22]     Plaintiffs also reference statements Mr. Keleghan made on July 25, 2002 regarding new FFIEC guidelines; they are not properly before the court, however, because Plaintiffs last purchased their stock on June 21, 2002.

[23]     The Memorandum of Law of Defendant Kevin Keleghan in Support of Motion to Dismiss is cited as "Keleghan Mem., at __."

is not the same as revealing that Sears deliberately targeted subprime customers as alleged in the Complaint. Indeed, during the same interview with *Bloomberg News*, Mr. Keleghan stated that "I don't suspect we'll come under the same scrutiny [as Capital One]. We don't do subprime lending at all in the MasterCard portfolio. All my growth is coming from prime and superprime." (Cmplt. ¶ 146.)

Mr. Keleghan insists that this statement was true – Sears did not target subprime lending in the MasterCard, as opposed to the Sears Card, portfolio. On a motion to dismiss, however, the court assumed that the facts alleged in the Complaint are true. *See Voelker v. Porsche Cars North America, Inc.*, 353 F.3d 516, 520 (7th Cir. 2003). In addition, given the allegations that Sears' total portfolio was heavily subprime, Plaintiffs have sufficiently alleged that the statement, when viewed together with other representations about how the company did not target subprime customers, is misleading. *See Tricontinental Indus.*, 215 F. Supp. 2d at 948 (quoting *HealthCare Compare*, 75 F.3d at 280) ("Rule 10b-5 prohibits more than statements that are facially false; it prohibits the 'omission of a material fact that would render [otherwise truthful] statements made misleading'"); *Lindelow v. Hill*, No. 00 C 3727, 2001 WL 830956, at *3 (N.D. Ill. July 20, 2001) ("[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers").

Mr. Keleghan also objects that Plaintiffs cannot attribute to him statements in the March 7, 2002 UBS Warburg article, because the article does not actually quote him and Plaintiffs do not allege that he "could have controlled the content" of the third-party statement. (Keleghan Mem., at 5) (quoting *Raab v. General Physics Corp.*, 4 F.3d 286, 288 (4th Cir. 1993).) Statements in an analyst report may be attributed to a company or a company official when the defendants "adopted the statements or were entangled with them." *In re Neopharm, Inc. Sec. Litig.*, No. 02 C 2976,

2003 WL 262369, at *12 (N.D. Ill. Feb. 7, 2003). The court in *Neopharm* found that statements in a UBS Warburg report could be attributed to the defendants because the report specifically mentioned discussions with senior management. *Id.* at *13 n.4. In this case, similarly, the March 7, 2002 UBS Warburg report specifically stated that "[w]e recently visited with Kevin Keleghan, President of Sears' Credit business, to gain a better understanding of the growth prospects of the business . . ." (Cmplt. ¶ 103.)

Mr. Keleghan urges that the *Neopharm* decision "cannot withstand scrutiny" because it cites two cases – *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369 (N.D. Cal. 1995), and *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922 (9th Cir. 1996) – that dismissed claims based on analyst reports. (Keleghan Reply, at 7.) Neither of those cases, however, involved statements based on an apparent interview with a company representative. *Compare Cypress Semiconductor*, 891 F. Supp. at 1376-77 (dismissing claims based on analyst reports that purported to quote company officials and indicated generally that information came from the company); *Syntex*, 95 F.3d at 934 (dismissing claims based on statements that were not attributed to any company official and that "were the culmination of a one-way flow of information, from Syntex representatives to analysts"). For purposes of a motion to dismiss, Plaintiffs have sufficiently attributed the statements in the report to Mr. Keleghan.

### b. Scienter

In support of his assertion that Plaintiffs have not alleged facts supporting a strong inference of scienter, Mr. Keleghan relies on several arguments set forth by the Sears Defendants. To the extent the court has already rejected those arguments, they do not provide a basis for dismissing Mr. Keleghan. Mr. Keleghan separately claims, however, that the allegations of fraudulent intent are based solely on his position as President of Sears Credit and an inference that he must have known that his statements were false. He also argues that general allegations that

57

he had access to non-public information cannot satisfy the pleading requirements of the PSLRA. (Keleghan Mem., at 6.)

