AC

| | | |
|---|---|---|
| **THOMAS G. ONG for THOMAS G. ONG IRA and THOMAS G. ONG, individually and on behalf of all others similarly situated,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | **No. 03 C 4142** |
| **SEARS, ROEBUCK & CO., SEARS, ROEBUCK ACCEPTANCE CORP., ALAN LACY, PAUL J. LISKA, GLENN R. RICHTER, KEVIN T. KELEGHAN, K.R. VISHWANATH, KEITH E. TROST, GEORGE F. SLOOK, LARRY R. RAYMOND, THOMAS E. BERGMANN, CREDIT SUISSE FIRST BOSTON, GOLDMAN, SACHS & CO., MORGAN STANLEY, BEAR, STEARNS & CO., INC., LEHMAN BROTHERS and MERRILL LYNCH & CO., INC.,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Judge Rebecca R. Pallmeyer** |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Thomas G. Ong, Thomas G. Ong IRA, and State Universities Retirement System of Illinois ("State Universities") bring this federal securities class action lawsuit on behalf of (1) all those who purchased, pursuant to a prospectus, securities issued by defendant Sears, Roebuck Acceptance Corp. ("SRAC"), a wholly-owned subsidiary of Defendant Sears, Roebuck & Co. ("Sears"), between October 24, 2001 and October 17, 2002 (the "Class Period"), in any of three debt securities offerings dated March 18, May 21, and June 21, 2002, and (2) all those who, during the Class Period, purchased publicly traded securities issued by SRAC before the Class Period and actively traded them through the public markets and over national securities exchanges.

Sears is one of North America's largest general retailers. In addition to its retail division, Sears provides financing to its customers through private label credit cards and installment plans.

SRAC's principal business is purchasing Sears' short-term notes and account receivable balances, which it finances through public sales of SRAC Notes. Defendants Alan Lacy, Glenn R. Richter, Paul J. Liska, Keith E. Trost, George F. Slook, Larry R. Raymond, Thomas E. Bergmann, Kevin T. Keleghan, and K.R. Vishwanath were all officers or directors of Sears, SRAC, or both. Defendants Credit Suisse First Boston Corporation ("CSFB"), Goldman, Sachs & Co. ("Goldman Sachs"), Morgan Stanley & Co., Inc. ("Morgan Stanley"), Bear, Stearns & Co., Inc. ("Bear Stearns"), Lehman Brothers Inc. ("Lehman Brothers"), and Merrill Lynch & Co., Inc. ("Merrill Lynch") were all underwriters of the three SRAC debt securities offerings at issue in this case.

Plaintiffs allege that Sears manipulated information regarding its credit card operations to make those operations appear "more stable and profitable than they actually were," which artificially inflated the market value of SRAC debt securities. Specifically, Sears misrepresented its reliance on subprime creditors; selectively reported delinquency and charge-off rates; and disguised portfolio losses in order to generate high levels of reported receivables that Sears knew would prove uncollectible. Plaintiffs claim that Defendants all made materially false and misleading statements or omissions in connection with Sears' credit card operations in violation of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o; and §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

On September 27, 2004, this court granted in part and denied in part Defendants' four separate motions to dismiss Plaintiffs' October 16, 2003 Amended Class Action Complaint. *Ong ex rel. Ong IRA*, __ F. Supp. 2d __, 2004 WL 2534615 (N.D. Ill. Sept. 27, 2004). In response,

Plaintiffs filed a Second Amended Class Action Complaint ("SAC"), adding a variety of new allegations and a new plaintiff, State Universities. Defendants, with the exception of Merrill Lynch,[1] insist that the changes to the SAC are not sufficient to remedy the flaws identified by the court, and seek dismissal of Counts Two, Four, Five, Seven, Eight, and Nine. For the reasons stated here, the motions are granted in part and denied in part.

## BACKGROUND

The extensive procedural and factual background of this case is set forth in this court's September 27, 2004 Memorandum Opinion and Order. *See Ong*, 2004 WL 2534615, at *2-15. The SAC largely repeats the allegations from the prior Complaint, as reflected below. This opinion assumes the reader's familiarity with the earlier decision and attempts to recite relevant facts only as necessary to resolve Defendants' current motions to dismiss.

Sears is one of the largest general retailers in North America. As part of its operations, Sears provides financing to customers through private label credit cards and installment plans. SRAC, Sears' wholly-owned subsidiary, is primarily in the business of purchasing short-term notes or receivable balances from Sears. SRAC funds these purchases by issuing debt securities such as commercial paper, medium term notes, and "other borrowings" (collectively, "SRAC Debt Securities") to the public. (SAC ¶¶ 12, 13, 46, 47.)[2] Three SRAC Debt Securities offerings are at issue in this case: (1) $600 million of 6.70% notes due April 15, 2012, offered pursuant to an Indenture dated May 15, 1995 (the "Indenture"), a Registration Statement and accompanying Prospectus dated September 3, 1998 (the "Registration Statement"), and a Prospectus and Prospectus Supplement dated March 18, 2002 (the "3/18/02 Offering"); (2) $1 billion of 7.0% notes

---

[1]     Merrill Lynch filed its answer and affirmative defenses to the SAC on January 28, 2005.

[2]     Plaintiffs' Second Amended Class Action Complaint for Violations of Federal Securities Laws is cited as "SAC ¶ ___."

due June 1, 2032, offered pursuant to the Indenture, the Registration Statement, and a Prospectus and Prospectus Supplement dated May 21, 2002 (the "5/21/02 Offering"); and (3) $250 million of 7.0% notes due July 15, 2042, offered pursuant to the Indenture, the Registration Statement, and a Prospectus and Prospectus Supplement dated June 21, 2002 (the "6/21/02 Offering"). (*Id.* ¶ 2.) Plaintiffs all allegedly purchased SRAC Debt Securities during the Class Period. (*Id.* ¶¶ 9-11.)

Mr. Lacy was Sears' Chief Executive Officer, President, and Chairman of the Board throughout the Class Period. Mr. Richter has been Sears' Chief Financial Officer since October 4, 2002 and also served as Sears' Senior Vice President, Finance prior to that date. Mr. Liska was Sears' Chief Financial Officer until Mr. Richter took over in October 2002. He also served as a director of SRAC. Mr. Trost was the President of SRAC as well as a director of the company. Mr. Slook, also a director of SRAC, was SRAC's Vice President of Finance. Mr. Raymond served as a director of SRAC, as did Mr. Bergmann, who was also Chief Accounting Officer and Controller of Sears. Mr. Keleghan was President of Sears' Credit and Financial Products segment and "an Executive Vice President from the start of the Class Period until October 4, 2002, when he was forced to resign." Mr. Vishwanath was Sears' Vice President of Risk Management until the company terminated his employment on October 16, 2002. (*Id.* ¶¶ 14-22.)

CSFB, Goldman Sachs, Morgan Stanley, Bear Stearns, Lehman Brothers, and Merrill Lynch are all integrated financial services institutions that provide securities, investment management, and credit services to corporations, governments, financial institutions, and individuals. CSFB and Goldman Sachs were joint "book runners" – i.e., managing underwriters – for the 3/18/02 Offering of SRAC Debt Securities. Morgan Stanley, Bear Stearns, and Lehman Brothers were all joint lead managers for the 5/21/02 Offering. Morgan Stanley was also the book runner for that offering. Merrill Lynch was the book runner for the 6/21/02 Offering. (*Id.* ¶¶ 33-38.)

4

## A.    The Relationship Between Sears and SRAC

SRAC's operating income is generated primarily from the earnings on its investments in Sears' short-term notes and account receivables.  In addition, Sears determined the amount of SRAC's earnings by requiring SRAC to maintain a set ratio of earnings to fixed expenses.  Plaintiffs allege that, "[a]s a result, the yield on SRAC's investment in Sears notes is directly related to SRAC's borrowing costs, i.e., the yield under which SRAC can issue and sell its Debt Securities." It is in Sears' financial interest to keep SRAC's borrowing costs as low as possible because the less SRAC pays purchasers of its Debt Securities, the less Sears must pay to borrow from SRAC.  (*Id.* ¶ 48.)

Given the inter-relationship between Sears and SRAC, "industry analysts and the rest of the market looked to the finances, financial condition and present and future operations of Sears when assessing the investment prospects for SRAC Debt Securities." (*Id.* ¶ 49.)  When industry analysts viewed Sears favorably, SRAC was viewed favorably as well; when Sears experienced a downward change in its financial condition, SRAC's financial condition suffered as well. (*Id.* ¶¶ 49-54.)  According to Plaintiffs, "the intertwining of the finances and operations of SRAC and Sears cause the SRAC Debt Securities to take on the status of a direct investment with Sears itself."  (*Id.* ¶ 56.)

## B.    Sears' Credit Problems

For many years, Sears was one of the largest credit card issuers in the country. (*Id.* ¶ 62.) Prior to 1993, Sears stores accepted only Sears' own proprietary credit cards ("Sears Cards") and those cards could only be used to make purchases at Sears. (*Id.* ¶ 63.)  When Sears began accepting general credit cards in 1993, the company saw a drastic decrease in the use of its Sears Cards; by mid-2000, 24 million of the 60 million Sears Cards were either inactive or carried a zero

5

balance. (Id.) At the same time, Sears' retail sales were also in decline due to increased competition from discount retailers like Wal-Mart and Kohl's. (Id. ¶ 64.)

In late 2000, Sears began to issue a Sears MasterCard, a general purpose credit card that could be used wherever MasterCard was accepted. The cards carried higher lines of credit and generated fee income for Sears when used at non-Sears locations. Sears hoped that the Sears MasterCard would "stimulate sales and help regain income Sears had lost in recent years due to the decline of its proprietary cards." (Id. ¶ 66.) In November 2000, Mr. Lacy, who had been named President and CEO of Sears just a month earlier, identified the Sears MasterCard as a top area for growth within the company. (Id. ¶¶ 65, 67.)

