**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS G. ONG for THOMAS G. ONG IRA and THOMAS G. ONG, individually and on behalf of all others similarly situated,** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) ) | |
| | ) | |
| **v.** | ) | **No. 03 C 4142** |
| | ) | |
| **SEARS, ROEBUCK & CO., SEARS ROEBUCK ACCEPTANCE CORP., ALAN LACY, PAUL J. LISKA, GLENN R. RICHTER, KEVIN T. KELEGHAN, K.R. VISHWANATH, KEITH E. TROST, GEORGE F. SLOOK, LARRY R. RAYMOND, THOMAS E. BERGMANN, CREDIT SUISSE FIRST BOSTON, GOLDMAN, SACHS & CO., MORGAN STANLEY, BEARS, STEARNS & CO., INC., LEHMAN BROTHERS and MERRILL LYNCH & CO., INC.,** | ) ) ) ) ) ) ) ) ) ) ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |

### AMENDED MEMORANDUM OPINION AND ORDER

Plaintiffs Thomas G. Ong, Thomas G. Ong IRA, and State Universities Retirement System of Illinois ("SURSI") filed this federal securities class action on behalf of (1) all those who purchased, pursuant to a prospectus, securities issued by Defendant Sears, Roebuck Acceptance Corp. ("SRAC"), a wholly-owned subsidiary of Defendant Sears, Roebuck & Co. ("Sears"), between October 24, 2001 and October 17, 2002 (the "Class Period"), and (2) all those who, during the Class Period, purchased publicly traded securities issued by SRAC before the Class Period and actively traded them through the public markets and over national securities exchanges.

Defendant Sears, one of North America's largest general retailers, provides financing to its customers through private label credit cards and installment plans. Defendant SRAC's principal business is purchasing Sears' short-term notes and account receivable balances, which it finances through public sales of SRAC debt. Plaintiffs have also named, as Defendants, the officers and directors of Sears and SRAC and the financial institutions that served as underwriters to the three

SRAC debt securities offerings at issue here.

Plaintiffs allege that Sears manipulated information regarding its credit card operations to make those operations appear "more stable and profitable than they actually were," which artificially inflated the market value of SRAC debt securities. Specifically, Sears misrepresented its reliance on subprime creditors; selectively reported delinquency and charge-off rates; and disguised portfolio losses in order to generate high levels of reported receivables that Sears knew would prove uncollectible. Plaintiffs claim that Defendants all made materially false and misleading statements or omissions in connection with Sears' credit card operations in violation of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o; and §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

Plaintiffs' Amended Class Action Complaint (the "First Complaint"), filed on October 16, 2003, was the target of four separate motions to dismiss. The court granted those motions in part and denied them in part in September 2004. *Ong ex rel. Ong v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871 (N.D. Ill. 2004). In a Second Amended Class Action Complaint (the "Second Complaint"), Plaintiffs added SURSI as an additional new Plaintiff, and made additional allegations of scienter. That complaint, too, was the subject of motions to dismiss, which the court granted in part and denied in part in September 2005. *Ong ex rel. Ong v. Sears, Roebuck & Co.*, No. 03 C 4142, 2005 WL 2284285, at *1 (N.D. Ill. Sept. 14, 2005). On October 28, 2005, Plaintiffs filed a Third Amended Class Action Complaint (the "Third Complaint"). Defendants Sears, SRAC, and their officers and directors (collectively, the "Sears Defendants") seek dismissal of Counts VIII and IX of the Third Complaint, in which Plaintiffs allege § 10(b) securities fraud and § 20(a) "control person" liability in light of the Supreme Court's recent decision in *Dura Pharmaceuticals, Inc., v. Broudo*, 544 U.S. 336 (2005). Defendants contend a third motion to dismiss is warranted because *Dura* changed the requirements for pleading loss and causation in a securities fraud claim. For the

reasons stated here, Defendants' motion is denied.

## BACKGROUND

The extensive procedural and factual background of this case is set forth in this court's two previous opinions in this case. *See Ong*, 2005 WL 2284285, at *2–8; *Ong*, 388 F. Supp. 2d at 876–88. The court assumes the reader's familiarity with the earlier decisions and attempts to recite only those facts relevant to the Sears Defendants' current motion to dismiss, and those needed for context.

Sears is one of the largest general retailers in North America. As part of its operations, Sears provides financing to customers through private label credit cards and installment plans.[1] SRAC, Sears' wholly-owned subsidiary, is primarily in the business of purchasing short-term notes and account receivable balances from Sears. SRAC funds these purchases by issuing debt securities such as commercial paper, medium term notes, and "other borrowings" (collectively, "SRAC Debt Securities") to the public. (Third Am. Compl. ¶¶ 12, 13, 47-48.) SRAC issued three such debt offerings during the Class period, pursuant to Prospectuses dated March 18, 2002 (the "3/18/02 Offering"), May 21, 2002 (the "5/21/02 Offering"), and June 21, 2002 (the "6/21/02 Offering"). (*Id.* ¶ 2.) Plaintiffs all purchased SRAC Debt Securities during the Class Period.[2] (*Id.*

---

[1] Plaintiffs assert that Sears decided to sell its credit operations in March 2003, (Third Am. Compl. ¶ 192), but provide no information as to whether any sale in fact transpired.

[2] Plaintiff Ong bought 12,000 shares of the 6/21/02 Offering on June 21, 2002, for a net purchase price of $300,000; he sold the shares, in six transactions of 2,000 shares each, between January 5 and January 16, 2003 for net proceeds of $294,771.40. (Certification of Plaintiff Pursuant to Federal Securities Law Regarding Sears Roebuck Acceptance Corp., Ex. B to Third Am. Compl.) Also on June 21, 2002, Plaintiff Ong for Thomas G. Ong IRA purchased 900 shares of the 6/21/02 offering for a net purchase price of $22,500; he has alleged no sale of these shares. (Certification of Plaintiff Pursuant to Federal Securities Law Regarding Sears Roebuck Acceptance Corp., Ex. C to Third Am. Compl.) Plaintiff SURSI bought a total of 2,080,000 shares of the 3/18/02 Offering between September 17 and October 17, 2002, and sold 1,700,000 of those shares between November 14 and November 22, 2002. (Certification of Named Plaintiff Pursuant to Federal Securities Laws, Ex. D to Third Am. Compl.) Between May 21, 2002, and June 18, 2002, SURSI also bought 980,000 shares of the 5/21/02 Offering, but has alleged no sale of these shares.
(continued...)

3

¶¶ 9-11.)

Defendants Lacy, Liska, Keleghan, Vishwanath, Bergmann, Richter, Trost, Slook, and Raymond were all senior executive officers and/or directors of Sears, SRAC, or both, at some point during the Class Period. (*Id.* ¶¶ 14–22.) Defendants Credit Suisse First Boston Corporation ("CSFB"), Goldman, Sachs & Co. ("Goldman Sachs"), Morgan Stanley & Co., Inc. ("Morgan Stanley"), Bear, Stearns & Co., Inc. ("Bear Stearns"), Lehman Brothers, Inc. ("Lehman Brothers"), and Merrill Lynch & Co., Inc. ("Merrill Lynch") (collectively, the "Underwriter Defendants") are integrated financial services institutions. (*Id.* ¶¶ 33-38.) Each of the Underwriter Defendants served as either managing underwriter, lead manager, or book runner for one or more of the three SRAC debt offerings. (*Id.*)

## A.    The Relationship between Sears and SRAC

SRAC, Sears' wholly-owned finance subsidiary, has its own board of directors,[3] its own SEC filings, and its own independently issued securities. (*Id.* ¶ 49.) Plaintiffs allege, however, an "intertwining of the finances and operations" of the two companies. (*Id.* ¶ 57.) According to Plaintiffs, SRAC's operating income is generated primarily from the earnings on its investments in Sears' short-term notes and account receivables. Moreover, Sears requires SRAC to maintain a set ratio of earnings to fixed expenses. As a result, "the yield on SRAC's investment in Sears notes is directly related to SRAC's borrowing costs, i.e., the yield under which SRAC can issue and sell its Debt Securities." It is thus in Sears' financial interest to keep SRAC's borrowing costs as low

---

[2](...continued)
(*Id.*)

[3]    Plaintiffs assert that two Defendants were senior executives with Sears as well as members of SRAC's board during the class period. The Third Complaint, however, identifies three such persons: Mr. Liska, Sears' Chief Financial Officer prior to October 4, 2002; Mr. Richter, Sears' Chief Financial Officer since October 4, 2002 and Senior Vice President of Finance prior to that; and Mr. Bergmann, Sears' Chief Accounting Officer and Controller. (Third Am. Compl. ¶¶ 15, 16, 22, 47.) It is thus unclear whether all three, or two of the three, were members of SRAC's board; and if only two were board members, which two.