Plaintiffs claim that they have alleged more than Mr. Keleghan's general access to non-public information; rather, they identify "a reporting system that communicated relevant information to the individual defendants." (Pl. Resp., at 43) (citing *Tricontinental Indus.*, 215 F. Supp. 2d at 950.) Specifically, Plaintiffs allege that Mr. Keleghan received monthly reports detailing delinquency and charge-off rates and customer credit scores, and led quarterly meetings "for all of the managers and directors responsible for collections around the country" at which the attendees discussed promotional policies, delinquency statistics, credit scores, and the effectiveness of collections operations. "[T]here would also be discussions of similar reports that were generated and available at headquarters, and in the field, detailing payment, delinquency, and charge-off data on a monthly basis." (Cmplt. ¶¶ 213, 214.) In addition, the Complaint alleges that as President of Sears Credit, Mr. Keleghan was responsible for implementing the company's risk management policies with respect to the credit portfolio. (*Id.* ¶ 224.)

This is a close case, but the court finds these allegations insufficient to allege scienter as to Mr. Keleghan. Plaintiffs have not identified any document or record that was authored or reviewed by Mr. Keleghan and that showed Sears deliberately sought out subprime customers. *Cf. Spiegel*, 2004 WL 1535844, at *4 (alleging that the defendants "dropped from their catalog and mailing lists many prospective customers within the "A" and "C" risk levels (the more credit-worthy customers)"). Plaintiffs have alleged that Mr. Keleghan routinely reviewed financial data indicating that the Sears Card and Sears MasterCard portfolios were separately declining throughout the Class Period, and that on March 14, 2002, he "brag[ged] that Sears' portfolio nearly equals the market leader MBNA in its charge-off rate." This one comment, however, is not enough to raise a strong inference that Mr. Keleghan acted with fraudulent intent. All of Mr. Keleghan's admissible statements regarding the quality of Sears' credit portfolio occurred on the first day of the Class

Period; the fact that the quality of the credit portfolio declined after that date does not demonstrate that Mr. Keleghan knew his statements on October 24, 2001 were false or misleading.

Plaintiffs note that Mr. Keleghan was "personally responsible for the implementation of Sears' risk management policies" and argue that "it defies credulity to suggest that Keleghan, head of Sears Credit, . . . didn't know such rudimentary facts as the extent to which the Company's outstanding loan balances were actually owed by subprime borrowers." (Pl. Resp., at 42-43; Cmplt. ¶ 224.) Maybe so, but Plaintiffs' only evidence of such knowledge is the March 7, 2002 UBS Warburg report indicating that Sears' "management *seems* focused on employing a prudent and risk averse growth strategy." (*Id.* ¶ 103) (emphasis added). This analyst's assessment does not establish a strong inference of scienter on the part of Mr. Keleghan. *Compare Tricontinental Indus.*, 215 F. Supp. 2d at 950 (single example of fraudulent billing, together with allegations that the individual defendants personally oversaw and directed the fraudulent billing scheme, had access to up-to-the-minute financial and transactional information, and announced substantial restatements that coincided with the duration of the alleged billing scheme, gave rise to a strong inference of scienter).

Nor can the court infer scienter from the fact that Mr. Keleghan was fired for failing to advise Sears' CEO of problems in the credit business. (Pl. Resp., at 41; Cmplt. ¶ 169.) As a preliminary matter, Mr. Lacy initially reported that Mr. Keleghan was fired because "I [Mr. Lacy] lost confidence in his personal credibility . . . His departure is not related to business performance and does not indicate a change in our credit strategy." (Cmplt. ¶ 162.) Significantly, W.R. Hambrecht commented on Mr. Lacy's claimed loss of confidence by stating that "[w]e don't know what that means." (*Id.* ¶ 165.) One week later, Mr. Lacy revised his position, stating that he felt Mr. Keleghan was "not being forthcoming about these issues that this business was facing . . . and had become a barrier to getting an objective situation assessment as to what was happening in our business." Given Mr. Lacy's own equivocation as to the reason for Mr. Keleghan's departure, the

court is unable to infer from his termination that Mr. Keleghan knowingly made fraudulent statements. *Compare In re Mercator Software, Inc. Sec. Litig.*, 161 F. Supp. 2d 143, 149-50 (D. Conn. 2001) (the plaintiffs adequately alleged scienter where, among other things, company executive was overheard on multiple occasions saying that "it doesn't look good"; there was a dramatic increase in the number of closed door meetings, often involving the executive; financial results were misstated by "nearly one hundred percent (100%) or more"; and the executive was fired on the same day that the company announced a restatement and revision of its financial statements).