By February 2001, the Sears MasterCard carried $1.4 billion in receivables and Sears, through its subsidiary Sears National Bank, had become one of the top 25 bank card issuers. A February 15, 2001 article in American Banker reported that Mr. Keleghan, President of Sears Credit, had described Sears MasterCard users as "a very pristine group, almost too pristine . . . . We don't expect significant delinquencies since we're starting out with a low-risk group." (Id. ¶ 69.) Sears' retail segment continued to decline over the next several months, but Mr. Lacy asserted at an April 19, 2001 analysts presentation that Sears' credit segment had "a strong portfolio quality overall" and was "a great business" and "strategically very important" to Sears. (Id. ¶¶ 70, 71.)

Despite these representations, Sears credit operations actually suffered from several weaknesses and problems which were hidden from the market. Those weaknesses, described below, ultimately led to an announcement that Sears planned to sell the credit business. (Id. ¶ 73.)

### 1.    Reliance on Subprime Creditors

During the Class Period, Sears aggressively marketed its credit cards, particularly the Sears MasterCard, to "create the appearance of a growing, profitable loan portfolio." (Id. ¶ 74.) To that end, Sears intentionally lowered its acceptable credit profile so that more consumers would qualify

6

for credit cards, and adopted aggressive marketing strategies designed to appeal to low-income or unstable borrowers. Sears also offered multiple credit cards and increased credit limits to customers who did not qualify for such benefits. (*Id.*) At the beginning of the Class Period, approximately 54% of Sears' credit portfolio consisted of subprime borrowers, compared with a United States industry average of 36.6%. By the end of the Class Period, the portfolio was still nearly half subprime. (*Id.* ¶¶ 75, 76.)

## 2. Selective Reporting Techniques

In addition to targeting subprime creditors, Sears misleadingly reported the charge-off and delinquency rates[3] of its credit cards on a portfolio-wide basis rather than separating out the performances of the Sears Card and the Sears MasterCard. The Sears MasterCard had higher credit limits than those traditionally offered under the Sears Card, as well as lower delinquency and charge-off rates. According to the Plaintiffs, "[t]hese factors, when combined with the dramatic increases in MasterCard receivables, declining Sears proprietary card receivables, [and] the fact that the Sears proprietary card portfolio was much larger than the new MasterCard portfolio, created an interesting phenomenon during the Class Period." Specifically, though both portfolios were separately experiencing a "striking rise in delinquencies and charge-offs every quarter," the combined portfolios reflected delinquencies and charge-offs that were relatively stable "because the Sears Card receivables overweighted the average of the two groups." (*Id.* ¶¶ 78-80.)

## 3. Disguised Losses

Plaintiffs allege that Sears also engaged in practices designed to disguise losses to its credit portfolio. Sears National Bank, which Sears created in 1995, is not subject to the same rules

---

[3]       Charge-offs are write-offs taken on uncollectible credit card receivables. *See In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 724 n.2 (N.D. Ill. 2003). Delinquency rates describe the number of credit card receivables that are past due relative to all outstanding loans.

and regulatory oversight as ordinary bank card issuers.[4]  Thus, Sears was able to adopt more lenient credit policies than its competitors.  (Id. ¶ 82.)  For example, Sears charged-off delinquent credit card loans after 240 days compared with 180 days by competitors.  (Id. ¶ 82(a).)  Sears also deferred charge-offs by relying on generous "renewal" policies, such as offering to make a delinquent account "current" if a customer made a single, minimum payment, and then closing the account and implementing an installment plan to collect the balance due.  In addition, Sears "cured" or "re-aged" delinquent accounts (i.e., converted them to current status) after receiving only two consecutive minimum payments; federal regulations require three consecutive minimum payments prior to re-aging.  (Id. ¶ 82(b) - (c).)

Sears also adopted promotional programs, such as zero percent financing, that allowed cardholders to minimize or avoid payments for periods of up to a year.  This made it "difficult, or even impossible, for cardholders to fall behind in their payments and allowed Sears to delay reporting such accounts as delinquent."  (Id. ¶ 82(d).)  In addition, Sears repeatedly lowered the required minimum monthly payments, which allowed individuals with poor credit histories to purchase higher priced items on more extended payment schedules.  This practice increased Sears' income from finance charges but also increased its exposure to bad debt.  (Id. ¶ 82(e).)  Finally, though it is industry practice to report delinquencies after 30 days, Sears did not report them until after 60 days.  (Id. ¶ 82(f).)  According to Plaintiffs, these policies misled investors as to the true quality of Sears' credit portfolio.  (Id. ¶ 83.)

### 4.    Fraudulent Billings

A final practice that served to weaken Sears' credit portfolio was fraudulent billings on customer accounts.  Sears strongly encouraged its employees to induce customers to purchase

---

[4]      The Complaint does not explain why Sears National Bank is not subject to federal regulation and oversight.  Nor does it describe the Bank's specific role with respect to Sears, though presumably it was the institution that issued the Sears credit cards.

additional services, including life insurance, credit protection, and extended warranties, whenever they bought a Sears product. "The incentives to make such sales were so strong that it became a regular practice for salespersons to put such items on customers' accounts without their knowledge or consent." (Id. ¶ 84.) This, in turn, "helped drive up the high levels of reported receivables that Sears knew to be uncollectible." (Id.)

## C.    False and Misleading Statements

Plaintiffs allege that Defendants issued numerous false and misleading statements to deceive the investing public into believing that Sears' credit operations were "far better, more successful and profitable, than was actually the case." (Id. ¶ 85.) See Ong, 2004 WL 2534615, at *5-12. For purposes of the pending motions to dismiss, there is no dispute that Plaintiffs have sufficiently alleged that the relevant Defendants made false and misleading statements and, thus, the court will not repeat them here.

The court notes generally, however, Plaintiffs' allegations that between the third quarter of 2001 and the second quarter of 2002, Defendants issued SEC Form 8-Ks and Form 10-Qs reflecting "strong" and "stable" credit portfolio quality. (Id. ¶¶ 72, 104.) In truth, the Sears Card and Sears MasterCard portfolios were excessively weighted towards the subprime market and, when viewed separately, each reflected rising delinquency and charge-off rates. (Id. ¶¶ 77, 80, 104, 110, 145, 174-75.) Nevertheless, Defendants made statements at analysts meetings, in press releases, and during investor conference calls confirming the stable and pristine quality of the portfolios and projecting significant increases in earnings each year. Indeed, by July 18, 2002, a Sears press release quoted Mr. Lacy as saying that Sears expected a 22% increase in full year comparable earnings. (See generally id. ¶¶ 86-158); Ong, 2004 WL 2534615, at *5-12.

9

D. **Sears Reveals Its Credit Problems**

Plaintiffs allege that the true state of Sears' credit portfolios finally began to emerge in October 2002. On October 4, 2002, Sears issued a press release abruptly announcing that Mr. Liska had replaced Mr. Keleghan as Sears' Executive Vice President and President of Credit and Financial Products. On October 7, 2002, Sears issued a press release reaffirming its July 18, 2002 projection of a 22% increase in comparable earnings per share, but stating that: "The company now expects comparable earnings increases . . . in the mid-single digit percent range in its credit and financial products segment." (*Id.* ¶¶ 159-62.) This represented a significant decrease from earlier projections; as of July 18, 2002, Sears had projected credit segment growth "in the low double digits." Sears' stock started to trade down in response to the revised projections. (*Id.* ¶ 162.)

Later that day, Mr. Lacy spoke to investors during a conference call and "reaffirm[ed]" Sears' projection of a 22% increase in earnings per share. With respect to Mr. Keleghan, Mr. Lacy explained that "Kevin left the company at my request, because I lost confidence in his personal credibility. . . . His departure is not related to business performance and does not indicate a change in our credit strategy." (*Id.* ¶¶ 163-65.) Financial services firm W.R. Hambrecht issued a report commenting on Mr. Keleghan's departure as follows: "[W]e got incrementally bad news . . . . CEO Lacy stated that he asked Keleghan to leave because he had lost confidence in Keleghan's personal credibility. We don't know what that means, exactly, but we believe it bodes poorly for Sears Credit operations which represent approximately 65% of operating profit and creates even greater uncertainty about the quality of earnings at the credit division." (*Id.* ¶ 168.) By the close of business on October 7, 2002, the price of Sears stock had fallen from $37.64 to $32.25. (*Id.* ¶ 166.) The price of SRAC Debt Securities issued pursuant to the 6/21/02 Offering also fell from $24.81 per share on October 8, 2002 to $21.91 per share on October 10, 2002. (*Id.* ¶ 167.)

On October 17, 2002, Sears issued a press release announcing that it would be increasing its allowance for bad debt by $222 million. The charge against earnings required to cover this increase reduced Sears' earnings for the quarter by 26% as compared to the prior year. Despite having ten days earlier projected a 22% increase in earnings per share that year, Sears now estimated earnings per share would increase only 15%. (*Id.* ¶ 171.) In an analysts meeting conducted by conference call that day, Mr. Lacy attributed Sears' problems in its credit business to the duplicity of Mr. Keleghan and Mr. Vishwanath:

> [I]t became clear to me that Kevin [Keleghan] was not being forthcoming about these issues that this business was facing . . . and had become a barrier to getting an objective situation assessment as to what was happening in our business and I terminated him for basically my personal loss of confidence in him relative to his personal credibility . . . You should also know that during the course of our analysis we determined that the VP of Risk Management and Credit [Mr. Vishwanath] had also withheld information and had led us to terminate his employment effective yesterday.

(*Id.* ¶ 172.)

When Mr. Liska took over the conference call, he admitted that "[o]ne of the disclosures that [we] make today centers around a portion of our portfolio that is Middle American. A large portion of the proprietary card, our proprietary card portfolio is Middle America." (*Id.* ¶ 173.) In an analysts meeting a year earlier, Mr. Keleghan had explained, "we try to target the middle market," distinguishing that group from the "subprime" market; in this October 2002 meeting, in contrast, Mr. Liska refers to "Middle America" as another way of saying "subprime": "It is generally recognized that [M]iddle America accounts deteriorate more quickly in a tough economy than prime accounts do." Though he suggested that the proportion of Sears borrowers that were subprime was declining, Mr. Liska acknowledged that Sears' credit portfolio had been heavily subprime for years: "In 1998 Middle America balances represent[ed] 60% of our portfolio. They represent 48% today. Last year the segment represented 54% of our portfolio." (*Id.* ¶ 174.)