4

as possible because the less SRAC pays purchasers of its Debt Securities, the less Sears must pay to borrow from SRAC. (*Id.* ¶ 49.)

Because of this "inter-relationship" between SRAC and Sears, industry analysts and the financial markets looked to Sears when assessing the investment prospects for SRAC Debt Securities. (*Id.* ¶ 50.) When analysts viewed Sears favorably, bond rating agencies issued positive ratings on SRAC debt; when Sears issued negative news, those agencies downgraded SRAC's credit rating. (*Id.*) Plaintiff also alleges a "direct relationship" between the market prices of the two companies' securities. For example, on October 17, 2002, Sears, as will be discussed, disclosed problems with its credit card operations. While the price of Sears stock reacted by falling $10.80 per share (approximately 32%) to close on October 17 at $23.15 on volume twelve times greater than Sears' daily trading average, SRAC Debt Securities from the 6/21/02 Offering fell 8.6% from $24.05 per share to $21.99 per share on six times the daily trading average. (*Id.* ¶¶ 51, 52.) Similarly, the interest rate on an SRAC proposed bond offering rose dramatically after Sears' October 17 announcement, from 13 to 38 basis points above the one-month London Interbank Offered Rate ("Libor").[4] (*Id.* at 54.) Thus, Plaintiffs assert, it was "reasonable for investors to believe that the ratings and yields on SRAC Debt Securities would correlate with the price of Sears' common stock, and in direct and immediate response to information disclosed to the market as it related to Sears' finances" and operations." (*Id.* ¶ 56.) The result, according to Plaintiffs, was that an investment in SRAC Debt Securities would "take on the status of a direct investment with Sears itself." (*Id.* ¶ 57.)

---

[4]     Libor represents the rate banks charge each other for short-term Eurodollar loans. It is frequently used as the base for resetting rates on floating-rate securities. *See* Tripp & Co., Inc., Glossary, http://www.trippco.com/glossary/.

## B.    Sears' Credit Problems

For many years, Sears was one of the largest credit card issuers in the country.  (*Id.* ¶ 63.) Prior to 1993, Sears stores accepted only Sears' own proprietary credit cards ("Sears Cards"), which could only be used to make purchases at Sears. (*Id.* ¶¶ 60, 64.) When Sears began accepting general credit cards in 1993, the company saw a drastic decrease in the use of Sears Cards.  (*Id.* ¶ 64.)  At the same time, Sears' retail sales were also in decline due to increased competition from discount retailers like Wal-Mart and Kohl's.  (*Id.*)  In late 2000, to stimulate sales and help regain income lost from the decline of its proprietary cards, Sears began to issue a Sears MasterCard, a general purpose credit card that could be used wherever MasterCard was accepted and that generated fee income for Sears when used at non-Sears locations. (*Id.* ¶ 67.) By February 2001, the Sears MasterCard carried $1.4 billion in receivables and Sears, through its subsidiary Sears National Bank, had become one of the top 25 bank card issuers. (*Id.* ¶ 70.)  As Sears' retail business continued to decline, Defendant Lacy, Sears' Chief Executive Officer, identified the Sears MasterCard as a top area for growth and emphasized its importance to the company.  (*Id.* ¶¶ 68, 71, 72.)  Before and during the Class Period, Mr. Lacy and other Sears executives touted the success of Sears' credit operations, repeatedly portraying the quality of Sears' credit portfolio as "strong," "stable," and "adequately reserved." (*Id.* ¶ 73.)  Defendant Keleghan, President of Sears Credit, described Sears MasterCard users as "a pristine group," noting "[w]e don't expect significant delinquencies since we're starting out with a low-risk group."  (*Id.* ¶ 70.)

In reality, Sears credit operations suffered from several weaknesses and problems which were hidden from the market.  (*Id.* ¶ 74.)  First, contrary to representations that Sears targeted only low-risk consumers for its Sears MasterCard, Sears in fact aggressively marketed the card to borrowers with subprime credit; as a result, the percentage of subprime borrowers in Sears' credit portfolio far exceeded the national average.  (*Id.* ¶¶ 76, 77.)  Second, Sears masked the true

charge-off and delinquency rates[5] of its credit cards by reporting those rates on a portfolio-wide basis rather than separating out the performances of the Sears Card and the Sears MasterCard. When the portfolio was viewed as a whole, the larger size of the Sears Card portfolio and the fast-growing receivables of the new MasterCard combined to give the appearance of stability, when in fact both groups were experiencing "a striking rise in delinquencies and charge-offs every quarter." (*Id.* ¶¶ 79–81.)  Third, Plaintiffs allege (without explanation) that Sears National Bank was not subject to the same rules and regulatory oversight requirements as "ordinary" bank card issuers, thus allowing Sears to adopt more lenient credit policies for customers falling behind in their payments and avoid having to report their accounts as delinquent.  (*Id.* ¶ 83.)  Finally, Plaintiffs assert that Sears engaged in fraudulent billing practices by providing such strong incentives for sales of additional services, such as extended warranties, that salespersons were induced to charge customers for these items without the customers' knowledge or consent.  As a result, Sears was able to report high receivables it knew to be uncollectible.  (*Id.* ¶ 85.)

## C.    False and Misleading Statements

Plaintiffs allege that Sears executives issued numerous false and misleading statements to deceive the investing public into believing that Sears' credit operations were "far better, more successful and profitable, than was actually the case." (*Id.* ¶ 86.)  This court in its first of two prior opinions in this case discussed in detail Defendants' alleged false and misleading statements regarding Sears' credit operations.  *See Ong*, 388 F. Supp. 2d 871 at 879–85.  The Third Complaint adds no new allegations in this regard.  (Third Am. Compl. ¶¶ 86–158.)  For purposes of the pending motion to dismiss, there is no dispute that Plaintiffs have sufficiently alleged that the relevant Defendants made false and misleading statements and, thus, the court will not repeat them

---

[5]    Charge-offs are write-offs taken on uncollectible credit card receivables. *See In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 724 n.2 (N.D. Ill. 2003).  Delinquency rates describe the number of credit card receivables that are past due relative to all outstanding loans.

here.  The court notes generally, however, Plaintiffs' allegations that between the third quarter of 2001 and the second quarter of 2002, Defendants issued SEC Form 8-Ks and Form 10-Qs reflecting stable delinquency rates and improving credit portfolio quality.  (*Id.* ¶¶ 96, 97, 99, 100, 109–11, 123–24, 132.)  In fact, as noted above, both the Sears Card and Sears MasterCard portfolios were excessively weighted towards the subprime market and, when viewed separately, each reflected rising delinquency and charge-off rates.  (*Id.* ¶¶ 76–81.)  Nevertheless, Defendants made statements at analyst meetings, in press releases, and during investor conference calls confirming the stable and even "pristine" quality of the portfolios and projecting significant increases in earnings each year.  (*Id.* ¶¶ 90–93, 98–100, 102, 114, 117–118, 132, 135, 139, 144, 149, 152.)

**D.      Sears' Disclosures of Problems with its Credit Operations and Market Reaction**

Plaintiffs allege that the true state of Sears' credit portfolios finally began to emerge in October 2002.  On October 4, 2002, Sears announced that Mr. Liska had replaced Mr. Keleghan as Sears' Executive Vice President and President of Credit and Financial Products.  (*Id.* ¶ 160.) On October 7, 2002, Sears issued a press release reaffirming its July 18, 2002 projection of a 22% increase in earnings per share, but forecasting that earnings from its credit and financial services segment would increase only "in the mid-single digit percent range."  This was a significant decrease from "low double digits" increase projected on July 18.  (*Id.* ¶¶ 161–62.)  Although Mr. Lacy characterized Mr. Keleghan's departure as unrelated to business performance, analyst W.R. Hambrecht wrote on October 7 that the departure "bodes poorly for Sears Credit operations . . . and creates even greater uncertainty about the quality of earnings at the credit division."  (*Id.* ¶¶ 165, 168.)  In response to the negative news, the price of Sears stock fell from a closing price of $37.64 on October 4, 2002, to $32.25 on October 7. (*Id.* ¶ 166.)  Subsequently, the price of SRAC Debt Securities issued pursuant to the 6/21/02 Offering also fell, from an October 8, 2002 close of $24.81 per share to a closing price of $21.91 on October 10, 2002. (*Id.* ¶ 167.)

On October 17, 2002, Sears issued a press release announcing that it would be increasing

its allowance for bad debt by $222 million. The charge against earnings required to cover this increase reduced Sears' earnings for the quarter by 26% as compared to the prior year. Despite having ten days earlier projected a 22% increase in earnings per share that year, Sears now estimated an increase in annual earnings of only 15%. The release also stated that the credit segment was "down 28 percent compared to the prior year." (*Id.* ¶ 171.)