### c.   Control Person Liability

Mr. Keleghan argues that Plaintiffs have failed to allege claims against him under § 20(a) of the SEA[24] because they have not alleged a primary violation under § 10(b). Having rejected the latter argument, the former fails as well. Mr. Keleghan nonetheless argues that Plaintiffs have failed to allege that he exercised any control over SRAC; he was President of Sears Credit and did not hold any position within SRAC. (Keleghan Mem., at 7.) Plaintiffs do not respond to this argument; "therefore, unless the court discerns that defendant['s] argument is obviously unfounded, it will not endeavor to make plaintiff[s'] argument for [them]." *In re Westell Technologies, Inc.*, No. 00 C 6735, 2001 WL 1313785, at *12 (N.D. Ill. Oct. 26, 2001).

Mr. Keleghan does not dispute that he can be a controlling person with respect to Sears, and Plaintiffs have alleged that there was a significant interrelation between Sears and SRAC. They also allege that Mr. Keleghan participated in and/or was aware of "both Sears' and SRAC's operations"; had "intimate knowledge of the statements filed by . . . Sears and/or SRAC with the SEC and disseminated to the investing public"; and "had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Sears and/or SRAC,

---

[24]    Plaintiffs concede that Mr. Keleghan is not liable as a controlling person under § 15 of the Securities Act because he is not alleged to have violated that Act. (Pl. Resp., at 62 n.53.)

including the content and dissemination of the SEC filings and other statements that Lead Plaintiffs contend are false and misleading." (Cmplt. ¶ 364.) "Determination of whether an individual defendant is a 'controlling person' under § 20(a) is a question of fact that cannot be determined at the pleading stage." *Sears, Roebuck and Co.*, 291 F. Supp. 2d at 727 (quoting *Lindelow*, 2001 WL 830956, at *9). Thus, Plaintiffs have sufficiently alleged control person liability against Mr. Keleghan, and his motion to dismiss this claim is denied. *Compare Starr v. !Hey, Inc.*, No. 01 C 6087, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003) (conclusory allegation that defendants had controlling authority based solely on their positions as shareholders, directors, and/or senior management were insufficient for purposes of § 20(a)).

### 3. Mr. Vishwanath

The Complaint does not allege that Mr. Vishwanath made any false or misleading statements during the Class Period; rather, Plaintiffs rely solely on the group pleading doctrine to establish his liability under § 10(b). The court has already rejected application of the group pleading doctrine to the individual Sears Defendants and finds it even less appropriate here. Nor can Plaintiffs establish that Mr. Vishwanath acted with fraudulent intent by virtue of his position as Vice President of Sears Credit or by reliance on the group pleading doctrine. *See Chu*, 100 F. Supp. 2d at 837 ("[t]o the extent the plaintiffs plead scienter based exclusively on an individual defendant's position in Sabratek's hierarchy, their claims must be dismissed") *Tellabs*, 262 F. Supp. 2d at 946 n.7 ("[i]t is entirely clear . . . that the PSLRA abolishes the use of the group pleading doctrine to allege defendant's scienter"). Accordingly, the § 10(b) allegations against Mr. Vishwanath must be dismissed.

For the reasons stated in discussing Mr. Keleghan's liability under § 20(a), however, Mr. Vishwanath's motion to dismiss Count Nine of the Complaint is denied.[25] The court recognizes that

---

[25] As with Mr. Keleghan, Plaintiffs concede that Mr. Vishwanath is not liable as a
(continued...)

the position of Vice President varies widely in the amount of control and responsibility conferred. *See, e.g., In re System Software Assocs., Inc.*, No. 97 C 177, 2000 WL 283099, at *16 (N.D. Ill. Mar. 8, 2000). For purposes of a motion to dismiss, however, Plaintiffs have adequately alleged that Mr. Vishwanath had the ability to control the content and dissemination of false or misleading statements. *See Sears, Roebuck and Co.*, 291 F. Supp. 2d at 727 (whether a defendant is a "controlling person" is a question of fact).

## C.    Collateral Estoppel

Plaintiffs argue that Sears, Mr. Lacy, Mr. Liska, Mr. Bergmann, Mr. Keleghan, and Mr. Vishwanath (the "Common Stock Defendants") should all be collaterally estopped from seeking dismissal in this case because Judge Bucklo already considered and rejected similar arguments in the related lawsuit (the "Common Stock Action"). *See Sears, Roebuck and Co.*, 291 F. Supp. 2d 722. Collateral estoppel applies if (1) the issue precluded was the same as the one decided in the earlier litigation; (2) the issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was fully represented in the prior action. *Meyer v. Rigdon*, 36 F.3d 1375, 1379 (7th Cir. 1994). Plaintiffs claim that a majority of the issues raised by the Common Stock Defendants are the same as those raised in the Common Stock Action, noting that the Defendants make similar arguments for dismissal in both cases. (Pl. Resp., at 47-48.)