11

In response to Sears' disclosures, W.R. Hambrecht reported that Sears' "shocking 26% decrease in earnings . . . stunned the Street and all in attendance" at the analysts meeting. "Frankly, it was the realization of our worst-case scenario regarding the state of the company's credit operations, which represent more than 60% of Sears' operating profit." (Id. ¶ 176.) Indeed, the price of Sears stock fell $10.80 per share (approximately 32%) to close at $23.15 on October 17, 2002, and there was "extraordinary trading volume" that day of 36 million shares, 12 times greater than Sears' daily trading average of 2.9 million shares during the Class Period. SRAC Debt Securities also fell 8.6% from $24.05 per share on October 16, 2002 to $21.99 per share on October 17, 2002, "on trading of 153,600 Notes, six times the daily trading average of 25,000 shares." (Id. ¶¶ 177, 178.) Shortly before the end of the Class Period, SRAC had announced its intention to offer approximately $800 million of three-year SRAC Debt Securities at an interest rate of 13 to 14 basis points above the one-month London Interbank Offered Rate ("Libor").[5] (Id. ¶¶ 53, 179.) After the October 2002 announcements, however, the debt securities were priced at 38 points above Libor. (Id. ¶ 180.)

On November 12, 2002, Sears filed its Form 10-Q for the third quarter of 2002. In that report, Sears for the first time revealed to investors how the Sears MasterCard and Sears Card portfolios had both been deteriorating during the Class Period. Sears explained that "[b]ecause the MasterCard portfolio has a lower delinquency rate than the Sears Card, the growth in the MasterCard portfolio coupled with the decline in the Sears Card portfolio led to an improvement in the total portfolio delinquency rate as compared to the third quarter of 2001." Sears also stated that it "charges off accounts at 240 days where[as] most bankcard issuers charge off at 180 days.

---

[5]     Libor represents the rate banks charge each other for short-term Eurodollar loans. Libor is "frequently used as the base for resetting rates on floating-rate securities." http://www.pncadvisors.com/investments/view/1,1419,Glossary,00.html.

Therefore Sears' delinquency rate is not directly comparable to participants of the bankcard industry." (*Id.* ¶¶ 182, 183.) With respect to its re-aging policies, Sears disclosed that

[t]he Company's current credit processing system charges off an account automatically when a customer's number of missed monthly payments reaches eight, except that accounts can be re-aged once per year when a customer makes two consecutive monthly payments. Also, accounts may be charged off sooner in the event of customer bankruptcy. Finance charge and credit card fee revenue is recorded until an account is charged off at which point the charged off balances are presented as a reduction of revenue.

(*Id.* ¶ 184.)

An article on *The Street.com* reported that this new data "shows deep deterioration in the MasterCard portfolio. A back-of-the-envelope calculation suggests that, if this rot continues, the company may have to make loan provisions in 2003 that could wipe out a large part of the earnings analysts currently forecast." (*Id.* ¶ 186.) On November 20, 2002, Bear Stearns described Sears' "aggressive write-off policy" as a "key concern," and expressed "uneas[e]" as to whether Sears had "adequately accounted for the potential level of charge-offs."[6] (*Id.* ¶ 187.)

On January 16, 2003, Sears issued a press release announcing that it was adding another $150 million to its reserves for uncollectible accounts, in part due to "increases in the net charge-off rate and delinquencies." (*Id.* ¶ 188.) On February 28, 2003, S&P downgraded its rating on Sears, no longer deeming the company to be A-list. On March 12, 2003, Sears filed its 2002 Form 10-K repeating the delinquency and charge-off information contained in the third quarter 2002 SEC filings. (*Id.* ¶¶ 189, 190.) For the first time in a Form 10-K, Sears acknowledged, as it had in the Form 10-Q for the third quarter of 2002, that "the Company contractually charges off accounts at 240 days, whereas most bank card issuers charge off at 180 days. As a result, Sears' delinquency rates are not directly comparable to participants in the bank card industry." (*Id.* ¶ 191.)

---

[6]     The Complaint does not identify the format of this report.

13

At its height, Sears' credit represented almost 70% of Sears' earnings and by 2003, Sears had become the third largest issuer of MasterCard. On March 26, 2003, however, Sears announced that it would be selling all of its credit operations "in an attempt to create value for all investors and focus on its profitable core retail and related services business." (Id. ¶ 192.) A number of lawsuits followed. See, e.g., In re Sears, Roebuck & Co. Sec. Litig., 291 F. Supp. 2d 722 (N.D. III. 2003) (securities action filed on behalf of all persons "who purchased securities of defendant Sears, Roebuck & Co. ('Sears') between October 24, 2001 and October 17, 2002 ('class period')."); In re Sears, Roebuck & Co. ERISA Litig., No. 02 C 8324, 2004 WL 407007 (N.D. III. Mar. 3, 2004) (ERISA action filed on behalf of participants in a Sears 401(k) Savings Plan).

## E. This Lawsuit

On June 17, 2003, Plaintiffs Thomas G. Ong and Thomas G. Ong IRA filed suit against Sears, SRAC, Mr. Lacy, Mr. Liska, Mr. Richter, and Mr. Bergmann, alleging violations of federal securities laws in connection with the 6/21/02 Offering of SRAC's Debt Securities. Shortly thereafter on August 27, 2003, the court appointed Plaintiffs Lead Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 780-4, et seq. Plaintiffs amended the Complaint on October 16, 2003, adding Mr. Keleghan, Mr. Vishwanath, Mr. Trost, Mr. Slook, Mr. Raymond, and all the underwriter Defendants as Defendants.

### 1. The September 27, 2004 Opinion

In January 2004, Defendants filed four separate motions to dismiss the amended Complaint, variously arguing that Plaintiffs lacked standing to pursue claims relating to the 3/18/02 and 5/21/02 Offerings; the Complaint failed to identify any false and misleading statements attributable to them; Plaintiffs failed to allege scienter; and there was no basis for control person liability under § 15 of the Securities Act or § 20(a) of the SEA.

14

The court first held that Plaintiffs did not have standing to pursue their §§ 11 and 12(a)(2) Securities Act claims against the underwriter Defendants involved in the 3/18/02 and 5/21/02 SRAC Debt Securities Offerings because Plaintiffs Ong and the Ong IRA purchased securities only in the 6/21/02 Offering. *Ong*, 2004 WL 2534615, at *18. The court declined, however, to dismiss Merrill Lynch, the sole underwriter Defendant involved in the 6/21/02 Offering, finding sufficient allegations that the company had made false and misleading statements in the Registration Statement and Prospectuses. *Id.* at *18-21.

The court next addressed Plaintiffs' claim that Sears, SRAC, and all of the individual Defendants had violated § 10(b) of the Securities Exchange Act and SEC Rule 10b-5 by misrepresenting the financial performance of Sears' credit operations. With respect to the "Sears Defendants" (including Sears, SRAC, Mr. Lacy, Mr. Liska, Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, and Mr. Bergman), the court agreed that Plaintiffs did not have standing to redress allegedly misleading statements made after Plaintiffs purchased their securities on June 21, 2002. *Id.* at *22-23. Plaintiffs adequately alleged that the Sears Defendants made false and misleading statements prior to that date relating to loan loss reserves, subprime lending, underwriting standards, and delinquencies and charge-offs. *Id.* at *23-25. Plaintiffs did not, however, allege false statements based on comparisons to other subprime lenders, such as Capital One and Discover. *Id.* at *26-27.

Nor did Plaintiffs allege facts giving rise to a strong inference that all of the Sears Defendants acted with fraudulent intent. Defendants did not dispute that Mr. Lacy or Mr. Liska had knowledge of the false and misleading statements alleged in the Complaint, which was sufficient to uphold their § 20(a) control person liability claim. *Id.* at *29, 33 (citing *Johnson v. Tellabs, Inc.*, 303 F. Supp. 2d 941, 969 (N.D. Ill. 2004) (a § 20(a) claim requires, in part, a primary violation of § 10(b).) As for Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, and Mr. Bergmann, however, the court found "no allegations . . . regarding any specific meetings that [they] attended, or the

information they received at those meetings that would have put them on notice that Sears was making material misstatements." *Id.* at *29. The mere fact that Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, and Mr. Bergmann were all corporate officers was insufficient to suggest that they were aware that Sears' SEC filings and other statements were false. *Id.* at *30. In addition, Plaintiffs did not allege any facts indicating that the men acted to achieve some concrete personal gain. *Id.* at *31.

The court found similar deficiencies in the § 10(b) allegations relating to Mr. Keleghan and Mr. Vishwanath. Plaintiffs sufficiently alleged false and misleading statements attributable to Mr. Keleghan, but they did not offer facts supporting a strong inference of *scienter*. Plaintiffs did not identify any document or record that was authored or reviewed by Mr. Keleghan and that showed Sears deliberately sought out subprime customers. *Id.* at *35. Mr. Keleghan allegedly "routinely reviewed financial data indicating that the Sears Card and Sears MasterCard portfolios were separately declining throughout the Class Period," but then on March 14, 2002 "brag[ged] that Sears' portfolio nearly equals the market leader MBNA in its charge-off rate." *Id.* In the court's view, this comment was not enough to raise a strong inference that Mr. Keleghan acted with fraudulent intent. "All of Mr. Keleghan's admissible statements regarding the quality of Sears' credit portfolio occurred on the first day of the Class Period [October 24, 2001]; the fact that the quality of the credit portfolio declined after that date does not demonstrate that Mr. Keleghan knew his statements on October 24, 2001 were false or misleading." *Id.*

Also unavailing was Plaintiffs' argument that Mr. Keleghan was "personally responsible for the implementation of Sears' risk management policies" and, thus, must have known "such rudimentary facts as the extent to which the Company's outstanding loan balances were actually owed by subprime borrowers." *Id.* at *36. The only evidence of such knowledge was a March 7, 2002 UBS Warburg report indicating that Sears' management "*seems* focused on employing a prudent and risk averse growth strategy." *Id.* (emphasis added). The court finally declined to find

16

an inference of *scienter* based on the fact that Mr. Keleghan was fired shortly before Sears' credit problems became public. "Given Mr. Lacy's own equivocation as to the reason for Mr. Keleghan's departure, the court is unable to infer from his termination that Mr. Keleghan knowingly made fraudulent statements." *Id.* The court did preface the foregoing conclusions, however, by noting that Mr. Keleghan's was a "close case." *Id.* at *35.