In an analysts meeting conducted by conference call that day, Mr. Lacy attributed Sears' problems in its credit business to the duplicity of Mr. Keleghan and Mr. Vishwanath, asserting that Mr. Keleghan had not been forthcoming about the issues facing Sears' credit business and had been fired due to Mr. Lacy's "personal loss of confidence in him relative to his personal credibility," and that Mr. Vishwanath had "withheld information" and had been terminated as well. (*Id.* ¶ 172.) When Mr. Liska took over the conference call, he disclosed that "Middle America" balances made up a large portion of Sears' credit portfolio. Although Mr. Keleghan had, a year earlier, explained that Sears targeted "middle market" consumers as a way of distinguishing that group from the "subprime" market, Mr. Liska now used the term "Middle America" as a euphemism for "subprime": "It is generally recognized that [M]iddle America accounts deteriorate more quickly in a tough economy than prime accounts do." (*Id.* ¶¶ 173–74.) In contrast to Sears' earlier representations of the quality of its credit card portfolio, Mr. Liska acknowledged that Sears' credit portfolio had been heavily subprime for years: "In 1998 Middle America balances represent[ed] 60% of our portfolio. They represent 48% today. Last year the segment represented 54% of our portfolio." (*Id.* ¶ 174.)

In response to Sears' October 17, 2002 disclosures, W.R. Hambrecht reported that Sears' "shocking 26% decrease in earnings . . . stunned the Street and all in attendance" at the analysts meeting. "Frankly, it was the realization of our worst-case scenario regarding the state of the company's credit operations, which represent more than 60% of Sears' operating profit." (*Id.* ¶ 176.) Indeed, as noted above, the price of Sears stock fell $10.80 per share (approximately 32%) to close at $23.15 on October 17, 2002, and there was "extraordinary trading volume" that day of

36 million shares, twelve times greater than Sears' daily trading average of 2.9 million shares during the Class Period.  (*Id.* ¶ 177.)  SRAC Debt Securities fell 8.6%, from a close of $24.05 per share on October 16, 2002 to $21.99 on October 17, "on trading of 153,600 Notes, six times the daily trading average of 25,000 shares." (*Id.* ¶ 178.)  A planned new debt offering by SRAC suffered as well.  Shortly before the end of the Class Period, SRAC had announced its intention to offer approximately $800 million of three-year SRAC Debt Securities at an interest rate of 13 to 14 basis points above the one-month Libor; after the October 17 disclosures, however, these debt securities were priced at 38 points above Libor.  (*Id.* ¶¶ 54, 179–80.)  Plaintiffs assert that "Wall Street analysts attributed this sudden and dramatic increase in interest rates to the recent adverse disclosures not by SRAC, but by its parent, Sears."  (*Id.* ¶ 54.)

On November 12, 2002, Sears filed its Form 10-Q for the third quarter of 2002.  In that report, Sears for the first time revealed to investors how the Sears MasterCard and Sears Card portfolios had both been deteriorating during the Class Period.  Sears disclosed that delinquency rates were rising in each portfolio when viewed separately; that Sears charged off accounts after 240 days, whereas most bank card issuers charge off at 180 days; that Sears allowed customers to "re-age" delinquent accounts (thus enabling Sears to avoid charging off the balance) once per year simply by making two consecutive monthly payments; and that Sears continued to record credit card fees and finance charges as revenue until an account was charged off.  (*Id.* ¶¶ 182–84.)

Analysts reacted negatively to Sears' third quarter 10-Q filing.  An article on *The Street.com* reported that the new data showed "a big jump in bad loans" that signified "deep deterioration in the MasterCard portfolio," and predicted that, "if this rot continues, the company may have to make loan provisions in 2003 that could wipe out a large part of the earnings analysts currently forecast." (*Id.* ¶ 186.)  On November 20, 2002, Bear Steams described Sears' "aggressive write-off policy" as a "key concern," and expressed "uneas[e]" as to whether Sears had "adequately accounted for the potential level of charge-offs."

On January 16, 2003, Sears issued a press release announcing that it was adding another $150 million to its reserves for uncollectible accounts, in part due to "increases in the net charge-off rate and delinquencies." (*Id.* ¶ 188.) On February 28, 2003, Sears lost its "A" credit rating when Standard and Poor's downgraded Sears debt. (*Id.* ¶ 189.) In its 2002 Form 10-K, filed on March 12, 2003, Sears repeated the delinquency and charge-off information contained in the third quarter 2002 SEC filings and acknowledged continuing deterioration in delinquency rates at the end of 2002. (*Id.* ¶¶ 190-91.) On March 26, 2003, Sears announced that it would seek to sell all of its credit operations "in an attempt to create value for all investors and focus on its profitable core retail and related services business." (*Id.* ¶ 192.)

## E.   This Lawsuit and its Procedural History

On June 17, 2003, Plaintiffs Thomas G. Ong and Thomas G. Ong IRA filed their initial complaint against Sears, SRAC, Mr. Lacy, Mr. Liska, Mr. Richter, and Mr. Bergmann, alleging violations of federal securities laws in connection with the 6/21/02 Offering of SRAC Debt Securities. Shortly thereafter on August 27, 2003, the court appointed Plaintiffs Lead Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 780-4, *et seq.* The First Amended Complaint, filed October 16, 2003, added Mr. Keleghan, Mr. Vishwanath, Mr. Trost, Mr. Slook, Mr. Raymond, and all the Underwriter Defendants as Defendants.

In their First Complaint, Plaintiffs sought to represent two classes: (1) all those who purchased or acquired SRAC Debt Securities pursuant to a prospectus during the Class Period; and (2) all those who, during the Class Period, purchased publicly traded SRAC Debt Securities that were issued by SRAC before the start of the Class Period and actively traded through the public markets and over national security exchanges. Plaintiffs alleged that Defendants, in violation of the Securities Act of 1933, made various misrepresentations in connection with the initial public offerings of the SRAC Debt Securities. Plaintiffs charged the Underwriter Defendants and several of the individual Sears Defendants with violating § 11 of the Securities Act, the Underwriter

Defendants with violating § 12(a)(2), and all the individual Defendants with violating § 15 as "controlling persons" of both Sears and SRAC. *See Ong*, 388 F. Supp. 2d at 888–89. Plaintiffs also alleged that the Sears Defendants violated § 10(b) of the SEA and Rule 10b-5 promulgated thereunder by deceiving the investing public and inducing Plaintiffs to buy SRAC Debt Securities at inflated prices during the class period. *Id.* at 889. Finally, Plaintiffs charged all the individual Defendants with violating § 20(a) of the SEA as "controlling persons."

### 1. The September 27, 2004 Opinion

In January 2004, Defendants filed four separate motions to dismiss the First Complaint, variously arguing that Plaintiffs lacked standing to pursue claims relating to the 3/18/02 and 5/21/02 Offerings; that Plaintiffs failed to identify any false and misleading statements attributable to them; that Plaintiffs failed to allege scienter; and that there was no basis for control person liability under § 15 of the Securities Act or § 20(a) of the SEA.

The court first held that Plaintiffs did not have standing to pursue their §§ 11 and 12(a)(2) Securities Act claims against the Underwriter Defendants involved in the 3/18/02 and 5/21/02 Offerings because Plaintiffs purchased securities only in the 6/21/02 Offering. *Ong*, 388 F. Supp. 2d at 891–92. The court declined, however, to dismiss Merrill Lynch, the sole underwriter Defendant involved in the 6/21/02 Offering, finding that Plaintiffs sufficiently alleged that Merrill Lynch had made false and misleading statements in the Registration Statement and Prospectuses for that offering. *Id.* at 892–94.

With respect to Plaintiffs' claims under § 10(b) of the SEA and Rule 10b-5, the court found that Plaintiffs adequately stated claims against Sears, SRAC, Mr. Lacy, and Mr. Liska; the court dismissed § 10(b) claims against the other individual Sears Defendants based either on the absence of false or misleading statements attributable to them, or the lack of a strong inference of fraudulent intent. *Id.* at 906–07, 909, 911. Plaintiffs' § 20(a ) "control person liability" claims survived dismissal as to all the individual Sears Defendants. *Id.* at 906, 910–11.

## 2.    The September 14, 2005 Opinion

On November 15, 2004, Plaintiffs filed their Second Amended Class Action Complaint, attempting to remedy the standing and scienter deficiencies by adding SURSI as a Plaintiff and by asserting several new allegations.  The Underwriter Defendants involved in the 3/18/02 and 5/21/02 Offerings moved to dismiss the §§ 11 and 12(a)(2) claims on grounds that Plaintiffs still lacked standing to assert claims arising from the 3/18/02 Offering despite the addition of SURSI, and had insufficiently alleged damages related to the 5/21/02 Offering.[6]  *Ong*, 2005 WL 2284285, at *13. The Sears and SRAC defendants urged the court to dismiss the § 10(b) and Rule 10b-5 claims, as well as §§ 15 and 20(a) "control person" claims, again arguing that Plaintiffs failed to adequately allege fraudulent intent or that the individual defendants were controlling persons.  *Id.* at *17.