The fact that defendants seek dismissal on similar grounds in two related cases does not establish that the issues raised are identical. As the Common Stock Defendants note, the two cases involved different complaints; different securities issued by different companies (this case involves SRAC notes whereas the Common Stock Action involves Sears common stock); and

---

[25](...continued)
controlling person under § 15 of the Securities Act because he is not alleged to have violated that Act. (Pl. Resp., at 62 n.53.)

different causes of action (the Common Stock Action does not raise any claims under the Securities Act). Rule 9(b) and the PSLRA require that a complaint state with particularity the circumstances constituting fraud and the facts giving rise to a strong inference of scienter. These requirements would arguably be undermined if Plaintiffs could simply rely on allegations in a previous complaint.

Nor have Plaintiffs demonstrated that the issues in the Common Stock Action were essential to the final judgment. Indeed, Plaintiffs concede that Judge Bucklo did not expressly discuss certain arguments, but they ask the court to infer that she "implicitly rejected" them in denying the motions to dismiss. (*Id.* at 49.) Plaintiffs insist that such an inference is proper in applying collateral estoppel, citing *Gilldorn Savings Ass'n v. Commerce Savings Ass'n*, 804 F.2d 390 (7th Cir. 1986). In *Gilldorn Savings Ass'n*, Gilldorn sued Commerce Savings Association in federal court in Illinois while Commerce simultaneously sued Gilldorn in Texas state court, to redress certain breaches arising from Gilldorn's purchase of a mortgage and finance company from Commerce. 804 F.2d at 391-92. Gilldorn moved to dismiss the Texas lawsuit on the grounds that it raised claims that constituted compulsory counterclaims in the federal action and, thus, had to be pursued in federal court. *Id.* at 392. The Texas court denied the motion and Gilldorn asked the federal court to enjoin the Texas action based on the same argument. *Id.* The federal court granted the injunction but the Seventh Circuit reversed on appeal, holding that the district court should have granted preclusive effect to the Texas court's decision. In reaching this conclusion, the court noted that "[a]lthough the Texas court did not make findings of fact in support of its decision nor explicitly consider each of the bases for the motion, the court implicitly rejected all four grounds in denying the motion." *Id.* at 394.

Unlike *Gilldorn Savings Ass'n*, which involved an identical issue between the same parties suing each other in separate courts, this case involves different securities issued by different companies. Significantly, the *Gilldorn* court found that its decision was buttressed by the fact that

63

"Gilldorn decided to pursue the compulsory counterclaim issue in the Texas district court instead of immediately requesting an injunction in the Illinois action. Having made that decision, Gilldorn must now abide by the Texas court's ruling." *Id.* at 395-96. In addition, the court found that the Texas action was not in fact a compulsory counterclaim under FED. R. CIV. P. 13(a). *Id.* at 396. Here, the court has determined that certain of Plaintiffs' allegations have not been properly pleaded and must be dismissed, regardless of whether the prior complaint was sufficient to withstand dismissal. In addition, Judge Bucklo's ruling on a motion to dismiss is not a "final judgment." Thus, Plaintiffs have not established grounds for applying collateral estoppel in this case.

## CONCLUSION

For the reasons stated above, the motions to dismiss filed by the Underwriter Defendants (Docket No. 29-1), the Sears Defendants (Docket No. 33-1), Mr. Keleghan (Docket No. 32-1) and Mr. Vishwanath (Docket No. 31-1) are all granted in part and denied in part as set forth in this opinion. Defendants Credit Suisse First Boston Corporation, Goldman, Sachs & Co., Morgan Stanley & Co., Bear, Stearns & Co., Inc. and Lehman Brothers, Inc. are all dismissed without prejudice. Plaintiffs' § 10(b) claim against Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, Mr. Bergmann, Mr. Keleghan, and Mr. Vishwanath are also dismissed without prejudice. Plaintiffs have until October 15, 2004 to file an amended complaint consistent with this opinion, and Defendants have until November 5, 2004 to answer or otherwise plead. Rule 16 conference is set for November 19, 2004, at 9:30 a.m.

ENTER:

Dated: September 24, 2004

REBECCA R. PALLMEYER
United States District Judge

64