Mr. Keleghan also sought dismissal of Plaintiffs' § 20(a) claim, insisting that as President of Sears Credit, he did not exercise any control over SRAC. *Id.* at *36. Plaintiffs failed to respond to this argument, but the court found it unpersuasive. There was no dispute that Mr. Keleghan could be a controlling person with respect to Sears, and Plaintiffs alleged that there was a significant interrelation between Sears and SRAC. In the court's view, "[d]etermination of whether an individual defendant is a 'controlling person' under § 20(a) is a question of fact that cannot be determined at the pleading stage." *Id.* at *37 (quoting *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003).

With respect to Mr. Vishwanath, the Complaint did not allege that he made any false or misleading statements during the Class Period. *Id.* Nor could Plaintiffs establish that Mr. Vishwanath acted with fraudulent intent solely based on his position as Vice President of Sears Credit, or by reliance on the group pleading doctrine. *Id.* (citing *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 837 (N.D. Ill. 2000) ("To the extent the plaintiffs plead *scienter* based exclusively on an individual defendant's position in Sabratek's hierarchy, their claims must be dismissed."); *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 946 n.7 (N.D. Ill. 2003) ("It is entirely clear . . . that the PSLRA abolishes the use of the group pleading doctrine to allege defendant's *scienter*.") As with the other Defendants, however, Plaintiffs' § 20(a) control liability claim against Mr. Vishwanath survived dismissal. *Id.*

## 2.  The Current Motions to Dismiss

On November 15, 2004, Lead Plaintiffs filed a second Amended Complaint (the "SAC"),

attempting to remedy these deficiencies by adding State Universities as a Plaintiff and by asserting

several new allegations.  As noted earlier, Plaintiffs here seek to represent (1) all those who

purchased or acquired SRAC Debt Securities pursuant to a prospectus during the Class Period (the

"Issuer Class") in the 3/18/02 Offering, the 5/21/02 Offering, and the 6/21/02 Offering; and (2) all

those who purchased, during the Class Period, publicly traded SRAC Debt Securities that were

issued by SRAC before the start of the Class Period and actively traded through the public markets

and over national security exchanges (the "Trader Class").

In Counts One through Three, Plaintiffs allege that the underwriter Defendants, as well as

Mr. Trost, Mr. Slook, Mr. Liska, Mr. Raymond, Mr. Richter, and Mr. Bergman violated § 11 of the

Securities Act by "failing to make a reasonable investigation or possess reasonable grounds for

believing that the representations contained in the Registration Statement, including the documents

incorporated therein, were true and without omissions of any material facts and were not

misleading." (SAC ¶¶ 249, 253, 254, 266, 270, 292, 296, 297.)  Counts Four through Six charge

the underwriter Defendants with violating § 12(a)(2) of the Securities Act by making material

misrepresentations in the three SRAC Debt Securities offerings "knowingly or recklessly and for

the purpose and effect of concealing the truth with respect to the SRAC's and Sears' operations,

business management, performance and prospects from the investing public and supporting the

artificially inflated price of the SRAC Debt Securities." (Id. ¶¶ 319, 331, 343.)  Count Seven alleges

that Mr. Lacy, Mr. Liska, Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, and Mr. Bergmann

violated § 15 of the Securities Act because they acted as controlling persons of SRAC and had the

power to influence and control the decision-making of both Sears and SRAC, "including the content

18

and dissemination of the various statements which Plaintiffs contend are false and misleading herein." (*Id.* ¶ 349.)

In Count Eight, Plaintiffs claim that Sears, SRAC, and all of the Individual Defendants except Mr. Vishwanath violated § 10(b) of the SEA and Rule 10b-5 promulgated thereunder by engaging in a "plan, scheme and course of conduct" to deceive the investing public regarding Sears' high-risk credit practices and induce Plaintiffs to purchase SRAC Debt Securities at artificially inflated prices during the Class Period. (*Id.* ¶ 353.) Plaintiffs also charge in Count Nine that all of the Individual Defendants violated § 20(a) of the SEA because they acted as controlling persons of SRAC and had the power to influence and control the decisions of SRAC and/or Sears, "including the content and dissemination of the SEC filings and other statements that Lead Plaintiffs contend are false and misleading." (*Id.* ¶ 365.)

Defendants have filed three separate motions to dismiss the SAC for failure to comply with the pleading requirements of FED. R. CIV. P. 9(b) and the PSLRA, and for failure to state a claim. The underwriter Defendants involved in the 3/18/02 and 5/21/02 SRAC Debt Securities Offerings – CSFB, Goldman Sachs, Morgan Stanley, Bears Stearns, and Lehman Brothers (collectively, the "Underwriter Defendants") – insist that Plaintiffs still lack standing to sue under § 12(a)(2) for statements made with respect to the 3/18/02 Offering. The Underwriter Defendants further argue that Plaintiffs have not sufficiently alleged damages relating to the 5/21/02 Offering. The Sears and SRAC Defendants, Mr. Keleghan, and Mr. Vishwanath variously claim that the SAC fails to allege that they acted with the requisite *scienter* for purposes of § 10(b) and SEC Rule 10b-5, and that they cannot be liable as control persons under § 20(a) of the Securities Exchange Act or § 15 of the Securities Act. The court addresses each argument in turn.

## DISCUSSION

The purpose of a motion to dismiss is to test the sufficiency of the plaintiffs' complaint, not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Plaintiffs alleging fraud must do so "with particularity," FED. R. CIV. P. 9(b), meaning that they must identify "the who, what, when, where and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990). The particularity requirement ensures that plaintiffs "conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).

In addition to complying with Rule 9(b), Plaintiffs must also follow the strict pleading requirements of the PSLRA, which was enacted to discourage claims of "so-called 'fraud by hindsight.'" *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1155 (N.D. Ill. 2004) (quoting *In re Brightpoint, Inc. Sec. Litig.*, No. IP99-0870-C-H/G, 2001 WL 395752, at *3 (S.D. Ind. Mar. 29, 2001)). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, [and] the reason why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). *See also Chu*, 100 F. Supp. 2d at 823.

### I.    The Underwriter Defendants

The Underwriter Defendants argue that the addition of State Universities as a Plaintiff in this case is not sufficient to allege a § 12(a)(2) claim with respect to the 3/18/02 Offering because State

Universities was an after-market purchaser. (UD Mem., at 5.)[7] The Underwriter Defendants also claim that Plaintiffs have not sufficiently alleged damages to support their §§ 11 and 12(a)(2) claims relating to the 5/21/02 Offering. The Sears Defendants have joined in both arguments and the court considers each in turn.

**A.     The 3/18/02 Offering**

The Underwriter Defendants first seek dismissal of Count Four of the SAC, in which Plaintiffs allege a § 12(a)(2) claim against CSFB and Goldman Sachs relating to the 3/18/02 Offering, for lack of standing. Standing under § 12(a)(2) requires the purchase of securities offered in the prospectus. *See Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 1194, 1196 (6th Cir. 1981) (options trader was a seller, and not a purchaser of securities so he lacked standing to sue under § 12(a)(2)); *Cathedral Trading, LLC v. Chicago Bd. Options Exchange*, 199 F. Supp. 2d 851, 858 (N.D. Ill. 2002) (quoting *Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987)) ("Section 12 imposes liability on persons who offer or sell securities and only grants standing to the person purchasing such security from them"). The purchase, moreover, must be from an initial public offering. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 580 (1995) ("Congress contemplated that § 12(2) would apply only to public offerings by an issuer."); *Danis v. USN Communications, Inc.*, 73 F. Supp. 2d 923, 932 (N.D. Ill. 1999) ("the text of § 12 grants a cause of action only to those who purchase 'from' 'a seller of a security by prospectus' – in an initial public offering.")

State Universities is the only named Plaintiff to have purchased stock from the 3/18/02 Offering. The Underwriter Defendants argue that State Universities purchased the stock on the open market, and not from the initial public offering. As a result, the Underwriter Defendants insist,

---

[7]     The Memorandum of Law in Support of Credit Suisse First Boston LLC, Goldman Sachs & Co., Inc., Morgan Stanley, Bear, Stearns & Co. Inc. and Lehman Brothers' Motion to Dismiss Counts II, IV and V of Plaintiffs' Second Amended Complaint is cited as "UD Mem., at __."

State Universities was an after-market purchaser and does not have standing to redress claims under § 12(a)(2). (UD Mem., at 4-5 (citing *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 158 (D. Mass. 2004) (dismissing § 12(a)(2) claim asserted by plaintiffs who admitted to purchasing their securities on the open market and not through an initial public offering); UD Reply, at 2.)[8]

Plaintiffs neither confirm nor deny that State Universities purchased stock on the open market, arguing instead that this presents a question of fact that cannot be resolved on a motion to dismiss. (Pl. UD Resp., at 3-4.)[9] In support of this assertion, Plaintiffs cite *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992), in which the plaintiffs brought §§ 11 and 12 claims against UJB, a bank holding company, alleging that it issued a false and misleading prospectus and registration statement in connection with a dividend reinvestment and stock purchase plan ("DRISP"). *Id.* at 275, 285-86. "Under the DRISP, shareholders reinvested their dividends by purchasing additional UJB Shares. . . . Some of these new shares were authorized but previously unissued treasury stock, but others were purchased by UJB in the secondary market." *Id.* at 285-86. Given that the after-market shares were purchased by the defendant, and not by the plaintiffs, the court determined that the plaintiffs needed discovery in order "to know whether their shares were newly issued or were purchased in the secondary market." *Id.* at 286. The court therefore assumed, for purposes of a motion to dismiss, that the "plaintiffs' shares did not come from the secondary market." *Id.* at 287 n.16.

---

[8]      The Reply Memorandum of Law in Support of Credit Suisse First Boston LLC, Goldman Sachs & Co., Inc., Morgan Stanley, Bear, Stearns & Co. Inc. and Lehman Brothers' Motion to Dismiss Counts II, IV and V of Plaintiffs' Second Amended Complaint is cited as "UD Reply, at __."