Addressing the Underwriter Defendants' arguments first, the court agreed that  Plaintiffs did not have standing to assert their § 12(a)(2) claim against CSFB and Goldman Sachs relating to the 3/18/02 Offering because SURSI, the only named Plaintiff to have purchased securities from that offering, did so on the aftermarket rather than from the initial public offering.  *Id.* at **13–14.  The court also dismissed the §§ 11 and 12(a)(2) claims against the Underwriter Defendants relating to the 5/21/02 offering, finding that because the 5/21/02 notes held by SURSI were worth more when Plaintiffs filed suit on June 17, 2003 than when SURSI purchased them, SURSI suffered no cognizable loss and thus failed to state a claim for damages.  *Id.* at **15–16.  As for the Sears Defendants, the court found the allegations of scienter sufficient to state § 10(b) and Rule 10b-5 claims against Mr. Lacy, Mr. Liska, and Mr. Keleghan, and thus against Sears and SRAC as well. *Id.* at **24–26.  The court found, however, that Plaintiffs had pleaded no facts demonstrating that the other individual Sears Defendants acted with the required fraudulent intent, and thus dismissed

---

[6]    Merrill Lynch, the only underwriter involved in the 6/21/02 Offering, filed an answer and affirmative defenses to the Second Amended Class Action Complaint on January 28, 2005.

the § 10(b) claims against Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, and Mr. Bergmann.[7]  *Id.* at **23–24.  The § 20(a) "control person" claims again survived as to all the individual Defendants, including Mr. Vishwanath.  *Id.* at *26.  Finally, the court dismissed, with leave to amend, the § 15 claim against the individual Sears Defendants as controlling persons of SRAC because SRAC had not been named as a primary violator in Plaintiffs' § 11 claims.  *Id.* at *27.

### 3.    Plaintiffs' Third Amended Complaint and the Current Motion to Dismiss

Plaintiffs filed their Third Amended Class Action Complaint on October 28, 2005.  The Third Complaint is substantially identical to the Second Complaint, except that it adds SRAC as a Defendant in Plaintiffs' § 11 Securities Act claims.  (Third Am. Compl. ¶¶ 245, 268, 295.)  Plaintiffs putative class definitions remain the same: an "Issuer Class," consisting of all persons and entities who purchased or otherwise acquired SRAC Debt Securities between October 24, 2001 and October 17, 2002, inclusive, pursuant to a prospectus or traceable to a prospectus; and a "Trader Class," consisting of all persons and entities who, during the Class Period, purchased or otherwise acquired SRAC Debt Securities that were actively traded through the public markets and over national securities exchanges.  (*Id.* ¶ 40.)

In Counts I through III, Plaintiffs allege that SRAC, the Underwriter Defendants, and Defendants Trost, Slook, Liska, Raymond, Richter, and Bergman, in connection with each of the 3/18/02, 5/21/02, and 6/21/02 SRAC Debt Securities offerings, violated § 11 of the Securities Act by "fail[ing] to make a reasonable investigation or possess reasonable grounds for believing that the representations contained in the Registration Statement, including the documents incorporated therein, were true and without omissions of any material facts and were not misleading." (*Id.* ¶¶ 243, 250, 268, 275, 295, 302.) Counts IV through VI charge the Underwriter Defendants with violating § 12(a)(2) of the Securities Act by making material misrepresentations in the three SRAC Debt

---

[7]    Plaintiffs did not assert a § 10(b) claim against Mr. Vishwanath in the Second Amended Class Action Complaint.  (Second Am. Compl. ¶ 352.)

Securities offerings "knowingly or recklessly and for the purpose and effect of concealing the truth with respect to the SRAC's and Sears' operations, business management, performance and prospects from the investing public and supporting the artificially inflated price of the [ ] SRAC Debt Securities." (*Id.* ¶¶ 323–26, 329, 335–38, 341, 347–350, 353.) Count VII alleges that Defendants Lacy, Liska, Richter, Trost, Slook, Raymond, and Bergmann violated § 15 of the Securities Act because they acted as controlling persons of SRAC and had the power to influence and control the decision-making of both Sears and SRAC, "including the content and dissemination of the various statements which Plaintiffs contend are false and misleading herein." (*Id.* ¶ 359–60.)

In Count VIII, Plaintiffs claim that Sears, SRAC, and all the individual Sears Defendants except Mr. Vishwanath violated § 10(b) of the SEA and Rule 10b-5 promulgated thereunder by engaging in a "plan, scheme and course of conduct" to deceive the investing public and induce Plaintiffs to purchase SRAC Debt Securities at artificially inflated prices during the Class Period. (*Id.* ¶ 363.) Plaintiffs assert that the Sears Defendants made untrue statements of material fact about Sears' and SRAC's business operations and future prospects, and omitted to state material facts necessary to make those statements not misleading. (*Id.* ¶ 366.) Plaintiffs allege that Defendants made their misrepresentations knowingly or with reckless disregard for the truth. (*Id.* ¶ 368.) As a result, "Plaintiffs and the members of the Trader Class acquired SRAC Debt Securities during the Class Period at artificially high prices and were damaged thereby." (*Id.* ¶ 369.)

Finally, Plaintiffs in Count IX charge all the individual Sears Defendants with violating § 20(a) of the SEA because they acted as controlling persons of SRAC and had the power to influence and control the decisions of SRAC and/or Sears, "including the content and dissemination of the SEC filings and other statements that Lead Plaintiffs contend are false and misleading." (*Id.* ¶ 375.)

The Sears Defendants, pursuant to FED. R. CIV. P. 12(b)(6), move to dismiss Counts VIII and

IX of the Third Complaint.[8] (Motion to Dismiss Claims Eight and Nine of the Third Amended Complaint (hereinafter "Defs. Mot."), at 1.) Defendants argue that Count VIII fails to state a claim under § 10(b) of the SEA and Rule 10b-5 in light of the Supreme Court's recent decision in *Dura*.[9] (Memorandum in Support of Defendants' Motion to Dismiss Claims Eight and Nine of the Third Amended Complaint (hereinafter "Defs. Mem."), at 1.) Specifically, Defendants contend that Plaintiffs have not adequately pleaded actual economic loss and proximate causation. (*Id.*) Because Count IX alleges "control person" liability based on the alleged primary § 10(b) violation in Count VIII, Defendants argue that Count IX must be dismissed as well, once the court finds that Count VIII fails to state a claim.[10] (Defs. Mot., at 2.)

## DISCUSSION

### I. Legal Standard and Pleading Requirements

The purpose of a motion to dismiss is to test the sufficiency of the plaintiffs' complaint, not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When

---

[8] As noted, the court has already dismissed Count VIII as to Defendants Bergmann, Richter, Trost, Slook, and Raymond; of the claims asserted in Count VIII, only those against Sears, SRAC, Mr. Lacy, Mr. Liska, and Mr. Keleghan are presently viable. Indeed, the court on September 14, 2005 also dismissed Counts II, IV, and V as to the Underwriter Defendants. Plaintiffs acknowledge these rulings and have reasserted their claims simply to preserve them for appeal. (*Id.* ¶ 377 n.2.)

[9] The Supreme Court decided *Dura* on April 19, 2005. Plaintiffs filed their Third Complaint on October 28, 2005.

[10] Plaintiffs contend that Rule 12(g) precludes Defendants from challenging Plaintiffs' loss and causation allegations because Defendants failed to raise these arguments in their previous motions to dismiss Plaintiffs' prior pleadings. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Claims Eight and Nine of the Third Amended Complaint, at 3 n.2.) Although Rule 12(g) does provide for waiver of certain arguments if omitted from a prior motion, the rule exempts claims identified in Rule 12(h)(2). FED. R. CIV. P. 12(g). Rule 12(h)(2), in turn, provides that "[a] defense of failure to state a claim upon which relief can be granted . . . may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits." FED. R. CIV. P. 12(h)(2). The court thus declines to hold that Defendants have waived their loss and causation arguments. *See Malin v. XL Capital Ltd.*, No. 3:03 CV 2001 PCD, 2005 WL 2146089, at *2 (D. Conn. Sept. 1, 2005).

considering a motion under Rule 12(b)(6), a court must take as true all facts alleged in the complaint, and construe all reasonable inferences in favor of the plaintiff. *Arazie v. Mullane*, 2 F.3d 1456, 1465 (7th Cir. 1993). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Rule 9(b) imposes a heightened pleading standard for civil cases involving allegations of fraud. *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 470 (7th Cir. 1999). Plaintiffs must allege fraud "with particularity," FED. R. CIV. P. 9(b), meaning that they must identify "the who, what, when, where and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990). In securities fraud cases, the PSLRA imposes an additional, and even stricter, particularity requirement than Rule 9(b). *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 594 (7th Cir. 2006) Under the PSLRA, a securities fraud complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1) and (2).