[9]      The Memorandum in Support of Plaintiffs' Opposition to Defendants Credit Suisse First Boston LLC, Goldman Sachs & Co., Inc., Morgan Stanley, Bears Stearns & Co. Inc., and Lehman Brothers Motion to Dismiss Counts II, IV and V of the Second Amended Complaint is cited as "Pl. UD Resp., at __."

Unlike the plaintiffs in *Shapiro*, Plaintiff State Universities purchased the stock at issue in this case. Plaintiffs surely do not need discovery to determine whether that purchase was from an initial public offering or the secondary market. Indeed, the SAC confirms that State Universities purchased stock from the 3/18/02 Offering on September 17, 2002, some six months after the initial offering. (SAC Ex. D ¶ 5.) As noted, Plaintiffs nowhere deny that State Universities was an after-market purchaser and, thus, it is not a qualified purchaser for purposes of § 12(a)(2).

Plaintiffs attempt to avoid this result by citing to cases addressing the pleading and traceability requirements of § 11. *See, e.g., Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1399-1400 (7th Cir. 1995) ("Section 11 of the Securities Act creates an express cause of action against a series of individuals for material misstatements in or omissions of material fact from a registration statement."); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003) (for purposes of § 11 claim, "[p]laintiffs have not been required to explain how their shares can be traced; general allegations that plaintiff purchased 'pursuant to' or traceable to false registration statement have been held sufficient to state a claim."); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 403 (D. Md. 2004) ("Considering the issue of traceability, . . . plaintiffs have not adequately stated a claim under § 11.") None of these cases, however, addresses § 12(a)(2)'s requirement that a plaintiff purchase stock pursuant to an initial public offering. Plaintiffs do not have standing to assert a § 12(a)(2) claim against CSFB and Goldman Sachs relating to the 3/18/02 Offering, and Count Four of the SAC is therefore dismissed.

**B.     The 5/21/02 Offering**

The Underwriter Defendants also argue that Plaintiffs' §§ 11 and 12(a)(2) claims relating to the 5/21/02 Offering (Counts Two and Five, respectively) must be dismissed for failure to allege any cognizable damages. To recover under §§ 11 and 12(a)(2), a purchaser must have suffered damages. *See, e.g., In re Old Banc One Shareholders*, No. 00 C 2100, 2004 WL 1144043, at *5

(N.D. Ill. Apr. 30, 2004) ("[T]here can be no recovery [under § 12] unless the purchaser has suffered a loss."); *In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203 (9th Cir. 2002) (dismissing §§ 11 and 12 claims where the plaintiff sold his shares at a profit). Section 11 provides that damages are capped at "the difference between the amount paid for the security . . . and (1) the value thereof as of the time such suit was brought." 15 U.S.C. §77k(e). Under § 12(a)(2), a plaintiff still holding the challenged security at the time he files a lawsuit is entitled to rescission; i.e., "the consideration paid for such security with interest thereon . . . ." 15 U.S.C. § 77l(a).

The SAC alleges that State Universities made the following purchases from the 5/21/02 Offering: (1) 430,000 shares on May 21, 2002 at $97.101 per share; (2) 200,000 shares on May 29, 2002 at $97.494 per share; and (3) 350,000 shares on June 18, 2002 at $97.478 per share. (SAC Ex. D ¶ 6.) The SAC also alleges generally that State Universities "purchased SRAC Debt Securities during the Class Period at artificially inflated prices and has been damaged thereby." (*Id.* ¶ 11.) The Underwriter Defendants insist that these allegations are inadequate because they nowhere suggest that State Universities sold its notes at a loss. (UD Mem., at 6-7 (citing *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, __ F. Supp. 2d __, 2004 WL 992991, at *38-39 (S.D.N.Y. May 5, 2004) (dismissing claims against bond underwriters for lack of standing where the bonds purchased by the plaintiffs "actually increased in value" and were trading above their offering prices when the underwriter defendants were added to the lawsuit).)

Plaintiffs concede that State Universities "continues to hold the May 2002 notes." (Pl. UD Resp., at 9.) The Underwriter Defendants argue that the value of these notes at the time of suit exceeded their value at the date of purchase, and that Plaintiffs therefore have no cognizable claim under § 11. (UD Mem., at 7.) Specifically, the Underwriter Defendants present securities prices for the 5/21/02 Offering notes[10] reflecting that at the time this lawsuit was filed on June 17, 2003,

---

[10]    On a motion to dismiss, the court may take judicial notice of published stock prices
(continued...)

24

the notes were trading at $113.65 per share. When Plaintiffs amended the complaint on October

16, 2003 to add the Underwriter Defendants, the notes were trading at $105.89. (*Id.* at 4-5, Ex. A.)

Indeed, between October 16, 2003 and November 17, 2004, the notes traded below $100 per

share only once – on May 13, 2004, when they traded at $99.84 (still higher than any price paid by

State Universities). (*Id.* Ex. A.)

Plaintiffs respond that this lawsuit "effectively commenced" for purposes of calculating

damages under § 11 on October 18, 2002, when they filed a different federal class action on behalf

of "persons who purchased securities of defendant Sears, Roebuck & Co. ("Sears") between

October 24, 2001 and October 17, 2002." *See In re Sears, Roebuck and Co. Sec. Litig.*, 291 F.

Supp. 2d 722, 724 (N.D. Ill. 2003); (Pl. UD Resp., at 6.) At that time, the notes were trading at

$81.25, "far lower than the approximately $97 [State Universities] originally paid."[11] (*Id.* at 7.)

Plaintiffs contend that under FED. R. CIV. P. 15(c)(2), the lawsuit pending before this court should

"relate back" to the earlier October 18, 2002 lawsuit, which remains pending before Judge Bucklo.

(*Id.*) Plaintiffs note that both cases allege "very similar, if not identical, violations of the federal

securities laws relating to [Sears'] earnings guidance and credit portfolio." (*Id.* at 7-8 (citing

*Bularz v. Prudential Ins. Co. of Am.*, 93 F.3d 372, 379 (7th Cir. 1996) (new substantive claim that

was otherwise time-barred related back to the date of the original pleading where the claim

stemmed from the same "'conduct, transaction or occurrence' as was alleged in the original

complaint.").)

Plaintiffs' argument misconstrues Rule 15(c)(2), which provides for relation back "where an

amended complaint asserts a new claim on the basis of the same core of facts, but involving a

---

[10](...continued)

if they are in the record. *Grimes v. Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 913 (N.D. Ill. 2002) (internal citations omitted).

[11]     The securities prices submitted by the Underwriter Defendants indicate that as of October 18, 2002, the notes were trading at $77.57. (UD Mem., Ex. A.)

different substantive legal theory than that advanced in the original pleading." *Bularz*, 93 F.3d at 379. Nothing in Rule 15(c)(2) supports the theory that one lawsuit may relate back to an entirely separate lawsuit. The fact that both lawsuits allege similar conduct by Sears is not sufficient, particularly where, as here, the October 18, 2002 lawsuit seeks redress for those who purchased Sears stock, not the SRAC Debt Securities at issue in this case. *See, e.g., Merzin v. Provident Fin. Group, Inc.*, 311 F. Supp. 2d 674, 686 (S.D. Ohio 2004) ("Silverback Plaintiffs" who did not file original complaint but who joined the lawsuit sometime thereafter could not price their securities as of the filing date of the original complaint; "[i]t would not comport with the interests of justice to allow the Silverback Plaintiffs to relate back to a Complaint which they did not file . . .") Plaintiffs do not dispute that the 5/21/02 notes purchased by State Universities were worth more on June 17 and October 16, 2003 than State Universities paid for them. The State Universities suffered no damage and, thus, Count Two of the SAC will be dismissed.

As for Plaintiffs' § 12(a)(2) claim, the Underwriter Defendants argue that State Universities' only potential remedy – rescission – is unavailable here because the notes are currently trading at a price that exceeds the purchase price. (UD Mem., at 7-8 (citing *Merzin*, 311 F. Supp. 2d at 684 (dismissing § 12(a)(2) claim where rescission "would clearly result in a loss for Plaintiffs.").) In *Merzin*, for example, the plaintiffs purchased securities for $25 per share. At the time they filed their lawsuit, the price per share had dipped below $25, but by the time of the court's ruling on the defendants' motion to dismiss, the stock was trading in excess of $30 per share. 311 F. Supp. 2d at 684. The court dismissed the plaintiffs' § 12(a)(2) claim, noting that they would suffer a loss by tendering back their stock in exchange for the value of the consideration paid (*i.e.*, $25 per share) as opposed to selling the shares on the open market for in excess of $30 per share. *Id.*

Plaintiffs oppose such a "moving target approach," noting that "[i]nvestors in this scenario would be forced into a form of Russian roulette in trying to time the sale of their securities." (Pl. UD Resp., at 9-10.) In Plaintiffs' view, "the damages suffered by investors who purchase securities

26

pursuant to false and misleading information [are] not abrogated simply because the price of those securities ultimately (or temporarily) rises." (*Id.* at 10.) Plaintiffs do not cite any support for this argument, and courts have found that "[t]he proper time for the plaintiff to choose between damages and rescission 'is at the time the complaint is filed.'" *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 2004 WL 992991, at *39 (quoting *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1035 (2d Cir. 1979)). *But see Merzin*, 311 F. Supp. 2d at 684. In this court's view, the proper time for the damages/rescission choice in this case was November 15, 2004, the date State Universities was added as a Plaintiff. On that date, the SRAC notes were trading at $105.04 per share, well above the $97 per share purchase price. (UD Reply, Ex. A.)

Even using the dates of the previous complaints, moreover, State Universities would still suffer a loss by tendering back its SRAC notes in exchange for the purchase price. On June 17, 2003, the notes were trading at $113.65 per share, and on October 16, 2003, the notes were trading at $105.89 per share. (*Id.*) Plaintiffs have failed to state a claim for damages under § 12(a)(2) with respect to the 5/21/02 notes and Count Five of the SAC is therefore dismissed.