This heightened particularity requirement does not, however, extend to the pleading of the elements of economic loss and proximate causation. *Dura Pharm.*, 544 U.S. at 346. Although the PSLRA requires a plaintiff to "allege and prove the traditional elements of causation and loss" for a securities fraud claim, neither the Rules nor the PSLRA imposes more than the requirement set forth in Rule 8(a)(2): "[A] short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(b)). Thus, with respect to proximate causation and economic loss, the complaint must "provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* (quoting *Conley*, 355 U.S. at 47).

17

## II.     Analysis

Section 10(b) of the SEA "forbids (1) the 'use or employ[ment] . . . of any deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.'"  *Dura Pharm.*, 544 U.S. at 341 (quoting 15 U.S.C. § 78j(b)).  SEC Rule 10b-5 prohibits "the making of any 'untrue statement of material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'"  *Id.* (quoting 17 C.F.R. § 240.10b-5).  To state a claim for damages under § 10(b) and Rule 10b-5, a plaintiff must show: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance on the misrepresentation (i.e., "'transaction causation'"), (5) economic loss, and (6) "'loss causation,' i.e., a causal connection between the material misrepresentation and the loss."  *Id.* (citations omitted).

Defendants argue that Plaintiffs have failed to adequately plead the elements of economic loss and loss causation.  According to Defendants, *Dura* requires plaintiffs in § 10(b) securities fraud actions to plead facts showing they have "realized an 'actual economic loss' and, further, that the loss was proximately caused by misrepresentation and not by other factors."  (Defs. Mem., at 1.)  Plaintiffs here do not make the required showing of actual economic loss, Defendants contend, because Plaintiffs (1) did not sell all their SRAC Debt Securities; or (2) merely allege an inflated purchase price, without showing that those securities lost value.  (*Id.* at 5–6.)  Defendants further maintain that Plaintiffs fail to show "loss causation" because Plaintiffs do not adequately plead facts showing "the absence of factors unrelated to the alleged fraud" that could have affected the value of Plaintiffs' securities.  (*Id.* at 5–6.)

In *Dura*, the Supreme Court reversed a Ninth Circuit decision that had found that a § 10(b) complaint adequately pleaded loss causation merely by alleging that the price of the security on the date of purchase was inflated because of the defendants' misrepresentations.  544 U.S. at 338. There, the plaintiffs alleged that Dura made false statements regarding both expected drug profits

and FDA approval of an asthmatic spray device.  *Id.* at 339.  With respect to the spray device claim, the Ninth Circuit had found the requirement of loss causation satisfied by "nothing significantly more" than an allegation that the plaintiffs "'paid artificially inflated prices for Dura securities' . . . and suffered 'damage[s]' thereby."  *Id.* at 339-40 (citation omitted).  The Supreme Court, reversing, noted that the Ninth Circuit's holding conflicted with the law of other circuits, including the Seventh.  *Id.* at 340 (citing *Bastian v. Petren Res. Corp.*, 892 F.2d 680 (7th Cir. 1990)).

The Court explained that an inflated purchase price will not itself constitute or cause the relevant economic loss, because at the moment of purchase, the purchaser owns an asset equal to that purchase price and thus has suffered no loss.  *Id.* at 342.  The Ninth Circuit's approach would thus have allowed recovery where no loss had occurred.  *Id.* at 343.  Moreover, even if a plaintiff later sells the security at a loss, there is no guarantee that the later, lower price was not the result of factors separate from the misrepresentation, particularly if some time has passed between the purchase and the sale.  *Id.* at 342-43.  Thus, plaintiffs in securities fraud actions, as in common law actions for deceit and misrepresentation, must "adequately allege and prove the traditional elements of causation and loss."  *Id.* at 345.

Turning to pleading requirements, the Court noted that Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Id.* at 346 (quoting FED. R. CIV. P. 8(a)(2)).  The court "assume[d], at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss."  *Id.*  Plaintiffs must, however, "provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  *Id.* (quoting *Conley*, 355 U.S. at 47).  The *Dura* plaintiffs failed "this simple test" because their complaint only alleged that the plaintiffs had paid an artificially high price: the complaint contained "nothing" that suggested that Dura's share price fell after the truth become known.  *Id.* at 347.  The Court thus held that a § 10(b) complaint must allege more than an inflated purchase price; specifically, a securities fraud

plaintiff must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* The Court observed, however, that this was "not meant to impose a great burden upon a plaintiff." *Id.*

As an initial matter, this court concludes that, to the extent Defendants suggest that *Dura* imposed stricter fact-pleading requirements for the economic loss and causation elements of an action under § 10(b), Defendants are mistaken. As noted above, the Court in *Dura* applied a notice-pleading standard to these elements; there, the complaint failed because the plaintiffs alleged no loss at all. It is true that the Supreme Court did not explicitly hold that neither Rule 9(b) nor the PSRLA imposed stricter pleading requirements, but only "assume[d]" so, "at least for argument's sake." *Id.* at 346. Nonetheless, the Court evaluated the complaint in *Dura* under the notice-pleading standard of Rule 8(b); had a stricter standard applied, one assumes the Court would have used it. Moreover, courts in this district and elsewhere have interpreted *Dura* as imposing no heightened pleading standard for loss and causation. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1026–27 (9th Cir. 2005) (holding, post-*Dura*, that a plaintiff adequately pleads loss and causation by alleging that disclosure of the defendant's true financial condition resulted in a steep drop in its stock price); *In re Sara Lee Corp. Sec. Litig.*, No. 03 C 2302, 2006 WL 1980199, at *7 (N.D. Ill. July 10, 2006) ("Plaintiffs . . . need not meet a heightened pleading standard in making [the] causal allegation" between defendants' misrepresentations and plaintiffs' economic losses); *In re Silicon Image, Inc. Sec. Litig.*, No. C 05 456 MMC, 2006 WL 1709424, at *3 (N.D. Cal. June 21, 2006) ("'loss causation' need not be pleaded with specificity"); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2006 WL 1120522, at *3 (N.D. Ill. Apr. 24, 2006) ("The *Dura* Court, in rejecting the Ninth Circuit's inflated purchase price approach, iterated that notice pleading applies to fraud-on-the-market claims . . . ."); *In re CMS Energy Sec. Litig.*, 403 F. Supp. 2d 625, 629 (E.D. Mich. 2005) ("The Supreme Court's opinion in *Dura* clearly explains that it does not modify the pleading requirements of [Rule] 8(a)(2)."); *Greater Pennsylvania Carpenters Pension*

*Fund v. Whitehall Jewelers, Inc.*, No. 04 C 1107, 2005 WL 1563206, at *6 (N. D. Ill. June 30, 2005) ("[T]he Supreme Court [in *Dura*] expressly noted that Federal Rule of Civil Procedure 8(a)(2) governs a plaintiff's allegations of loss causation, not Rule 9(b)"); *see also D.E. & J. Ltd. P'ship v. Conway*, 133 Fed. Appx. 994, 999 (6th Cir. 2005) (noting that alleging causation and loss requires only Rule 8(a)(2)'s "short and plain statement . . . showing that the pleader is entitled to relief.").

Defendants have cited no authority suggesting that *Dura* imposes such heightened pleading requirements, and this court can locate none. The court thus concludes that Plaintiffs in this case are not required to plead facts showing economic loss or causation. Rather, the pleading standard is precisely what the Court set forth in *Dura*: Plaintiffs must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *See* 544 U.S. at 347. Under this notice-pleading standard, the court finds that Plaintiffs' Third Complaint sufficiently alleges the loss and causation elements of Plaintiffs' § 10(b) claim in Count XIII. The court addresses each element in turn.

### A.     Actual Loss

Defendants argue that Plaintiffs have not made the required showing of actual economic loss. First, Defendants maintain that after *Dura*, securities fraud plaintiffs must have actually realized a loss by selling their securities, and that Plaintiffs Thomas G. Ong IRA and SURSI cannot make the required showing because they have not sold all their SRAC Debt Securities. (Defs. Mem., at 5-6.) Second, Defendants contend that the Third Complaint is "indistinguishable" from the failed complaint in *Dura* because Plaintiffs have merely alleged an inflated purchase price for the SRAC notes, without showing any specific price declines in those securities after Sears' October 2002 disclosures. (*Id.* at 4–5, 7.)