## II.    The Sears and SRAC Defendants

Plaintiffs allege that Sears, SRAC, and all of the individual Defendants except Mr. Vishwanath violated § 10(b) of the Securities Exchange Act and SEC Rule 10b-5 by misrepresenting the financial performance of Sears' credit operations, which caused Plaintiffs to purchase securities at artificially inflated prices. Plaintiffs also allege that all of the individual Defendants are responsible for the misrepresentations as controlling persons under § 20(a) of the SEA and under § 15 of the Securities Act. To state a claim under § 10(b) and Rule 10b-5, Plaintiffs must allege that each defendant "(1) made a misstatement or omission, (2) of material fact, (3) with *scienter*, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff[s]

27

relied, and (6) that reliance proximately caused plaintiff[s'] injuries." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280 (7th Cir. 1996).

To state a claim under § 20(a) of the Act, Plaintiffs must allege "(1) a primary securities violation; (2) [that] each of the Individual Defendants exercised general control over the operations of [Sears and/or SRAC]; and (3) [that] each of the Individual Defendants 'possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised.'" *Tellabs*, 303 F. Supp. 2d at 969 (quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)). The requirements for claims under § 15 of the Securities Act "are largely co-extensive with the requirements for Section 11 claims. The only additional element that Section 15 would require is that the Defendant was in a position of control over the alleged violators of Section 11." *Miller v. Apropos Technology, Inc.*, No. 01 C 8406, 2003 WL 1733558, at *7 (N.D. Ill. Mar. 31, 2003). *See also* 15 U.S.C. § 77o(a).

In addition to Count Two discussed above, the Sears Defendants have moved to dismiss Counts Seven, Eight, and Nine of the SAC. They insist that Plaintiffs have once again failed to allege that Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, or Mr. Bergmann acted with fraudulent intent for purposes of a § 10(b) claim. The Sears Defendants also urge that the *scienter* allegations against Mr. Lacy and Mr. Liska are insufficient as a matter of law. As a result, the Sears Defendants argue, the § 10(b) claim against Sears and SRAC fails as well, requiring dismissal of Plaintiffs' §§ 10(b) and 20(a) claims (Counts Eight and Nine). Finally, the Sears Defendants seek dismissal of Count Seven on the ground that none of the Individual Sears Defendants was a controlling person of SRAC. Mr. Keleghan and Mr. Vishwanath have separately moved to dismiss Counts Eight and Nine on similar grounds. The court addresses each argument in turn.

## A. Scienter

The Sears and SRAC Defendants argue that Plaintiffs have not alleged *scienter* with respect to any of the individual Defendants in this case, and that the § 10(b) claims against all Defendants should therefore be dismissed. To establish *scienter*, Plaintiffs must plead facts establishing that the Sears and SRAC Defendants acted with intent to deceive. *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998). The Seventh Circuit has not addressed the proper test for *scienter* in light of the PSLRA, and courts in this district are split. Most courts, however, have adopted the standard enunciated by the Second Circuit, requiring plaintiffs in a PSLRA action to allege (1) facts showing that defendants had both motive and opportunity to commit fraud; or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *Press v. Chemical Investment Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999). *See In re Spiegel, Inc. Sec. Litig.*, __ F. Supp. 2d __, 2004 WL 1535844, at *24 (N.D. Ill. July 8, 2004) (collecting cases).

Plaintiffs claim that the Sears and SRAC Defendants knew that Sears' credit card accounts were riskier and more unstable than they led the public to believe, which demonstrates conscious misbehavior or recklessness. (Pl. Sears Resp., at 3.)[12] Recklessness requires "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Finance Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the

---

[12]     Plaintiffs' Response to the Sears Defendants' Motion to Dismiss Claims Two, Seven, Eight and Nine of the Second Amended Class Action Complaint is cited as "Pl. Sears Resp., at __."

corporation." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). One of the "classic fact patterns" that gives rise to a strong inference of *scienter* is where "defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665-66 (8th Cir. 2001) (citing *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1260-61 (10th Cir. 2001)); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000); *Novak*, 216 F.3d at 311.

### 1. The Deficiencies in the Amended Complaint

As noted, this court found the *scienter* allegations of the Amended Complaint lacking in several respects. First, the court found "no allegations . . . regarding any specific meetings that Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, or Mr. Bergmann attended, or the information they received at those meetings that would have put them on notice that Sears was making material misstatements." *Ong*, 2004 WL 2534615, at *29. The mere fact that Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, and Mr. Bergmann were all corporate officers was insufficient to suggest that they were aware that Sears' SEC filings and other statements were false. *Id.* at *30. In addition, Plaintiffs did not allege any facts indicating that the men acted to achieve some concrete personal gain. *Id.* at *31.

The court also determined that "[a]ll of Mr. Keleghan's admissible statements regarding the quality of Sears' credit portfolio occurred on the first day of the Class Period [October 24, 2001]," and that the decline in the credit portfolio quality after that date "d[id] not demonstrate that Mr. Keleghan knew his statements on October 24, 2001 were false or misleading." *Id.* at *35. In that regard, the court noted that Plaintiffs did not identify any document or record that was authored or reviewed by Mr. Keleghan and that showed Sears deliberately sought out subprime customers. *Id.* at *35. Plaintiffs' assertion that Mr. Keleghan "routinely reviewed financial data indicating that

the Sears Card and Sears MasterCard portfolios were separately declining throughout the Class Period" and was "personally responsible for the implementation of Sears' risk management policies," without more, was not sufficient to raise a strong inference that Mr. Keleghan acted with fraudulent intent. *Id.* at *35, 36.

In addition, Mr. Keleghan's discharge shortly before Sears' credit problems became public did not support an inference of *scienter* given "Mr. Lacy's own equivocation as to the reason for Mr. Keleghan's departure." *Id.* at *36. The court allowed Plaintiffs' § 10(b) claims to proceed as against Sears, SRAC, Mr. Lacy, and Mr. Liska, however, finding no clear objection to the sufficiency of the *scienter* allegations with respect to the latter two individuals. The court nonetheless invited Mr. Lacy and Mr. Liska to challenge the *scienter* allegations in light of the findings regarding the other individual Defendants. *Id.* at *29 n.20.

### 2.    The *Scienter* Allegations in the SAC

In the SAC, Plaintiffs allege that the Individual Defendants "were fully aware of the problems inherent in [Sears' credit] portfolio because of a detailed reporting system that enabled them to monitor the credit ratings of each consumer on a regular basis." (SAC ¶ 209.) Plaintiffs note that in Sears' 2001 Form 10-K, "[m]anagement represented . . . that it [Sears] maintained a system of internal controls to ensure proper accounting and financial disclosures, and that it reviewed loan loss reserves to ensure that such reserves were adequate to account for likely losses inherent in the portfolio." (*Id.* ¶ 210.) The President of Sears National Bank in Arizona, which developed Sears' policies for granting credit, reported directly to Mr. Keleghan. So did both the Vice President of Asset Management and Risk Management and the Vice President of Account Services, who oversaw Sears' collections and accounts services provided by regional credit centers. (*Id.* ¶¶ 214, 215.) Each credit center had a collection division that handled matters relating to payment, and

31

an account services division that handled initial grants of credit, alteration of credit limits, and general consumer inquiries. (*Id.* ¶ 215.)

According to the SAC, information "was gathered" every month from the regional centers and compiled into reports detailing delinquency and charge-off rates. In addition, the entire Sears portfolio "would be rescored for credit history" every quarter, and reports "were compiled" detailing the credit scores of Sears' cardholders. (*Id.* ¶ 216.) Plaintiffs do not indicate who did the gathering, compiling, or rescoring, but they do allege that the reports "were provided to" Mr. Keleghan, Mr. Vishwanath and Mr. Lacy. (*Id.*) Plaintiffs further allege that all senior executives and management, including the Individual Defendants, received a Monthly Operating Review ("MOR") from each of the collection and account services divisions. The MORs "were circulated in the second week of each month" and "compiled all pertinent financial information for each division," including "the amount of profits derived from late fees, up-to-date delinquency figures, and other important information" on charge-offs, customer composition, and loan loss reserves. (*Id.* ¶¶ 217, 218.)

In addition to receiving the MORs, Mr. Keleghan purportedly attended monthly meetings at Sears headquarters to discuss problems in Sears' credit business. According to an unidentified former Sears employee who "served as an analyst in the credit finance division until November 2001," Mr. Keleghan also met "routinely" with Mr. Liska to discuss matters addressed in the division meetings, and he met with Mr. Lacy in that regard "on occasion." (*Id.* ¶¶ 217, 219, 220.) At Sears' quarterly meetings for all managers and directors responsible for collection, which were "usually" led by Mr. Keleghan and attended by Mr. Lacy, participants discussed promotional policies, delinquency statistics, credit scores, and the effectiveness of the collections operations. "Each meeting also included discussions of similar reports that were generated and available at headquarters, and in the field, detailing payment, delinquency, and charge-off data on a monthly basis." (*Id.* ¶ 221.) Plaintiffs claim that these meetings demonstrate that "organizational structures were in place which facilitated the flow of information, through meetings and reports, to senior

32

management at Sears and SRAC," and that "Sears' top management (including the Sears Defendants) were made personally aware of the credit scores of the entire Sears credit portfolio." (Id. ¶¶ 220, 222.)

According to another unidentified former Sears employee described as "a twenty-year veteran of the Company who served as director of finance for Sears' retail division from 1993 through 2001," Mr. Lacy and Mr. Liska attended planning meetings where "each division presented key financial information, analyses of each division's performance, and comparative analyses with previous years' performance and projections." (Id. ¶ 223.) All of the Sears Defendants, moreover, "were kept apprised of" the credit card business by virtue of a DOS-based computer program known as Total System ("TSYS"). According to a third, unidentified former Sears national management employee who worked at the company from June 2002 until January 2003, "TSYS processed and tracked all credit card transactions, as well as delinquencies and charge-offs." Plaintiffs claim that TSYS "could be viewed at any point in time so that managers could be kept informed of current delinquency and charge-off data." (Id. ¶ 226.) In fact, TSYS integrated a computer program developed by Mr. Keleghan and Mr. Vishwanath and launched in 1999 "that conducted risk analyses for the credit card portfolio." (Id. ¶ 233.)