Defendants' first argument is without merit. It is true, as Defendants contend, that Plaintiffs Thomas G. Ong IRA and SURSI did not sell all the SRAC Debt Securities that they had purchased in connection with Defendants' alleged misrepresentations regarding Sears' credit operations. *See*

*supra* n.2.  Nothing in *Dura* suggests, however, a requirement that § 10(b) securities fraud plaintiffs must sell their securities in order to suffer the requisite economic loss.  As discussed, *Dura* held that a plaintiff must show economic loss and causation; the Court nowhere stated that the loss must be realized through a sale.  Indeed, the Court emphasized the narrowness of its holding: "In sum, we find the Ninth Circuit's approach inconsistent with the law's requirement that a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss.  We need not, and do not, consider other proximate cause or loss-related questions."  *Dura Pharm.*, 544 U.S. at 346.  Defendants argue that because the Court discussed economic loss in the context of a later sale of securities, and several times used the words "sale" and "sells," a sale requirement is implied.  (Reply Memorandum in Support of Defendants' Motion to Dismiss Claims Eight and Nine of the Third Amended Complaint (hereinafter "Defs. Reply"), at 3.)  But the Court in the passage cited by Defendants was discussing hypothetical situations where a purchaser of securities sells "before the relevant truth begins to leak out," or after a period of time where a decline in price might be caused by factors other than misrepresentation and disclosure.  The fact that the Court used the terms "sale" and "sells" while discussing these hypotheticals is not tantamount to imposing a realization requirement.  The court thus declines to read into *Dura* a requirement that a § 10(b) plaintiff alleging fraud in connection with the purchase of securities must sell the securities to realize a loss before being allowed to sue.  *See In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp. 2d 605, 612 (D.N.J. 2005) ("*Royal Dutch II*") ("[I]t is clear that *Dura* does not mandate that a securities fraud plaintiff plead both purchase and subsequent sale of securities to establish economic loss and loss causation.").

Defendants cite a single district court case from the Third Circuit that held that a plaintiff must sell its securities in order to suffer an economic loss.  *See In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509, 557 (D.N.J. 2005) (Bissell, J.) ("*Royal Dutch I*").  The court's entire discussion of the issue was as follows:

> Defendants also argue that the claims of those purchasers that have not yet sold the securities cannot survive this motion to dismiss. In light of the *Dura* decision, this Court agrees. Such purchasers are invoking the exact insurance policy that *Dura* warned against and any such losses are speculative, at best. Those who purchased during the Class Period but have yet to sell their securities have not alleged proximate causation and economic loss; therefore those purchasers may not join the putative class.

*Id.* This court finds Defendants' reliance on this brief treatment of the issue misplaced. Significantly, the court's holding on this issue was reversed upon reconsideration and reassignment of the case to another judge. *See Royal Dutch II*, 404 F. Supp. 2d at 607. In *Royal Dutch II*, Judge Pisano held that neither *Dura* nor the PSLRA requires a plaintiff alleging fraud in connection with the purchase of securities to subsequently sell the securities. *Id.* at 607–08. Judge Pisano noted that a sale requirement would, in fact, be inconsistent with the PSLRA, which sets damages as the difference between the purchase price of the security and the mean trading price of that security in the 90-day period following disclosure of information correcting the misrepresentation, and with the traditional measure of damages in securities fraud actions, which measures damages as the difference between the purchase price and the "true value" of the securities after fraud is revealed. *Id.* at 608–10. Moreover, a "sell-to-sue" requirement could lead to market imbalances as defrauded investors rush to sell shares of an already-declining stock. *Id.* This court agrees with Judge Pisano's analysis, and declines to follow the (now abrogated) holding of *Royal Dutch I*.[11]

Defendants' second argument is ultimately unavailing as well. Defendants characterize the Third Complaint as "indistinguishable" from the complaint in *Dura* in that it alleges that Plaintiffs paid

---

[11]    This court further notes that the sell-to-sue requirement advocated by Defendants would potentially harm, rather than help, companies such as Sears and SRAC. Typically, corrective disclosures such as Sears' October 2002 announcements revealing the true condition of its credit operations result, as they did in this case, in sharp and sudden drops in a company's share price. If every misled investor were forced to sell their positions if they hoped to bring a securities fraud action, the rush of sell orders would only exacerbate the decline. This could put the company in a precarious financial position, or even cause it to be de-listed from national security exchanges. *See* NYSE Listing Standards, http://www.nyse.com/regulation/listed/ 1147474807436.html. Without a sell-to-sue requirement, at least some investors would presumably hang on in the hope that the share price would recover.

"artificially inflated prices and were damaged thereby." (Defs. Mem., at 4; Am. Compl. ¶ 369.) Defendants thus contend that Plaintiffs have not sufficiently alleged economic loss, even under a Rule 8(a)(2) notice-pleading standard. (Defs. Reply, at 2.) Defendants acknowledge, however, that Plaintiffs have alleged two specific price declines in SRAC notes from the 6/21/02 Offering: $24.81 per share to $21.91 from October 8, 2002 to October 10, 2002; and $24.05 per share to $21.99 on October 17, 2002 (Defs. Mem., at 4–5; Third Am. Compl. ¶¶ 167, 178.) Defendants maintain this is nevertheless insufficient because Plaintiffs have not alleged "any specific declines in the prices of [the other] 151 of the 152 SRAC notes series" after Sears' October 2002 disclosures. (Defs. Reply, at 2.)

In one sense, Defendants' arguments are inconsistent: Defendants contend that Plaintiffs have not alleged a decline in SRAC notes while simultaneously arguing that Plaintiffs' specific allegations of a decline in SRAC notes are insufficient because Plaintiffs should have made more such allegations. By Defendants' own admission, Plaintiffs have alleged more than an inflated purchase price for SRAC notes; thus, the Third Complaint is clearly distinguishable from the complaint in *Dura*. Second, Defendants' reference to "152 SRAC note series" is overbroad. The "152" figure appears to refer to the total number of offerings constituting SRAC's total outstanding debt during the last five months of the Class Period. (Sears Roebuck Acceptance Corp., Debt Outstanding for the Period June 21, 2002 through October 17, 2002, Ex. A to Third Am. Compl.) Although Plaintiffs bring their securities fraud claims on behalf of a class of those who purchased other SRAC notes during the Class Period, Plaintiffs themselves purchased SRAC Debt Securities from only three offerings, on 3/18/02, 5/21/02, and 6/21/02. Defendants fail to explain why Plaintiffs must further allege specific price declines in every one of SRAC's outstanding debt series.

More importantly, however, the kind of specificity the Defendants seek is simply not required at the pleading stage. To sufficiently allege economic loss, a securities fraud plaintiff, as discussed above, need only "provide a defendant with some indication of the loss." *Dura Pharm.*, 544 U.S.

24

at 347.  As noted earlier, the complaint in *Dura* failed not because the plaintiffs neglected to allege specific declines in share prices by date and amount, but because the plaintiffs neglected to allege that the shares declined at all.  *Id.* (noting "[t]he complaint's failure to claim that Dura's share price fell significantly after the truth became known").  For purposes of a motion to dismiss, the economic loss element is satisfied by allegations that the market price of Plaintiffs' securities declined after the defendant's disclosure of corrective information.  *See In re Daou*, 411 F.3d at 1027 ("the [complaint's] assertions of a steep drop in Daou's stock price following the revelation of Daou's true financial situation are sufficient to enable the complaint to survive a motion to dismiss.").

Plaintiffs have pleaded both general and specific allegations of a decline in the value of SRAC Debt Securities after Sears' October 2002 disclosures of problems with its credit operations. Plaintiffs generally allege that the value of all SRAC Debt Securities "dropped steeply" at the end of the Class Period.  (Third Am. Compl. ¶¶ 258, 283, 310.)  But Plaintiffs also allege two specific price declines in the 6/21/02 Offering: the first, from October 8 to 10, 2002, occurring after Sears' October 7 disclosure of lower expected earnings in the credit card division; the second on October 17, 2002, when Sears announced it was taking a $222 million charge against earnings. (*Id.* ¶¶ 167, 178.*)*  Plaintiffs also allege specific declines in the price of Sears common stock, and assert a "direct relation" between the price of SRAC notes and Sears' financial condition, and between the market prices of Sears stock and SRAC Debt Securities.  (*Id.* ¶¶ 51, 52.)  Indeed, Plaintiffs assert that an investment in SRAC was equivalent to a direct investment in Sears.  (*Id.* ¶ 57.)  Although Defendants dispute Plaintiffs' allegations of a relationship between Sears and SRAC, and assert that the prices of the two companies' securities did not move in lockstep during the class period, (Defs. Reply, at 2), the court for purposes of this motion assumes the truth of all facts alleged in the Third Complaint and construes all reasonable inferences in favor of Plaintiffs.  *See Arazie*, 2 F.3d at 1465.  The court thus finds that Plaintiffs' allegations of declines in the price Sears stock are sufficient to also constitute allegations of a decline in the value SRAC Debt Securities.