### 3. Analysis

Plaintiffs' new allegations essentially fall into three categories: (1) all senior executives and management received MORs containing profit and loss information, including up-to-date delinquency figures and information on charge-offs, customer composition, and loan loss reserves (id. ¶¶ 217, 218); (2) senior executives met regularly to discuss the performance of Sears' credit division (id. ¶¶ 218-220, 223); and (3) Sears management had access to the TSYS computer database, which integrated a risk analysis computer program developed by Mr. Keleghan and Mr. Vishwanath. (Id. ¶ 233.) The Sears and SRAC Defendants argue that these new allegations are

33

insufficient to demonstrate that they knew or recklessly disregarded the truth about the quality of the Sears portfolio. For the reasons explained below, the court sustains Defendants' objections in part and overrules them in part.

### a. The Individual Defendants

The Individual Defendants begin by arguing that general allegations that a defendant received internal financial reports cannot support an inference of *scienter*. (Sears Mem., at 5 (citing *Johnson v. Tellabs, Inc.*); K/V Mem., at 10).)[13] In *Tellabs*, the plaintiffs alleged that the defendants knew or recklessly disregarded that their statements about Tellabs' financial condition were false because the defendants received regular reports about daily product bookings, revenues, and product development. 303 F. Supp. 2d at 963. The court found these allegations insufficient, noting that the complaint omitted a variety of pertinent details about those reports:

> Plaintiffs do not describe the contents of these reports or detail what such reports reflected. They do not allege who, other than the "finance department," prepared such reports. They do not allege any particularized facts showing how the information contained in the reports demonstrated the falsity of Tellabs' fourth quarter financial results or sufficient facts regarding how the information supports any inference of knowledge of falsity.

*Id.* Also insufficient were slightly more specific allegations that the reports showed "declining demand in the third and fourth quarters of 2000 for a variety of Tellabs' products, including the TITAN 5500." Specifically, the plaintiffs failed to allege "what reports showed a decline in the demand," "who received such reports," "what information was reflected in th[e] report[s], how significant the decline in demand was, or how much of the decline was attributed to the TITAN 5500 as opposed to other products." *Id.* In the court's view, "allowing a plaintiff to go forward with a case based on general allegations of 'negative internal reports' would expose all . . . companies

---

[13] The Memorandum of Law in Support of Motion to Dismiss of Defendants Kevin Keleghan and K.R. Vishwanath is cited as "K/V Mem., at __."

[with internal reporting systems] to securities litigation whenever their stock prices dropped." *Id.* at 963-64 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087-88 (9th Cir. 2002)).

The Individual Defendants also rely on *Tellabs* for the proposition that attendance at meetings is not alone sufficient to demonstrate fraudulent intent. (Sears Mem., at 7-8 (citing *Tellabs*, 303 F. Supp. 2d at 966 (fact that Tellabs' officer made quarterly presentations with respect to Tellabs' financial position at "town hall" meetings did not create strong inference of *scienter* absent allegations that the officer knew of the alleged problems with the product at issue); K/V Mem., at 9-10.) As for access to the TSYS computer database, the Sears Defendants argue, Plaintiffs point to no specific information contained in that system that would have put the Individual Defendants on notice that Sears was making material misstatements. (*Id.* at 8; K/V Mem., at 9.) In addition, Plaintiffs do not allege that any individual Defendant actually received, reviewed, or recklessly ignored reports generated by TSYS. (*Id.* at 9.)

Plaintiffs first object that the Individual Defendants have employed the wrong standard for pleading *scienter* because this court adopted the Second Circuit's test, which the *Tellabs* court rejected. (Pl. Sears Resp., at 4.) This argument is a non-starter. In a case where a plaintiff seeks to establish *scienter* based on conscious disregard or recklessness, the requirements set forth in *Tellabs* are the same as those adopted by this court: "Reckless conduct is, at least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Tellabs*, 303 F. Supp. 2d at 961 n.15 (quoting *Rehm*, 954 F. Supp. at 1255); *Ong*, 2004 WL 2534615, at *27 (quoting *Rehm*, 954 F. Supp. at 1255). The *Tellabs* court held that plaintiffs "may use 'motive and opportunity' or 'circumstantial evidence' to establish *scienter* under the PSLRA, only if Plaintiffs' allegations support a strong inference that each Defendant acted recklessly or knowingly." 303 F. Supp. 2d at 961. This court has already determined that Plaintiffs failed to plead *scienter* based on motive and opportunity even under a

35

test arguably less stringent than the one imposed by *Tellabs*, and the SAC does not add any new allegations in that regard. *Ong*, 2004 WL 2534615, at *30-31.

Plaintiffs next insist that the SAC does provide allegations of "specific documents received by the Sears Defendants and specific meetings attended by them." (Pl. Sears Resp., at 9; Pl. K/V Resp., at 7-8.)[14] For example, all senior executives and management received MORs and had access to the TSYS computer program, which was integrated with a risk analysis program developed by Mr. Keleghan. (SAC ¶¶ 217, 218, 226, 233.) In addition, Mr. Lacy "w[as] provided [with]" reports detailing delinquency and charge-off rates and the credit scores of Sears' cardholders. (*Id.* ¶ 221.) Mr. Liska "routinely" met with Mr. Keleghan to discuss matters addressed at monthly meetings of executives within Mr. Keleghan's division, and Mr. Lacy and Mr. Liska both attended planning meetings two or three times per year at which each division presented certain "key financial information." (*Id.* ¶¶ 220, 223.) (*See also* Pl. Sears Resp., at 9-11.) In Plaintiffs' view, these allegations, "read in conjunction with the entire Complaint, show an organizational structure that gave each Sears Defendant access to the very credit information concealed from the investing public." (*Id.* at 11.)

In support of this argument, Plaintiffs cite *Sutton v. Bernard*, No. 00 C 6676, 2001 WL 897593 (N.D. Ill. Aug. 9, 2001), where the plaintiffs alleged that the defendants were high-level executives who were involved in the day-to-day operations of the company and who closely monitored the company through internal reports. The court found those allegations sufficient to create a strong inference of *scienter*. *Id.* at *6. Notably, however, *Sutton* also embraced the "group pleading" doctrine, which "allows plaintiffs to rely on the presumption that certain statements of a company, such as financial reports, prospectuses, registration statements, and press releases, are

---

[14]    Plaintiffs' Memorandum of Law in Opposition to Motion of Defendants Kevin Keleghan and K.R. Vishwanath to Dismiss the Second Amended Class Action Complaint is cited as "Pl. K/V Resp., at __."

the collective work of those high-level individuals with direct involvement in the everyday business of the company." *Id.* at *5 n.5. In *Ong*, this court reaffirmed its conclusion that "group pleading may be appropriate in certain circumstances notwithstanding the PSLRA, [only] as long as the complaint sets forth facts demonstrating that each defendant may be responsible for the fraudulent statements." 2004 WL 2534615, at *30 (quoting *Spiegel*, 2004 WL 1535844, at *20-23). Under that standard, Plaintiffs' allegations are sufficient only with respect to some of the Individual Defendants.

i. **Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, and Mr. Bergmann**

The SAC does not present any facts demonstrating that Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, or Mr. Bergmann acted with fraudulent intent. Plaintiffs once again fail to identify a single meeting that these Defendants attended, much less the specific information they purportedly reviewed at those meetings. Indeed, the names of these five individuals do not appear anywhere in Plaintiffs' new *scienter* allegations. (SAC ¶¶ 209-34.) General allegations that these Defendants attended meetings where they discussed promotional policies, delinquency statistics, credit scores, and the effectiveness of the collections operation do not satisfy the PSLRA's requirement that Plaintiffs plead facts showing that each Defendant knew or recklessly disregarded that Sears was making material misstatements. (SAC ¶ 221.) Significantly, these are the same allegations this court found lacking to establish *scienter* on the part of Mr. Keleghan in the prior Complaint. *Ong*, 2004 WL 1534615, at *35. *See also* 15 U.S.C. § 78u-4(b)(2) (plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."); *Chu*, 100 F. Supp. 2d at 823.

With respect to the MORs and the monthly reports from the regional centers, Plaintiffs identify neither who prepared the documents nor which ones Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond or Mr. Bergmann actually saw or reviewed. Plaintiffs also fail to cite any specific data

within those reports that should have alerted these Defendants that Sears was making material misstatements. Plaintiffs' general assertions that the reports and MORs contained "pertinent financial information" regarding delinquency and charge-off rates is insufficient. *See, e.g., Arazie v. Mullane*, 2 F.3d 1456, 1466-67 (7th Cir. 1993) (affirming dismissal where stockholders failed to refer to any document, meeting, or transaction that could or should have put the defendant on notice that the New Jersey Casino Control Commission objected to a $50 million loan from defendant's Atlantic City casino to service its own debt on casinos located in Nevada).

The fact that "TSYS could be viewed at any point in time" and was "made available to each Individual Defendant" similarly fails to establish that Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond or Mr. Bergmann knew their statements regarding Sears' credit portfolio were false. Plaintiffs do not allege that these Defendants ever accessed TSYS or received and reviewed specific TSYS reports that conflicted with Sears' public statements. *See In re Spiegel*, 2004 WL 1535844, at *35 (finding no inference of *scienter* where the plaintiffs did not allege that the company's CEO "actually received or reviewed" two documents prepared by an internal auditor regarding serious problems with the company's credit business). *Compare Asher v. Baxter Int'l, Inc.*, No. 02 C 5608, 2005 WL 331572, at *8 (N.D. Ill. Feb. 3, 2005) (allegations that the individual defendants "routinely accessed . . . Baxter's weekly (and even daily) revenue and financial reports via a computer system," combined with allegations that nine of eleven defendants financially benefitted from false information by selling their company stock, and that the company was able to acquire a competitor at a much lower cost, supported inference of *scienter*).

Plaintiffs' additional arguments regarding Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, and Mr. Bergmann merit little discussion. The court has already rejected Plaintiffs' theory that *scienter* may be inferred because "organizational structures were in place which facilitated the flow of information, through meetings and reports, to senior management at Sears and SRAC." (SAC ¶ 223.) *Ong*, 2004 WL 2534615, at *35. In addition, a violation of Generally Accepted Accounting

38

Principles ("GAAP"), standing alone, is insufficient to raise an inference of fraudulent intent. *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003).