The court acknowledges that Plaintiffs have not alleged specific price declines in the 3/18/02 and 5/21/02 Offerings.[12] However, the court finds that the specific allegations of declines in the 6/21/02 Offering and Sears common stock, combined with Plaintiffs' general allegation of a steep drop in SRAC Debt Securities, are more than sufficient to give Defendants "some indication of the loss." *See Dura Pharm.*, 544 U.S. at 347. At the pleading stage, no more is required. *Cf. id.* (noting that other than alleging an inflated purchase price, "the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be.").

## B.    Loss Causation

Defendants argue that Plaintiffs also fail to satisfy the loss causation requirement. A plaintiff in a § 10(b) action must allege and prove that the defendant's misrepresentation or other fraudulent conduct proximately caused the plaintiff's economic loss. *Dura Pharm.*, 544 U.S. at 345–46 (citing 15 U.S.C. § 78u-4(b)(4)) ("[T]he [PSLRA] imposes on plaintiffs '"the burden of proving' that the defendants' misrepresentations 'caused the loss for which the plaintiff seeks to recover.'"). The Seventh Circuit has defined this "loss causation" requirement as a restatement of the rule in common law fraud actions requiring a plaintiff to show that "but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." *Bastian*, 892 F.2d at 683, 685. A securities fraud plaintiff, in other words, must show that "'but for the circumstances that the fraud concealed, the investment . . . would not have lost its value.'" *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648–49 (7th Cir. 1997) (quoting *Bastian*, 892 F.2d at 683).

At the pleading stage, a plaintiff must "provide a defendant with some indication . . . of the

---

[12]     Although not alleged in the Third Complaint itself, SURSI, in its certification statement listing its transactions in SRAC Debt Securities, provides an indication of the slide in prices of the 3/18 Offering. SURSI purchased SRAC shares on 9/17/02 and 9/20/02 in three transactions at prices of 106.66, 106.366, and 105.841. When SURSI purchased additional shares on 10/17/02, the price had fallen to 87. SURSI sold shares on 11/14/02, 11/19/02, and 11/22/02 at prices of 91.3, 92.155, and 95.375. (Certification of Named Plaintiff Pursuant to Federal Securities Laws, Ex. D to Third Am. Compl.)

causal connection that the plaintiff has in mind." *Dura Pharm.*, 544 U.S. at 347. A plaintiff cannot rely on a mere allegation that it suffered damages from purchasing securities at a price artificially inflated due to a defendant's misrepresentations. *Id.* This requirement, however, "ought not place unrealistic burdens on the plaintiff at the initial pleading stage." *Caremark*, 113 F.3d at 649. A plaintiff need not prove that all its loss can be attributed to the defendant's misrepresentation, and a complaint is not rendered infirm because the loss could have been caused by other, undisclosed wrongful conduct of the defendant or other factors that influenced the price of the plaintiff's securities. *Id.*

Defendants argue that *Dura* changed the pleading standards for loss causation, and that a § 10(b) plaintiff now "must allege facts showing that the difference between the sale and the purchase prices," which, according to Defendants, constitutes a plaintiff's economic loss, "was caused by an earlier misrepresentation, not by other factors." (Defs. Mem., at 3.) Plaintiffs fail to meet this standard, Defendants contend, by "not alleg[ing] the absence of factors unrelated to the alleged fraud that could have affected the sale price" of the SRAC Debt Securities sold by Plaintiffs. (*Id.* at 6.) In other words, Defendants argue that Plaintiffs fail to satisfy loss causation because they have failed to plead facts showing that the price declines of SRAC notes between Plaintiffs' purchases and sales were not caused by any factors other than Sears' alleged misrepresentations and subsequent disclosures.

As discussed above, Defendants' claim that *Dura* requires fact pleading for loss causation is incorrect. *Dura* itself assumed that notice pleading applied to allegations of loss and causation, and courts following *Dura* have rejected any suggestion that *Dura* imposes a stricter standard. *See, e.g., Jaffe*, 2006 WL 1120522, at *3 (rejecting the defendants' argument that *Dura* changed Seventh Circuit pleading standards with regard to loss causation). Indeed, as noted, Defendants cite no authority, and this court can find none, that holds a § 10(b) complaint to a fact-pleading standard as to loss and causation.

27

Defendants' argument that Plaintiffs are required to show the absence of other factors which could have caused the price decline in SRAC notes merits greater analysis. Defendants point to the following passage in *Dura* in support of their argument that Plaintiffs must affirmatively show the lack of such other factors:

> [T]he logical link between the inflated share purchase price and any later economic loss is not invariably strong. . . . If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price might mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. . . . Other things being equal, the longer the time between purchase and sale, the more likely that this is so, i.e., the more likely that other factors caused the loss.

*Dura Pharm.*, 544 U.S. at 342–43.

The court declines to read into this language a holding that a plaintiff can only allege causation by ruling out all other factors that may have contributed to a security's lower resale price. In the above passage, the Court was explaining its rationale for reversing the Ninth Circuit's conclusion that a plaintiff could show proximate causation, i.e., loss causation, merely by alleging an inflated purchase price. The Court's discussion of the potential for other factors contributing to a declining share price provides a rationale for requiring a plaintiff to tie that decline to a defendant's wrongful conduct. The Court did not, however, specify how a plaintiff must go about making the required showing. In short, the Court in *Dura* held that a § 10(b) plaintiff must show proximate cause, and cannot do so merely by relying on an allegation that the share price was artificially inflated when the plaintiff bought its securities; but that is all the Court held. As noted, the Court expressly limited its holding to finding that the Ninth Circuit's approach was inconsistent with the requirement that a plaintiff show causation and loss: "We need not, and do not, consider other proximate cause or loss-related questions." *Id.* at 346.

At most, the passage cited by Defendants simply recognizes the difficulty a plaintiff can face

in showing proximate causation. Prior to *Dura*, the Seventh Circuit had addressed this difficulty in *Caremark*. There, Caremark negotiated to sell its blood infusion business to Coram, the defendant, in exchange for notes and cash; however, Coram failed to disclose that it was simultaneously negotiating a merger with another company. *Caremark*, 113 F.3d at 647. After the deal with Caremark closed, the merger was announced, and the value of Coram's notes, now in Caremark's hands, dropped dramatically. *Id.* The Seventh Circuit held that Caremark had "alleged a plausible theory" of proximate cause by asserting that Coram's failure to disclose the merger negotiations caused it to undervalue the risk it was taking by accepting the notes as payment. *Id.* at 649. The court explained what was required to allege proximate cause at the pleading stage:

> We do not believe that Caremark's claim is rendered infirm because its alleged injuries equally could have been caused by factors which Coram did disclose. Caremark pleaded that its injury was caused by its reliance on the very fact which Coram misrepresented, and that allegation is sufficient at this early stage of the litigation. Nor do we believe that the adequacy of Caremark's allegation is negated by its having mentioned in the complaint other causes that could have contributed to the fall in the value of the notes. . . .[I]t is possible for more than one cause to affect the price of a security and, should the case survive to that point, a trier of fact can determine the damages attributable to the fraudulent conduct.

*Id.* Thus, the Seventh Circuit noted, like the Supreme Court in *Dura*, the possibility that other forces can contribute to a decline in the value of a plaintiff's securities. But the Seventh Circuit does not require a plaintiff to affirmatively rule out those other factors in its complaint; rather, that burden arises at trial.

*Dura* has not abrogated *Caremark* or changed the law in the Seventh Circuit. Both *Caremark* and the Seventh Circuit's decision in *Bastian* emphasized that a plaintiff in a securities fraud action must allege and prove loss causation, and nothing in *Dura* alters the Seventh Circuit's approach. *See Jaffe*, 2006 WL 1120522, at *3 ("*Dura* did not change the controlling law in this circuit."). Indeed, the Supreme Court cited *Bastian* when observing that other circuits had rejected the "inflated purchase price" approach to pleading loss causation. *Dura Pharm.*, 544 U.S. at 344. Thus, there is no reason to question *Caremark's* holding that a plaintiff need not allege that its loss

was caused only by the defendant's misrepresentation, and not by any factors. Defendant cites no authority holding to the contrary; indeed, courts in other circuits decline to require that a plaintiff, at least at the pleading stage, rule out other factors that may have contributed to the plaintiff's loss. For example, the Ninth Circuit, in a decision amended after *Dura* and which cites extensively to *Dura*, explained that "[a] plaintiff is not required to show 'that a misrepresentation was the sole reason for the investment's decline in value' in order to establish loss causation. . . . '[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement' but will play a role 'in determining recoverable damages.'" *In re Daou*, 411 F.3d at 1025 (quoting *Robbins v. Koger Prop., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)).