### ii. Mr. Lacy, Mr. Liska, and Mr. Keleghan

With respect to Mr. Lacy, Mr. Liska, and Mr. Keleghan, the court concludes that Plaintiffs have sufficiently alleged *scienter* for purposes of the PSLRA. Unlike the other Individual Defendants, Mr. Liska and Mr. Keleghan both attended management meetings to discuss Sears' financial status. For example, Plaintiffs allege that two or three times a year, Mr. Lacy's "staff – including CFO Paul Liska" attended senior management planning meetings at which "each [account services and collection] division presented key financial information, analyses of each division's performance, and comparative analyses with previous years' performance and projections." (SAC ¶ 223.) Plaintiffs also allege that Mr. Keleghan attended monthly meetings at which "all Sears credit delinquencies were tracked and discussed," and that he led quarterly meetings for all managers and directors responsible for collections around the country. (*Id.* ¶¶ 219, 221.) Mr. Keleghan also developed the credit portfolio risk analysis computer program that was integrated with the TSYS system. (*Id.* ¶ 233.)

Of primary significance, however, is the fact that the court may now consider statements that Mr. Lacy, Mr. Liska, and Mr. Keleghan made after June 21, 2002. The court previously determined that such statements were inadmissible because the only Plaintiffs named in the Amended Complaint, Thomas G. Ong and the Thomas G. Ong IRA, had purchased their debt securities on June 21, 2002. Thus, the court determined that the purchase price "could not have been affected by statements made after that date." *Ong*, 2004 WL 2534615, at *23. The Sears Defendants now concede that the addition of State Universities as a named Plaintiff "cures the Section 10(b) standing defect; according to its certification, [State Universities] bought SRAC notes as late as October 17, 2002." (Sears Mem., at 2 n.3.)

Mr. Lacy, Mr. Liska, and Mr. Keleghan made several admissible statements within the Class Period suggesting that they had knowledge regarding the performance of the separate Sears Card and Sears MasterCard portfolios. During an April 18, 2002 conference call with analysts, for example, Mr. Liska declined to provide information on the separate portfolios, stating:

> [W]e're approaching this on a portfolio basis, because as you probably know, we originally . . . substituted people out of the Sears card into the Sears MasterCard that were of better credit quality or had stopped using their Sears card. So we look at it more as managing a portfolio and we're probably never going to be in that position that we're going to talk about them as discrete portfolios because we don't manage it like that. And it would probably be misleading if we did that. So, we're just going to comment on it on a total portfolio basis.

(*Id.* ¶ 121.) Sears' decision to move customers from one card to the other based on their credit quality suggests that Sears did have data regarding the separate portfolios. Indeed, during a July 18, 2002 conference call with analysts, Mr. Lacy stated, "what we've been about with our *MasterCard* product, is having a product that has a better rate structure and more convenience, that's more appealing to better credit quality customers." (*Id.* ¶ 139 (emphasis added).) Mr. Lacy further stated that "Sears['] billed *MasterCard* balances at the end of the quarter were $8.5 billion . . . ." (*Id.* ¶ 141 (emphasis added).) Mr. Keleghan similarly appeared to have separate information regarding the Sears Card and Sears MasterCard portfolios when he stated in a July 25, 2002 interview with *Bloomberg News* that "[w]e don't do subprime lending at all *in the MasterCard portfolio*. All my growth is coming from prime and superprime." (*Id.* ¶ 149 (emphasis added).)

Approximately two months after Mr. Keleghan assured investors that the Sears portfolio consisted entirely of prime and superprime customers, he was abruptly discharged on October 4, 2002. (*Id.* ¶¶ 149, 160.) Three days later, Mr. Lacy spoke to investors during a conference call and explained that "Kevin [Keleghan] left the company at my request, because I lost confidence in his personal credibility. . . . His departure is not related to business performance and does not indicate a change in our credit strategy." (*Id.* ¶¶ 163, 165.) At an analysts meeting on October 17, 2002, however, Mr. Liska stated that "Kevin was not being forthcoming about these issues that this

40

business was facing . . . and had become a barrier to getting an objective situation assessment as to what was happening in our business and I terminated him for basically my personal loss of confidence in him relative to his personal credibility." (Id. ¶ 172.)

Also on October 17, 2002, Sears issued a press release announcing that it would be increasing its allowance for bad debt by $222 million. (Id. ¶ 171.) At that time, Mr. Liska acknowledged that Sears' credit portfolio actually had been heavily subprime for years: "In 1998 Middle America balances represent[ed] 60% of our portfolio. They represent 48% today. Last year the segment represented 54% of our portfolio." (Id. ¶¶ 171, 174.) Despite the magnitude of the increased allowance for bad debt, Mr. Lacy had assured investors just three months earlier on July 18, 2002 that "[t]he credit quality of our receivables portfolio has . . . improved." Mr. Liska had similarly confirmed that Sears had invested significantly in risk management and "fe[lt] very good about the systems environment." (Id. ¶¶ 135, 142.)

In light of these allegations, the court is satisfied that Plaintiffs have raised a strong inference that Mr. Lacy, Mr. Liska, and Mr. Keleghan either knew or were reckless in disregarding information that the separate Sears MasterCard and Sears Card portfolios were in decline.

### b. Sears and SRAC

In light of the court's determination that Plaintiffs' § 10(b) claims against Mr. Lacy, Mr. Liska, and Mr. Keleghan survive this motion, Defendants' motion to dismiss the § 10(b) claims against Sears and SRAC is denied. See Ong, 2004 WL 2534615, at *28 n.19 ("A corporation can only 'know' those things known by persons acting on its behalf. The court concludes that if Plaintiffs' allegations on this matter [scienter] are adequate with respect to the Individual Defendants, they are adequate with respect to Sears and SRAC, as well.")

41

## B.    Control Person Liability Under § 20(a)

To state a claim under § 20(a) of the Act, Plaintiffs must allege (1) a primary violation of § 10(b); (2) each defendant's control over the operations of Sears and/or SRAC; and (3) each defendant's power or ability to control the specific transaction or activity forming the basis of the primary violation. *Tellabs*, 303 F. Supp. 2d at 969; *Sears, Roebuck and Co.*, 291 F. Supp. 2d at 727. Section 20(a) does not require *scienter* or heightened pleading. *Sears, Roebuck and Co.*, 291 F. Supp. 2d at 727. The Sears and SRAC Defendants claim that Plaintiffs' § 20(a) claim must fail because they have not alleged a primary violation under § 10(b). (Sears Mem., at 11-12; K/M Mem., at 10.) Having rejected the latter argument, the court concludes that the former fails as well.

Mr. Vishwanath separately argues that the § 20(a) claim against him must be dismissed because there are no allegations indicating that he had the "power or ability to control the specific transaction or activity forming the basis of the primary violation." (K/M Mem., at 11.) The court has already considered and rejected this argument in addressing Mr. Vishwanath's previous motion to dismiss. *Ong*, 2004 WL 2534615, at *37 (recognizing that the position of Vice President varies widely in the amount of control and responsibility conferred but noting that whether a defendant is a "controlling person" is a question of fact). *See also In re System Software Assocs., Inc.*, No. 97 C 177, 2000 WL 283099, at *16 (N.D. Ill. Mar. 8, 2000).

Mr. Vishwanath insists that Plaintiffs have improperly relied on the group pleading doctrine to establish his control over Sears. In fact, the SAC alleges that "all credit finance models within the Company were under Vishwanath's control," and that Mr. Vishwanath "directly supervised the consultants who build the credit models" and "controlled the data that was released and disseminated." (SAC ¶ 224.) In addition, Mr. Vishwanath received weekly reports from the regional credit centers detailing delinquency and charge-off rates, and he helped Mr. Keleghan develop the risk analysis computer program. (*Id.* ¶¶ 225, 233.) These allegations do not rely on Mr.

42

Vishwanath's membership in a group and are sufficient to allege that he was a controlling person for purposes of § 20(a).

## C.   Control Person Liability Under § 15

The Sears and SRAC Defendants finally argue that Count Seven should be dismissed because Plaintiffs have not named SRAC as a primary violator of the Securities Act. Controlling person liability under § 15 of the Securities Act requires a primary violation of § 11. *See Tabankin v. Kemper Short-Term Global Income Fund*, No. 93 C 5231, 1994 WL 30541, at *6 (N.D. Ill. Feb. 1, 1994) ("Without primary liability, there is no secondary liability.") The SAC alleges that Mr. Lacy, Mr. Liska, Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, and Mr. Bergmann violated § 15 because they were "controlling persons of SRAC." (SAC ¶ 349.) SRAC, however, is not named as a defendant with respect to the § 11 claims.

Plaintiffs insist that the SAC, "when taken in its totality, clearly puts the defendants on notice that SRAC is [a] primary violator under the Securities Act for the issuance of false and misleading registration statements and prospectuses." (Pl. Sears Resp., at 14-15.) The court disagrees that such an inference suffices for purposes of imposing control liability under § 15. Neither party has addressed whether SRAC qualifies as a primary violator under § 11 and, thus, Plaintiffs will be granted leave to amend the SAC with respect to this issue. The court cautions, however, that any amendment should be consistent with applicable law and immune to further objection from Defendants.

## CONCLUSION

For the reasons stated above, the Underwriter Defendants' Motion to Dismiss Counts Two, Four, and Five (Docket No. 56) is granted. The Motions to Dismiss filed by Mr. Lacy and Mr. Liska, by the Sears and SRAC Defendants, and by Mr. Keleghan and Mr. Vishwanath (Docket Nos. 51, 57, and 59) are granted in part and denied in part. Count Two is dismissed for the reasons stated

in discussing the Underwriter Defendants' motion to dismiss. Count Eight is dismissed as against all Defendants except Sears, SRAC, Mr. Lacy, Mr. Liska, and Mr. Keleghan. Finally, the motion to dismiss Count Seven is granted with leave to amend as set forth in this opinion, but the motion to dismiss Count Nine is denied.

ENTER:

Dated: September 14, 2005

REBECCA R. PALLMEYER
United States District Judge