The general pleading requirement in the Seventh Circuit for loss causation, therefore, remains as it was articulated in *Bastian* and *Caremark*: "[T]he plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries." *Caremark*, 113 F.3d at 649. Notice-pleading applies to allegations of loss causation, and plaintiffs are not required to allege the absence of other factors that may have affected the price of securities. The court recognizes that the precise parameters of what is required to sufficiently plead loss causation are not entirely clear, and that *Dura* provides little guidance beyond establishing that a plaintiff must allege more than price inflation. Presumably, the complaint must at least indicate how a defendant's misrepresentations caused the plaintiff's economic losses. *See In re Sara Lee*, 2006 WL 1980199, at *7 (citing *Dura Pharm.*, 544 U.S. at 345-46) (Norgle, J.) ("A complaint in a securities fraud action . . . must allege actual misrepresentations or other fraudulent conduct on the part of the defendants, and describe how it is that defendants' alleged misrepresentations or fraudulent conduct caused the plaintiffs' economic losses.").

Courts since *Dura* have found loss causation properly pleaded where the plaintiff asserted that it bought securities at prices artificially inflated due to a defendant's misrepresentations, and

30

that the price dropped as the result of the truth being revealed. For example, in *Asher v. Baxter Int'l, Inc.*, No. 02 C 5608, 2006 WL 299068, at *1 (N.D. Ill. Feb. 7, 2006), the plaintiffs alleged that Baxter fraudulently issued optimistic and unattainable financial predictions in order to conceal pervasive operational problems, resulting in an artificially inflated share price. When Baxter announced a shortfall in earnings reflecting the company's true condition, its share price dropped significantly. *Id.* at *1–2. Judge Manning found these allegations sufficient to allege loss causation, concluding that the steep drop in the share price once Baxter's true condition came to light would not have occurred but for Baxter's prior misrepresentations. *Id.* at *7. In *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1025 (S.D. Cal. 2005), the plaintiffs alleged that the defendant's stock price was inflated because the defendant had misrepresented an HIV drug's effectiveness and likelihood of FDA approval, and that the stock "collapsed" upon disappointing study results and the defendant's decision to terminate the drug's funding. The court found that the "conjunction" of the allegations of price inflation upon the misrepresentations and share price collapse when the truth came out were sufficient to plead loss causation under *Dura*. *Id. See also In re Loewen Group Inc. Sec. Litig.*, 395 F. Supp. 2d 211, 218 (E.D. Pa. 2005) ("Plaintiffs have pleaded loss causation adequately by alleging that they purchased TLGI stock at an inflated price and lost money when the price fell."); *cf. In re Sara Lee*, 2006 WL 1980199, at *7–8 (holding that plaintiffs failed to allege a causal connection between defendants' alleged misrepresentations and plaintiffs' losses because defendants' statements either did not rise to the level of actual misrepresentations or could not be tied to plaintiffs' losses).

Turning to the facts of this case, the court finds that Plaintiffs have adequately pleaded loss causation. First, Plaintiffs allege price inflation. Plaintiffs assert that Sears executives issued numerous false and misleading statements to deceive the investing public into believing that Sears' credit operations were more stable and profitable than was the case. (Third Am. Compl. ¶ 86.) Defendants, in numerous financial statements, press releases, and analysts meetings lauded the

improving and even "pristine" credit quality of Sears' credit card portfolio, and projected increased earnings and revenue from credit operations. (*Id.* ¶¶ 70–73, 90–100.) In reality, both the Sears Card and Sears MasterCard portfolios were excessively weighted towards the subprime market and, when viewed separately, each reflected rising delinquency and charge-off rates. (*Id.* ¶¶ 76–81.) Plaintiffs allege that Defendants' misrepresentations caused SRAC Debt Securities to trade at artificially inflated prices during the Class Period, and that Plaintiffs purchased their SRAC holdings at these artificially inflated prices. (*Id.* ¶¶ 9–11, 32.) Next, Plaintiffs plead a specific causal connection between Sears' disclosure of the truth about its credit operations and steep declines in the value of SRAC Debt Securities and Sears common stock. After Sears' October 4, 2002 announcement of Mr. Keleghan's termination and its October 7, 2002 announcement that it expected earnings in the credit card division in the mid-single digits, rather than the low double digits as previously forecast, the price of Sears stock and SRAC notes fell sharply. (*Id.* ¶¶ 166-67.) Upon Sears' October 17, 2002 disclosures of a $222 million charge against earnings to cover bad debt, reduced profits in the credit card segment, and the fact that Sears' credit portfolio was heavily subprime, Sears stock plunged 32% and SRAC notes fell 8.6%. (*Id.* ¶¶ 171–78.) Plaintiffs have thus adequately alleged that Defendants' misrepresentations not only inflated the price of the stock, but caused the steep drop in price when the truth was revealed. As discussed above, Plaintiffs have adequately alleged economic loss from the price drop; by tying that loss to Defendants' misrepresentations and corrective disclosures, Plaintiffs have adequately pleaded loss causation as well.

Defendants finally argue that Plaintiffs insufficiently plead loss causation by failing to connect Sears' corrective disclosures in October 2002 with the price of SRAC Debt Securities at the time Plaintiffs actually sold their securities. (Defs. Mem., at 5–6.) Specifically, Defendants argue that because Plaintiff Ong did not sell SRAC notes until January 2003, and SURSI began selling in November 2002, Plaintiffs have not shown that the events of October 2002 had anything

to do with their actual, realized loss. (*Id.*) Defendants thus appear to suggest that a securities fraud plaintiff is required to connect a defendant's misrepresentations not to any decline in price after a defendant's corrective disclosures, but to the price of the security if and when a plaintiff actually sells it.

This argument, however, misconceives what is meant by "economic loss." A securities fraud plaintiff does not suffer economic loss only if and when it actually realizes a loss by selling shares; rather, the economic loss occurs upon the decline in the value of the security after a defendant's corrective disclosures. Because of the loss causation requirement, the Plaintiff must then tie that decline to the disclosure. Defendants' suggested requirement that a plaintiff allege a connection with the eventual sale price fails for several reasons. First, as noted above, there is no requirement that a plaintiff actually sell securities in order to suffer the required economic injury for a § 10(b) action. *See Royal Dutch II*, 404 F. Supp. 2d at 612. Second, the measure of damages in a securities fraud action is not established by the difference between the plaintiff's purchase and sale prices of a security; rather, damages in a § 10(b) action are measured by the difference between the purchase price and its value if the truth had been known. *See Caremark*, 113 F.3d at 649 n.6 (citations omitted); *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1551 (7th Cir. 1990) ("The federal securities laws allow victims of fraud to recover their actual loss—the difference between what they paid for the stock and what it was worth."). Thus, damages under § 10(b) can be measured by reference to the amount the price of a security drops when the truth comes out. *Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 966–67 (7th Cir. 1989) ("When markets are liquid and respond quickly to news, the drop when the truth appears is a good measure of the value of the information, making it the appropriate measure of damages.") If damages are not measured by reference to an eventual sale price for a § 10(b) claim, then neither should economic loss or loss causation. Finally, Defendants' approach would deny recovery to a an injured plaintiff who declined to sell in the hope that the price would recover. Under Defendants'

33

conception of loss and causation, a plaintiff who purchased a security at an inflated price due to a defendant's misrepresentations, held on after a precipitous price drop upon the defendant's corrective disclosures, and finally sold years later when the security had finally recovered to level of the plaintiff's purchase price, would have suffered no economic loss; or, if the price had still not recovered, would be unable to establish causation after such a long time. But the plaintiff would still have been injured by initially paying more for the security than its true value, and this injury would not have been redressed. The only way for a plaintiff to avoid this outcome would be to sell immediately after the decline, resulting in a *de facto* sell-to-sue requirement that, as noted, § 10(b) does not mandate.

The court concludes that Plaintiffs have adequately pleaded both the economic loss and loss causation elements of their § 10(b) claim in Count VIII of their Third Complaint. Because Defendants' motion to dismiss the § 20(a) "control person" claim in Count IX is premised upon the court finding that Plaintiffs have failed to allege a primary violation under § 10(b) in Count VIII, (Defs. Mot., at 2), the court declines to dismiss Count IX as well.

### CONCLUSION

For the foregoing reasons, the court denies Defendants' motion to dismiss Counts VIII and IX of Plaintiff's Third Complaint (98).

ENTER:

Dated: October 18, 2006

REBECCA R. PALLMEYER
United States District Judge